UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------------X
CONGREGATION RABBINICAL INSTITUTE                    Civil Action No.:
OF TARTIKOV, INC. f/k/a CONGREGATION
RABBINICAL COLLEGE OF TARTIKOV, INC,
RABBI MORDECHAI BABAD, MEILECH MENCZER,
JACOB HERSHKOWITZ, CHAIM SHMIEL ROSENFELD
and ISAAC ROSENBAUM                                  COMPLAINT

                                    Plaintiffs,

-against-

VILLAGE OF POMONA, NY, BOARD OF TRUSTEES
OF THE VILLAGE OF POMONA, NY, ZONING BOARD OF
APPEALS OF THE VILLAGE OF POMONA, NY, PLANNING
BOARD OF THE VILLAGE OF POMONA, NY, and LOUIS ZUMMO
in his official capacity as the Building Inspector of Pomona, NY


                                    Defendants.
---------------------------------------------------------------------------------X

      Congregation Rabbinical Institute of Tartikov, Inc. f/k/a Congregation Rabbinical

College of Tartikov, Inc. ("Tartikov"), Rabbi Mordechai Babad, Meilech Menczer,

Jacob Hershkowitz, Chaim Shmiel Rosenfeld and Isaac Rosenbaum ("Individual Plaintiffs")

(collectively "Plaintiffs"), by their attorneys, Savad Churgin, Storzer & Associates, P.C., and

Stepanovich Law P.L.C., as for their Complaint against the Defendants Village of Pomona, NY,

Board of Trustees of The Village of Pomona, NY, Zoning Board of Appeals of the Village of

Pomona, NY, Planning Board of the Village of Pomona, NY, and Louis Zummo, in his official

capacity as the Building Inspector of Pomona, NY, allege as follows:

## NATURE OF ACTION

1.      Plaintiffs commence this action to redress violations of their civil and constitutional rights as protected by the United States and New York Constitutions, the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. §§ 2000cc, *et seq.* ("RLUIPA"), the Fair Housing Act, 42 U.S.C. §§ 3601, *et seq.* ("FHA"), and the New York Civil Practice Law and Rules Article 78. The Defendants violated these rights of the Plaintiffs by their implementation and application of arbitrary, burdensome and discriminatory land use regulations, which have prohibited Tartikov from building and operating a Rabbinical Institute ("Rabbinical Institute").

2.      Tartikov's planned Rabbinical Institute will include places of worship, religious educational facilities, religious courts, libraries of Jewish texts, and housing dedicated for religious use by the Plaintiff Tartikov's full-time rabbinical students, lecturers, and their families.

3.      Tartikov owns the property at issue ("Subject Property"), comprising approximately 119 acres, situated entirely within the Village of Pomona, New York ("Village" or "Pomona").  It is bordered by U.S. Route 202 on the north and New York State Route 306 on the west.

4.      The Village's Zoning Code totally forbids the Rabbinical Institute's use anywhere in the Village.  As a result, Tartikov has no means of utilizing the Subject Property as a Rabbinical Institute.

5.      In Southern District of New York Case No. 7:07-CV-6304 ("*Tartikov I*"), the Court found that Pomona's Local Law No. 1 of 2001, Local Law No. 5 of 2004, Local Law No. 1 of 2007 and Local Law No. 5 of 2007 (collectively the "Challenged Laws") substantially burdened Plaintiffs' religious exercise and that Defendants had adopted the Challenged Laws with the

discriminatory purpose of preventing members of the Orthodox/Hasidic Jewish community from moving to the Village, and to specifically target the Subject Property and Tartikov.

6.     The Court's discrimination holdings were upheld by the United States Court of Appeals for the Second Circuit with respect to Local Law No. 1 of 2007 and Local Law No. 5 of 2007, but were overturned with respect to Local Law No. 1 of 2001 and Local Law No, 5 of 2004. Defendants were enjoined from applying Local Law No. 1 of 2007 and Local Law No. 5 of 2007 to the Plaintiffs.

7.     On appeal, the Second Circuit held that Plaintiffs did not have standing to contest the Challenged Laws with respect to Plaintiffs' remaining claims until they engaged in "conduct that would implicate or invoke the operation of the challenged zoning laws."

8.     During *Tartikov I*, Defendants advised Plaintiffs the way to challenge those zoning laws was to apply for a text amendment to the Village Zoning Code.  As a result, Tartikov applied for a text amendment which was denied by the Village in 2020. Tartikov then filed a second lawsuit ("*Tartikov II*") on August 6, 2020.

9.     The Court dismissed *Tartikov II* because it found that "Plaintiffs have not alleged a cognizable injury and have not received a final decision from the Village as to the Challenged Laws." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, No. 20-CV-6158 (KMK), 2021 WL 4392489, at *10 (S.D.N.Y. Sept. 24, 2021), *aff'd*, No. 21-2822, 2022 WL 1697660 (2d Cir. May 27, 2022).

10.     Following the decision in *Tartikov II*, Tartikov continued its efforts to locate its Rabbinical Institute on its property in the Village.  Between 2021 and 2024 Tartikov filed a

3

second text amendment, a request for interpretation, a site plan application, a special permit

application, a zone change petition, two applications for use variances and two appeals to the

Zoning Board of Appeals. All of those applications were denied by the Village.

11.     Tartikov has submitted all applications and petitions to the Village that could potentially

afford it the relief that it seeks. There are no more applications it can make. Each decision of the

Village was a final decision rejecting Tartikov's attempts to build its rabbinical institute.

12.     The Village's laws, on their face, and as applied, completely bar the rabbinical institute

from the Village and burden Plaintiffs' rights. The application of these laws to Plaintiffs also

discriminate against them on the basis of race and religion, and have a disparate impact on

Hasidic Jews. Plaintiffs, as Hasidic Jews, seek relief protecting their right to gather, worship and

engage in religious education and expression that have been consistently rejected by the Village.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343(3), (4),

42 U.S.C. §§ 2000cc, *et seq.*, 42 U.S.C. §§ 3613(a), *et seq.*, and 42 U.S.C. § 1983, which confer

original jurisdiction on federal district courts in suits to redress the deprivation of rights,

privileges and immunities secured by the laws and Constitution of the United States, particularly

the First and Fourteenth Amendments to the Constitution of the United States, and the Religious

Land Use and Institutionalized Persons Act of 2000 and the Fair Housing Act.

14.     This Court has jurisdiction over the request for declaratory relief pursuant to 28 U.S.C.

§§ 2201 and 2202. This Court has supplemental jurisdiction over all state law claims under 28

U.S.C. § 1367(a).

15.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b), because the acts and transactions complained of occurred, and continue to occur, in this District.

## THE PARTIES

16.    Plaintiff Tartikov is a New York Religious Corporation.

17.    Plaintiffs Rabbi Mordechai Babad, Meilech Menczer, Jacob Hershkowitz, Rabbi Chaim Shmiel Rosenfeld and Isaac Rosenbaum are individuals who seek to live, teach, and/or study at Tartikov's proposed rabbinical institute.

18.    Plaintiff Rabbi Mordechai (a/k/a Mordcho) Babad resides in Rockland County, New York with his wife and children and intends to live at Tartikov's Rabbinical Institute for the purposes of religious exercise, expression, association, and instruction, and who, among others, is prevented from doing so due to the laws and actions of the Village. He will be the academic head (Dean) of the proposed Rabbinical Institute.

19.    Plaintiff Meilech Menczer resides in Rockland County, New York with his wife and children and plans to attend and live at Tartikov's Rabbinical Institute for the purposes of religious exercise, expression, association, and instruction, and who, among others, is prevented from doing so due to the laws and actions of the Village.

20.    Plaintiff Jacob Hershkowitz resides in Rockland County, New York with his wife and children and plans to attend and live at Tartikov's Rabbinical Institute for the purposes of religious exercise, expression, association, and instruction, and who, among others, is prevented from doing so due to the laws and actions of the Village.

21.    Plaintiff Chaim Shmiel Rosenfeld resides in Rockland County, New York with his wife

and children and intends to attend and live at Tartikov's Rabbinical Institute for the purposes of religious exercise, expression, association, and instruction, and who, among others, is prevented from doing so due to the laws and actions of the Village.

22.      Plaintiff Isaac Rosenbaum resides in Rockland County, New York with his wife and plans to attend and live at Tartikov's Rabbinical Institute for the purposes of religious exercise, expression, association, and instruction, and who, among others, is prevented from doing so due to the laws and actions of the Village.

23.      All Plaintiffs that are natural persons will reside in student family housing on the campus of the proposed Rabbinical Institute.

24.      Defendant Village of Pomona is a municipal corporation duly formed and existing pursuant to the laws of the State of New York.  The Village is a "government" within the meaning of 42 U.S.C. § 2000cc-5(4)(a).

25.      Defendant Board of Trustees of the Village of Pomona ("Village Board") is the municipal legislative body authorized by New York Village Law § 7-700 to adopt zoning and land use regulations for the Village of Pomona.  The Board of Trustees is a branch, department, agency or instrumentality of a government within the meaning of 42 U.S.C. § 2000cc-5(4)(a).

26.      Defendant Zoning Board of Appeals of the Village of Pomona ("ZBA") is the municipal legislative body authorized by New York Village Law § 7-712 to review zoning related appeals for the Village of Pomona.  The ZBA is a branch, department, agency or instrumentality of a government within the meaning of 42 U.S.C. § 2000cc-5(4)(a).

27.      Defendant Planning Board of the Village of Pomona ("Planning Board") is the municipal

legislative body authorized by New York Village Law § 7-718 to advise on community

development, review land use and approve subdivisions for the Village of Pomona. The

Planning Board is a branch, department, agency or instrumentality of a government within the

meaning of 42 U.S.C. § 2000cc-5(4)(a).

28.    Defendant Louis Zummo is the Building Inspector of the Village of Pomona.


## BACKGROUND

### Tartikov's Need for a Rabbinical Institute

29.    The individual Plaintiffs are all Hasidic Jews.

30.    As Hasidic Jews, Plaintiffs hold the sincere religious belief that they are not permitted to

resolve conflicts in the secular court system, but rather must have them adjudicated in rabbinical

courts (*bais din*) before qualified rabbinical judges (*dayanim*) applying Jewish law.

31.    Plaintiffs have observed that the rabbinical courts in the United States are overburdened

because there are not enough qualified rabbinical judges, forcing many Orthodox/Hasidic Jews

to go to secular courts to resolve their disputes.

32.     Tartikov, motivated by its sincerely held religious beliefs, seeks to establish its

Rabbinical Institute to fulfill the need of the religious community for qualified dayanim capable

of applying Jewish law according to Orthodox/Hasidic tradition.

33.    Tartikov believes that in order for students to become qualified rabbinical judges they

must be properly trained in all four sections of the *Shulchan Aruch,* a compilation of Jewish laws

of the Orthodox/Hasidic Jewish tradition, also known as the Code of Jewish Law.

34.    To meet these religious needs and to satisfy its religious obligations, Tartikov intends to build a rabbinical institute that will train students in all four sections of the *Shulchan Aruch*.

35.    Tartikov's religious beliefs compel it to develop the Rabbinical Institute as a Torah Community, a living and learning campus free from distractions of the outside world, allowing students to be totally dedicated to religious obligations of mastering the *Shulchan Aruch*.

36.    In order for Tartikov to fulfill its religious and educational mission, the Rabbinical Institute will be a Torah Community which will include housing for students and their families.

37.    The Student Plaintiffs are motivated by their sincerely held religious belief that in order to become qualified rabbinical judges, they should be trained in all four books of the *Shulchan Aruch* and live in a Torah Community.

38.    The Student Plaintiffs, as members of the Hasidic Community, have been and continue to be denied the opportunity to obtain housing within Pomona by the conduct and actions of the Village.

39.    This Court previously found that the "Student [Plaintiffs] are studying the Torah at Kollel Belz [which does not provide on-campus housing] because they have no other option.  They cannot study in a Torah community because no such community exists within the United States." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, NY, 280 F. Supp. 3d 426, 473 (S.D.N.Y. 2017), *aff'd in part, rev'd in part and remanded*, 945 F.3d 83 (2d Cir. 2019).

**Tartikov Cannot Be Accredited**.

40.    Pomona's laws require that an educational institution must be accredited by the New York State Education Department or similar recognized accrediting agency.

41.    Tartikov cannot be accredited by any New York State agency because New York no longer serves as an institutional accrediting agency.

42.    Tartikov could not be accredited by the New York State Education Department when it performed that function because, among other reasons, Tartikov would have to be fully operational prior to being accredited.

43.    Tartikov cannot be accredited by the Association of Advanced Rabbinical and Talmudic Schools ("AARTS"), the accrediting agency for advanced rabbinical and Talmudic schools, because, among other reasons, it must be in existence for at least two years prior to consideration for accreditation and it cannot be in existence if it does not have existing operational facilities.

44.    Tartikov cannot be accredited by AARTS due to the Catch-22 of the Village's zoning laws.  Tartikov must be operational before it can be accredited by AARTS, but Tartikov cannot become operational until it obtains a special use permit and site plan approval from the Village and is operational for two years, which requires accreditation.

45.    There is no "similar recognized accrediting agency" available to Tartikov for accreditation.

46.    In *Tartikov I*, the Second Circuit held that Tartikov can "not be accredited by the New York State Education Department or the Association for Advanced Rabbinical and Talmudic Schools, the only accrediting agencies relevant to [Tartikov]'s program of study". *Congregation*

*Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83, 100 (2d Cir. 2019).

47.     In *Tartikov I*, this Court held that Tartikov would have to "be in existence for at least two years before it can be accredited" by AARTS. *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 280 F. Supp. 3d 426,437-38 (S.D.N.Y. 2017), *aff'd in part, rev'd in part and remanded*, 945 F.3d 83 (2d Cir. 2019).

48.     In *Tartikov I*, this Court also held that "Defendants do not dispute that '[t]o be accredited' at all, an educational institution has to first be in existence and fully operational, (Pls.' 56.1 ¶ 590; Defs.' Counter 56.1 ¶ 590), placing Plaintiffs, and likely any other group that sought to build an educational institution in the Village, in a catch-22: they cannot build a rabbinical college unless it is accredited, and they cannot have their rabbinical college accredited until it is built". *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 414 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY,* 945 F.3d 83 (2d Cir. 2019).

## Plaintiffs' Need for Student Family Housing

49.     The Rabbinical Institute requires family housing for its students and teachers to meet the needs of its students and teachers, and to fulfill its religious and educational mission to create a Torah community.

50.     The Student Plaintiffs are motivated by their religious beliefs to live in such a community and are motivated by their religious beliefs to become full-time rabbinical judges qualified in all four books of the *Shulchan Aruch*.

10

51.     The Plaintiffs have the sincere religious belief that the Torah commands the Student Plaintiffs to study the Torah, day and night.

52.     This Court previously found that the religious beliefs of Tartikov, Rabbi Mordechai Babad, Meilech Menczer, and Jacob Hershkowitz "regarding the Torah community are sincere." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, NY, 280 F. Supp. 3d 426, 474 (S.D.N.Y. 2017), *aff'd in part, rev'd in part and remanded*, 945 F.3d 83 (2d Cir. 2019).

53.     Living in a Torah community facilitates the learning experience because the students live among their fellow students and teachers.

54.     For these Hasidic Jewish students and teachers, the study of the Torah depends on immersing oneself in a community of Torah scholars, and the provision of on-campus housing is a means to serve these ends.

55.     Without on-campus housing, Tartikov sincerely believes that its rabbinical institute would otherwise be unsuccessful in training judges versed in the four books of the *Shulchan Aruch* and would fail in its religious purpose.

56.     This Court previously found that the purpose of Tartikov's proposed housing "is to facilitate religious exercise." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 280 F. Supp. 3d 426, 472 (S.D.N.Y. 2017), *aff'd in part, rev'd in part on other grounds and remanded*, 945 F.3d 83 (2d Cir. 2019).

57.     This Court also found that Tartikov was seeking to "create a particular type of living and learning community—one that is free from the distractions of the outside world and permits students to focus on studying Torah day and night, while surrounded by like-minded

individuals." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 280 F. Supp. 3d 426, 473 (S.D.N.Y. 2017), *aff'd in part, rev'd in part and remanded*, 945 F.3d 83 (2d Cir. 2019).

58.     This Court previously found that "there may be other ways to become conversant in the Shulchan Aruch" but that "does not discredit the Students' beliefs that they 'have to live in a Torah community in order to study, to succeed in the studies to become a rabbinical judge.'" *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, NY, 280 F. Supp. 3d 426, 473 (S.D.N.Y. 2017), *aff'd in part, rev'd in part and remanded*, 945 F.3d 83 (2d Cir. 2019).

59.     Tartikov's student family housing is to accommodate the Student Plaintiffs' sincerely held religious belief that Jewish law requires men to live with their families and to marry at a young age, have large families, and teach their children the Torah.

60.     This Court previously found that Student Plaintiffs Meilech Menczer and Jacob Hershkowitz "are each motivated by their religious beliefs to become full-time rabbinical judges qualified in all four books of the Shulchan Aruch"; "believe that the Torah commands them to study the Torah day and night" believe that "[a]ny unjustified detraction from Torah study is a sin"; and "[a]s a matter of religious faith, the Students are motivated to live in [a Torah] community." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, NY, 280 F. Supp. 3d 426, 471-472 (S.D.N.Y. 2017), *aff'd in part, rev'd in part and remanded*, 945 F.3d 83 (2d Cir. 2019).

61.     Tartikov has no feasible alternative to create a Torah community at the Rabbinical Institute other than building on-campus student family housing.

62.     Tartikov will also include additional facilities made necessary by the religious beliefs and practices of Hasidic Jews; those facilities include classrooms, study halls, courtrooms, a library, one or more shuls (synagogues), and mikvahs (ritual baths).

63.     All of these facilities are necessary to the religious exercise of the Plaintiffs.

64.     The library will hold thousands of religious studies and commentaries that discuss and explain the *Shulchan Aruch*.

65.     The mikvahs will serve the religious needs of the Rabbinical Institute students, teachers and their wives.

66.     One or more shuls (synagogues) will be constructed so residents on campus can pray together.

67.     Tartikov's proposed campus will be located approximately ten miles from the New Jersey-New York state line.

68.     Tartikov's proposed campus will serve students from both New York and outside of New York.

## Plaintiffs Were Denied a Request for Interpretation

69.     On January 7, 2021, Tartikov submitted a Request for Interpretation to Village of Pomona Building Inspector Louis Zummo.  The Request for Interpretation was to receive a determination as to whether a non-accredited rabbinical institute with student family housing is permitted in the Village of Pomona, and if so, how the delineated issues will be resolved.

70.     On March 2, 2021, Brian Nugent, Esq., the Village Attorney, sent a letter to Tartikov's counsel advising that the Building Inspector would not be responding to Tartikov's Request for

Interpretation other than one minor issue that Mr. Nugent responded to.

71.    On March 31, 2021, Tartikov submitted an appeal to the ZBA of the Building Inspector's refusal to respond to Tartikov's Request for Interpretation.

72.    On August 11, 2021, Pomona sent a letter to Tartikov stating that the ZBA would not be reviewing the Building Inspector's refusal to respond to Tartikov's Request for Interpretation and would be returning the filing fee.

## Plaintiffs Were Denied a Text Amendment by Pomona in 2022

73.    In *Tartikov II,* Defendants claimed that Tartikov "merely demanded the Village to repeal two . . . local laws in toto."  S.D.N.Y. Case No. Case 7:20-cv-06158 Docket No. 45 at page 7.

74.    As a result, Tartikov filed a second text amendment petition on March 11, 2021 in order to repeal the specific portions of the laws requiring an educational institution be accredited and those that prohibited student family housing, rather than repealing the "local laws in toto".

75.    On November 28, 2022, the Village Board of Trustees declined to consider Tartikov's March 11, 2021 text amendment and voted to refund Tartikov's text amendment fee.

## Plaintiffs Were Denied A Special Permit, Site Plan Approval, Use Variances, and Its Zone Change Petition

76.    Undaunted, on October 19, 2023, Tartikov submitted to Pomona applications for a special use permit (**Exhibit A)**, a site plan (**Exhibit B**), use variances (**Exhibit C**), and a zone change petition (**Exhibit D)**. All of these were denied or declined to be considered by Defendants, as set forth below.

77.    The applications described Tartikov's proposed Rabbinical Institute as a non-accredited rabbinical institute that included, in addition to the school building, 255 student family housing units and accessory improvements that are customary to religious educational uses and necessary for the religious beliefs and practices of the Institute, its faculty, students, and their families.

78.    Tartikov filed the special use permit application because Pomona's zoning code designates the entire village as an "R-40" residential district, which only allows specific permitted uses but not non-accredited rabbinical institutes.

79.    The application for use variances addressed both issues of accreditation and student family housing that was not allowed under the current regulations.

80.    The site plan application provided necessary information about the property layout.

81.    The zone change petition sought a permit for Tartikov's non-accredited rabbinical institute with student family housing.

82.    On October 19, 2023 Tartikov's counsel informed Pomona's Village attorney that he had personally delivered the four applications to Village Hall and followed that call with a letter memorializing Tartikov's submission.

83.    Tartikov's counsel requested that the special permit application and the zone change petition be placed on the November 27, 2023 Board of Trustees agenda, that the site plan application be placed on the November 16, 2023 Planning Board Agenda, and that the application for use variances be placed on the November 22, 2023 ZBA agenda.

84.    Despite Tartikov's request, none of its applications were placed on the three Boards' November 2023 agendas.  (Agenda, minutes and recordings of Pomona Board of Trustees

15

meetings, Planning Board meetings and ZBA meetings can be accessed through

https://pomonavillage.com/?page_id=3234).

85.     None of the three Boards made a determination in November, 2023 as required by

SEQRA § 617 to (1) determine whether the action in subject to SEQRA, (2) determine whether

the action may involve one or more other agencies and (3) make a preliminary classification of

the action as a Type 1 or unlisted action.

86.     On December 11, 2023, nearly two months after Tartikov submitted its special permit

application, Pomona's Building Inspector sent a letter to Tartikov requiring that the Part I

Environmental Assessment Forms (EAF) for the special permit application, site plan application

and zone change petition be re-submitted because, even though the substance of the EAFs

submitted with each application were identical, each EAF had a title and a project description

that corresponded to the application with which it was submitted, rather than one uniform title

and description.

87.     The December 11, 2023 letter also denied the use variances as premature.

88.     On January 19, 2024, Tartikov's attorney went to Village Hall and provided replacement

EAFs for the special permit application, for the site plan application, for the application for use

variances and for the zone change petition.  Tartikov's attorney also e-mailed the replacement

EAFs to the Building Inspector.

89.     None of Tartikov's applications were placed on any of the three Boards' February 2024

agendas.

90.     Pomona waited a full month, until February 26, 2024, to acknowledge receipt of the

replacement EAFs, but rejected them because Tartikov had submitted replacement EAFs instead of retrieving the October 2023 applications and submitting new applications (despite the fact that the Village Clerk stated that she would replace the EAFs in the applications).

91.    Tartikov's attorneys went to the Village Hall on February 26, 2024 and physically removed the original EAF for the special permit application, site plan application and zone change petition and replaced them with the EAFs requested by the Village. Tartikov was directed to retrieve the application for use variances because it had been denied.

92.    On March 17, 2024, five months after Tartikov submitted its special permit, site plan, and Zone Change applications, Pomona's attorney informed Tartikov's attorney that these applications were finally "under initial review by the Building Inspector."

93.    Neither Tartikov's special permit application nor its site plan application were placed on the March, 2024 Board of Trustees or Planning Board agendas.

94.    Tartikov's zone change petition was placed on the March 25, 2024 Board of Trustees agenda.

95.    Tartikov's attorneys were not permitted to speak when the Village Attorney introduced the zone change petition.

96.    Pomona's attorney advised the Board of Trustees that it has the discretion to consider or not consider the zone change petition.

97.    The Board did not respond regarding the zone change petition. Nobody on the Board made a motion to consider Tartikov's zone change petition.

98.    The Board then passed a motion to refund Tartikov's application fee for the zone change

petition because it had not been processed.

99.     On April 1, 2024, Pomona's Building Inspector sent a letter to Tartikov's attorney denying Tartikov's special permit application and site plan application.

100.    The denial stated that "accreditation is a requirement for an educational institution and that unaccredited educational uses are prohibited in the Village" and that Tartikov's "proposed use as 'an unaccredited educational institution' is not permitted in the Village of Pomona, accordingly both applications are hereby denied."

101.    The denial stated that to be considered for approval, Tartikov would need to pursue a use variance from the Village of Pomona Zoning Board of Appeals and would then need to satisfy the statutory factors required to attain such a variance.

### Plaintiffs Were Denied Their Application for Use Variances, Appeal of the Denial of the Special Permit Application and Appeal of the Denial of the Site Plan Application by Pomona

102.    On April 26, 2024, Tartikov's attorney personally delivered to Pomona Village Hall the following for the Pomona's Zoning Board of Appeals:  an application for use variances to permit Tartikov's use as a non-accredited Rabbinical Institute and student family housing for Tartikov's married students and their children (the "2024 Application for Use Variances") (**Exhibit E**); an appeal of Pomona's April 1, 2024 denial of Tartikov's special permit application ("appeal of denial of special permit application") (**Exhibit F);** and an appeal of Pomona's April 1, 2024 denial of Tartikov's site plan application ("appeal of denial of site plan application") (**Exhibit G**) (collectively "Tartikov's three 2024 ZBA applications")**.**

103.    The Defendants' arbitrary and capricious treatment of Tartikov's three 2024 ZBA

applications were fraught with procedural irregularities, violations of state and local law, missed deadlines, and differential treatment.

104.    All three of Tartikov's 2024 ZBA applications were submitted three days before the advertised deadline for the May 22, 2024 ZBA meeting.

105.    Despite the timely submission, Tartikov did not receive any notification or confirmation from the Village that applications would be on the May 22, 2024 agenda.

106.    Tartikov's attorney sent letters and left phone messages for ZBA attorney J. David McCartney Jr., seeking confirmation that Tartikov would be on the May 22, 2024 agenda.

107.    After the second letter, the ZBA's attorney responded that Tartikov's applications "will be placed on the June 26, 2024 ZBA agenda for the initial appearance" because the ZBA "had received two applications well before the receipt of Tartikov's ZBA applications and the previously received applications were placed on the Village ZBA agenda for May 22, 2024" and "does not desire to have five (5) applications on for one meeting".

108.    The ZBA deviated from its rules published on its website by failing to place Tartikov's timely applications on the May 22, 2024 agenda.

109.    The ZBA caused delay to Tartikov by failing to place Tartikov's applications on the May 22, 2024 agenda.

110.    All three of Tartikov's 2024 ZBA applications were placed on the agenda for Pomona's June 26, 2024 ZBA meeting for an introduction of the project.

111.    The two applications that had allegedly prevented Tartikov from being on the May 22 agenda also appeared on the June 26 agenda, showing that the purported reason for excluding

Tartikov's applications on the May 22 agenda was pretextual.

112.    The ZBA addressed all of Tartikov's three 2024 ZBA applications together.  A recording of the June 26, 2024 ZBA Meeting is available online at https://pomonavillage.com/wp-content/uploads/2024/07/ZBA-62624-REC.mp3.

113.    Tartikov's attorneys introduced its project and explained that Tartikov is in need of use variances to permit the use of a non-accredited Rabbinical Institute and to permit student and faculty housing.

114.    Tartikov's attorney explained that because the Rabbinical Institute is not operational and because of the religious nature of the proposed Rabbinical Institute, it cannot be accredited.

115.    Tartikov's attorney asked the ZBA to advance the application forward so that a lead agency could be established for SEQRA purposes and that a hearing be held.

116.    The ZBA scheduled the public hearing for Tartikov's three ZBA applications for July 24, 2024.

117.    At the July 24, 2024 ZBA meeting, the ZBA held the three public hearings for the three applications at the same time.  A recording of the July 24, 2024 ZBA meeting can be found at https://pomonavillage.com/wp-content/uploads/2024/07/ZBA-62624-REC.mp3.

118.    The ZBA Attorney admitted that the SEQRA regulations and New York state law disfavor segmentation of the SEQRA process, but recommended and provided the ZBA members with a resolution to proceed in a segmented fashion and first review only on the issue of accreditation.

119.    Tartikov's attorney responded by clarifying that Tartikov's application was for two use

20

variances, a use variance to permit Tartikov's non-accredited Rabbinical Institute, and a use variance to permit Tartikov's student family housing.

120.    The ZBA insisted on proceeding with a segmented review of only the accreditation issue. Tartikov's attorney objected to the segmented review.

121.    The resolutions also stated that the ZBA declares its intent to assume Lead Agency status for a coordinated review and directed notice of such intent to be issued to all involved agencies, including but not limited to the Village Board of Trustees and the Village Planning Board.

122.    The ZBA first intended to declare itself lead agency and circulate notices to the other involved agencies in July of 2024, despite the fact that it had been required to do so by May 26, 2024.

123.    The ZBA was required to make a determination as to environmental significance under SEQRA within twenty days of declaration of lead agency and failed to do so

124.    Following the ZBA's adoption of the SEQRA resolutions at the July 24, 2024 ZBA meeting, the ZBA held a public hearing on Tartikov's three 2024 ZBA applications.

125.    Members of the public spoke out in opposition to the requested variances and appeals. These comments included statements that "we do not want more segregated schools in the town" and "you have to balance those things and make sure that we do not keep approving segregated schools".  Upon information and belief, "segregated" was a code word for an all-Jewish school.

126.    The ZBA voted to continue the public hearing about the three applications on September 25, 2024, skipping the scheduled August ZBA meeting.

127.    At no time during the July, 2024 ZBA meeting did any member of the ZBA or staff

member of Pomona challenge the fact that Tartikov would be non-accredited or even ask

Tartikov's representatives about its non-accredited status.

128.    On August 15, 2024, the Rockland County Department of Planning issued its General

Municipal Law ("GML") Review of Tartikov's variance application stating:

> **This department is generally not in favor of granting use variances** because of
> the land use precedent that can be set and the relatively high threshold of
> demonstrating that the applicable zoning regulations have caused an unnecessary
> hardship. However, the determining factor regarding the permissibility of the
> proposed development is the lack of accreditation from the New York State
> Education Department or similar recognized accrediting agency on the part of the
> applicant. In all other respects, the proposed development appears to meet the
> definition of an Educational Institution, which is a use allowed by special permit.
> **It is this department's opinion that the lack of accreditation, in and of itself,
> does not result in any significant land use impacts. Therefore, we have no
> objection to the granting of the requested use variance.** (Emphases added).

129.    The public hearing for Tartikov's three 2024 ZBA applications resumed on September

25, 2024.  A recording of the September 25, 2024 ZBA meeting can be accessed at

https://pomonavillage.com/wp-content/uploads/2024/11/ZBA-92524-REC.mp3.

130.    The ZBA began the hearing by stating that there are no other involved agencies, and the

notices of intent had therefore not been circulated.

131.    The ZBA's statement directly contradicts the resolutions passed at the July, 2024 meeting

in which the ZBA declared its intent to assume Lead Agency status for a coordinated review and

directed notice of such intent to be issued to all involved agencies, including but not limited to

the Village Board of Trustees and the Village Planning Board.

132.    Two months later, the ZBA passed three new resolutions that rescinded the portion of the

July 24, 2024 Resolutions that had directed that notice of intent be issued to all involved

agencies and which declared the ZBA Lead Agency.

133.    The ZBA then passed a resolution to have the Village Planner prepare the EAF Part 2.

134.    The ZBA delayed a decision on Tartikov's applications because it did not declare itself Lead Agency during Tartikov's first appearance in front of the ZBA on June 26, 2024.

135.    The ZBA further delayed a decision on Tartikov's applications because it did not declare itself Lead Agency at the July 24, 2024 meeting, but instead adopted a resolution that it rescinded on September 25, 2024.

136.    Following the adoption of the resolution at the September 25, 2024 meeting, the ZBA resumed the public hearing about Tartikov's three 2024 ZBA applications.

137.    At this public hearing, the ZBA chairman questioned Tartikov about its accreditation status. This was the first time the ZBA or any Village official made this inquiry.

138.    Tartikov's applications explicitly state its intentions to build a non-accredited rabbinical institute.

139.    Pomona's Building Inspector's denial of the Special Use Permit application and the Site Plan application clearly states that because "the principal proposed use as an 'unaccredited educational institution' is not permitted in the Village of Pomona, accordingly both applications are hereby denied."

140.    These questions regarding whether Tartikov can be accredited were brought up for the first time, nearly five months after receiving Tartikov's applications were submitted and at the third ZBA meeting at which Tartikov was presenting.

141.    Tartikov's attorney responded by directing the ZBA to the portions of the *Tartikov I* trial

transcript in which <u>Pomona</u>'s expert stated that AARTS (which would be the proper accrediting agency for a rabbinical institute) requires that the educational institution must be operational (and have facilities) in order for it to be accredited.

142.    Tartikov's attorney also directed the ZBA to the portion of the *Tartikov I* decision where the Court found that Tartikov "cannot be accredited until it is operational, . . . ('So the first step it would have to do is to be in the position where it could be operational ....')), but it cannot become operational under the Accreditation Law until it is accredited.  At the end of the day, no matter what Tartikov does to its curriculum or admissions standards, it cannot be accredited without first being operational.  Thus, the Accreditation Law blocks Tartikov from building a rabbinical college within the Village."  *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 280 F. Supp. 3d 426, 456 (S.D.N.Y. 2017), *aff'd in part, rev'd in part and remanded,* 945 F.3d 83 (2d Cir. 2019).

143.    The ZBA chairperson then suggested that Tartikov was obligated to rent a different space outside of Pomona and operate in that different space and then apply to Pomona after it is operational, stating "a lot of people rent interim house, right, interim spaces until their building is ready."

144.    This ludicrous suggestion would be unduly burdensome on Tartikov, requiring it to procure another large parcel and build a school with family housing to be used for two years as an "interim space," or find a pre-existing facility meeting their multiple religious requirements for a rabbinical institute, including classrooms, a library, one or more shuls, a mikvah, and sufficient family housing to create a Torah community.

145.    The ZBA's suggestion would impose undue delay, expense and uncertainty on Tartikov.

146.    The ZBA then asked if a written communication exists between Tartikov and AARTS regarding the accreditation issues.  Tartikov's attorney stated that it was in the trial record, which the ZBA previously incorporated by reference into the record for Tartikov's applications.

147.    Rather than accept a citation to the trial record, the ZBA insisted that Tartikov supply the writing and would not close the public hearing on Tartikov's applications.

148.    No evidence was introduced in the ZBA's hearings, nor did the ZBA refer to any that contradicted the fact that Tartikov cannot be accredited.

149.    Following the discussion regarding accreditation, the ZBA chair said that he wanted to speak about public safety and health and wanted to talk about the proposed 255 housing units.

150.    Tartikov's attorney responded that this was an inappropriate inquiry because, over Tartikov's objection, the ZBA had voted to segment its review and confine its consideration to only the accreditation issue.

151.    The ZBA failed to follow its rules by raising the specifics of Tartikov's number of housing units when it had (over Tartikov's objections) refused to consider anything other than the accreditation issue.

152.    The ZBA did not close the public hearing that night because they wanted Tartikov to supply the accreditation writing from the *Tartikov I* trial.

153.    The next ZBA meeting in October 2024 was scheduled during the Jewish holiday of *Sukkos*, which meant that Tartikov could not conduct business or appear at the ZBA meeting.

154.    The ZBA therefore voted to continue the public hearing on Tartikov's applications until

November 20, 2024.

155.    The ZBA delayed Tartikov's applications by waiting until Tartikov's third appearance before it to ask about accreditation.

156.    The ZBA delayed Tartikov's applications by refusing to close the public hearing due to its request that Tartikov provide it with a writing that was in the trial record and was already incorporated into the record for Tartikov's applications.

157.    The ZBA delayed Tartikov's applications by holding the October ZBA meeting on the Jewish holiday of *Sukkos* when Tartikov could not attend the meeting, forcing Tartikov to wait until November for the continued public hearing on its applications.

158.    Tartikov requested that the Full Environmental Assessment Form (FEAF) (which had not been completed because of the ZBA's delays in declaring itself Lead Agency) be completed by the November meeting.  The ZBA Attorney said that he expected that it would be completed by then.

159.    On October 23, 2024, Tartikov submitted a letter to the ZBA which enclosed *Tartikov I* Trial Exhibit 2, a letter from AARTS to Tartikov which stated that Tartikov could not be accredited by AARTS because, among other reasons, Tartikov is not operational with a physical location.

160.    The public hearing on Tartikov's three ZBA applications resumed on November 20, 2024.

161.    The ZBA again questioned Tartikov's inability to be accredited at its November 20, 2024 hearing, and Tartikov's attorneys again explained the Catch-22 nature of the issue: Tartikov

cannot be accredited unless it is operational and it cannot be operational under Pomona's laws unless it is accredited.

162.    There was no evidence contradicting this continuing impediment.

163.    In response to the ZBA's question at the November 20, 2024 public hearing, Tartikov's attorney told the ZBA that Tartikov reviewed AARTS requirements since 2008 and Tartikov confirmed that it is still true that Tartikov cannot be accredited because it is not operational.

164.    In response to a second question regarding whether AARTS' requirements have changed, Tartikov's attorney stated that it is still a requirement of AARTS for a rabbinical institute to be in existence in order to be accredited.

165.    The ZBA chairperson asked Tartikov again if it had "looked into" renting another space until its building was ready.

166.    It would be unduly burdensome to require Tartikov to build a rabbinical institute or find one for rent that meets all its requirements so that it can operate for two years and then get accredited and then go to Pomona for an approval to build on its property.

167.    The ZBA then announced that it still did not have Part 2 of the E.A.F. prepared.

168.    This was another delay as two months had passed since the ZBA declared itself Lead Agency and the ZBA Attorney had stated that he expected it to be complete by the November 20, 2024 meeting, and this was supposed to have been completed by August 13, 2024.

169.    This delay was in addition to the previous delays.

170.    The ZBA closed the public hearing on Tartikov's three 2024 ZBA applications and stated that it would deal with the FEAF Part 2 at the December 18, 2024 ZBA meeting.

171.    At the December 18, 2024 ZBA meeting, the ZBA did not address the SEQRA determination/ FEAF Part 2.  Tartikov's attorney inquired about the FEAF Part 2 because the ZBA had stated at the November meeting that they would address the issue at the December meeting, and because it was supposed to have been done by August 13, 2024.  The ZBA attorney stated that they would address this at the January meeting.

172.    This was another delay as the FEAF Part 2 should have been completed months earlier.

173.    The ZBA voted on Tartikov's three 2024 ZBA applications at the January 22, 2025 ZBA meeting.

174.    The FEAF Part 2 found that the proposed actions would not have an impact on land, on geological features, on surface water, on groundwater, on flooding, on air, on plants and animals, on agricultural resources, on aesthetic resources, on historic and archeological resources, on open space and recreation, on critical environmental areas, on transportation, on energy, on noise, odor and light, on human health, or on consistency with community character.

175.    The FEAF Part 2 found that only consistency with community plans would be impacted by the proposed action.

176.    The FEAF Part 3 found that the proposed action "will result in no significant adverse impacts on the environment, and, therefore, an environmental impact statement need not be prepared" and therefore issued a negative declaration.

177.    The ZBA Attorney stated that he had prepared two different resolutions for each of the applications: one granting the applications and one denying the application.

178.    The ZBA did not have any discussion on the record regarding the basis for how they

28

would vote.

179.    Two members simply stated that they were in favor of denial.

180.    One other ZBA member stated that they were in favor of denial based on the fact that the "Applicant has not set forth any reasons to do otherwise as set forth in the Resolution".

181.    The ZBA Chair stated "I feel the same way about the denial and I think the Resolution lays out the Board's thinking on – on what – what we've heard in front of us":

182.    The ZBA then unanimously passed a resolution denying Tartikov's application for use variances, denying Tartikov's appeal of the denial of the site plan application and affirming the determination of the Building Inspector, and denying Tartikov's denial of appeal of the special permit application and affirming the determination of the Building Inspector.

183.    The ZBA denied Tartikov's applications with the knowledge that Tartikov could not build its rabbinical institute if the applications were denied.

184.    The ZBA denied Tartikov's applications with the knowledge that a Federal Court had already found that Pomona's accreditation requirement and restrictions on student family housing substantially burdened Tartikov and its students' religious exercise.

185.    The ZBA denied Tartikov's applications with no public discussion by the ZBA members of the reasons for its decision.

186.    The ZBA denied Tartikov's applications even though Pomona's FEAF Part 2 found that the requested action would have no impact on geological features, surface water, on groundwater, flooding, air, plants and animals, agricultural resources, aesthetic resources, historic and archeological resources, open space and recreation, critical environmental areas,

transportation, energy, noise, odor and light, human health, or consistency with community
character.

187.    The ZBA denied Tartikov's applications even though Pomona's FEAF Part 3 found that
the requested action will not result in any significant adverse impacts on the environment.

188.    The ZBA denied Tartikov's applications even though the Rockland County Department
of Planning, which is generally not in favor of granting use variances, found that the lack of
accreditation, in and of itself, does not result in any significant land use impacts and therefore,
had no objection to the granting of Tartikov's requested use variance.

189.    The ZBA resolution stated that their denial of Tartikov's applications was based on an
allegation that Tartikov hasn't proven that it cannot be accredited despite the fact that:

> (a) Tartikov's applications were for a nonaccredited rabbinical institute and
Tartikov would not have to apply for a variance if it was accredited;

> (b) Pomona's own Building Inspector issued a determination that Tartikov's use
as a nonaccredited rabbinical institute is not permitted by Pomona's laws;

> (c) The District Court held in its summary judgment decision (that was not
overturned) that Defendants do not dispute that "[t]o be accredited" at all, an educational
institution has to first be in existence and fully operational . . . placing Plaintiffs . . . in a catch-
22: they cannot build a rabbinical college unless it is accredited, and they cannot have their
rabbinical college accredited until it is built". *Congregation Rabbinical Coll. of Tartikov, Inc. v.
Vill. of Pomona*, 138 F. Supp. 3d 352, 414 (S.D.N.Y. 2015), *aff'd sub nom. Congregation
Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY,* 945 F.3d 83 (2d Cir. 2019);

(d) The District Court rejected Pomona's argument that Tartikov could make some changes in order to be accredited, holding that Pomona's argument "suffers from a fatal flaw. Tartikov must be operational before it can be accredited, but Tartikov cannot become operational until it obtains a special use permit, which requires accreditation. Therefore, even if Tartikov changed its curriculum and instituted an admissions test, it cannot be accredited." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY,* 280 F. Supp. 3d 426, 476 (S.D.N.Y. 2017), *affd in part, rev'd in part and remanded,* 945 F.3d 83 (2d Cir. 2019) (internal citations omitted); and

(e) Pomona's expert took the position that Tartikov cannot be accredited until it is operational.

190.    The ZBA denied Tartikov's applications based upon its alleged "compelling interest in, among other things and without limitation, ensuring educational quality, protecting students and families from fraud and mismanagement, maintaining academic standards, protecting public health and safety, and ensuring proper facilities and qualified instructors with proper monitoring and oversight" that it alleges "is narrow and tailored to achieve these interests and it applies equally to all bona fide educational institutes, secular or religious, and if religious, it applies equally to  all religions and belief systems."

191.    However, the District Court in *Tartikov I* held that Pomona "proffered no compelling governmental interest justifying" the accreditation requirement and the accreditation requirement is "not the least restrictive means of achieving their desired goals" because "Defendants are able to limit the size and scope of Plaintiffs' use through other provisions in the Village Code. Before

31

Plaintiffs can build any rabbinical college, they must obtain a special permit from the Board of

Trustees, obtain site plan approval from the Village Planning Board, and go through the Village's

architectural review process." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of*

*Pomona, NY*, 280 F. Supp. 3d 426, 482 (S.D.N.Y. 2017), *aff'd in part, rev'd in part and*

*remanded,* 945 F.3d 83 (2d Cir. 2019) (internal citations omitted).

192.    The Resolution acknowledged that any application for a variance would be futile, as

Tartikov could never meet any of the statutorily mandated factors.

193.    The Resolution stated:

> There is no question here that the applicant <u>could not possibly meet those</u>
> <u>statutory criteria for the grant of a use variance,</u> particularly given the fact that
> there are clearly many economically viable uses of this expansive property other
> than as an unaccredited educational institution.  (Emphasis added.)

194.    The Resolution further states:

> The Village has a compelling interest in, among other things and without
> limitation, ensuring educational quality, protecting students and families from
> fraud and mismanagement, maintaining academic standards, protecting public
> health and safety, and ensuring proper facilities and qualified instructors with
> proper monitoring and oversight.

195.    New York's Village Law, in granting power to Zoning Boards of Appeals to decide use

variances, provides:

> § 7-700 Grant of power. For the purpose of promoting the health, safety, morals,
> or the general welfare of the community, the board of trustees of a village is
> hereby empowered, by local law, to regulate and restrict the height, number of
> stories and size of buildings and other structures, the percentage of lot that may be
> occupied, the size of yards, courts and other open spaces, the density of
> population, and the location and use of buildings, structures and land for trade,
> industry, residence or other purposes.  As a part of the comprehensive plan and
> design, the village board is empowered by local law, to regulate and restrict
> certain areas as national historic landmarks, special historic sites, places and

buildings for the purpose of conservation, protection, enhancement and perpetuation of these places of natural heritage. Such regulations shall provide that a <u>board of appeals may determine and vary their application in harmony with the general purpose and intent, and in accordance with general or specific rules therein contained</u>.  (Emphasis added.)

196.    The ZBA's decision and Resolution, in attempting to regulate education quality, go far beyond its authority to vary the zoning local laws that "regulate and restrict the height, number of stories and size of buildings and other structures, the percentage of lot that may be occupied, the size of yards, courts and other open spaces, the density of population, and the location and use of buildings, structures and land for trade, industry, residence or other purposes."

197.    The Resolution failed to provide Tartikov with any relief regarding its application for a use variance for adult student housing; instead, it merely and incorrectly affirmed the Building Inspector's decision that it lacked "jurisdiction" to hear such application for variance.

198.    The Resolution stated: "As set forth above, [the Building Inspector] determined that without a permissible primary use, the proposed accessory use cannot be considered."

199.    The Building Inspector's determination was incorrect as a matter of state law.

200.    The Resolution further determined that "the Board affirms [the Building Inspector's] determination that, without a legal primary use, there can be no consideration of an accessory use."

201.    The Resolution did not state that there were any other applications or petitions that Tartikov could apply for that would permit it to develop the Rabbinical Institute.

202.    The ZBA's denials were final decisions.

203.    The ZBA's final denials cannot be appealed to any other administrative body.

**Plaintiffs' Religious Exercise is Substantially Burdened by the Imposition and Implementation of Its Land Use Regulations that Prohibit Tartikov's Rabbinical Institute Use.**

204.    Plaintiffs' religious exercise is burdened by the imposition and implementation of the Village's land use regulations, as described above.

205.    The Village's land use regulations, the Village's refusal to consider a text amendment and zone change petition to remove the prohibitions on Tartikov's rabbinical institute's use, and the Village's denial of the Tartikov's site plan, special permit, variance and appeals, bar outright Tartikov's rabbinical institute within the Village, because (a) Tartikov cannot be accredited prior to submitting an application (or at all); and (b) the Village's land use regulations prohibit the student family housing necessary for the rabbinical institute and Plaintiffs' religious exercise.

206.    This Court previously found that Local Law No. 5 of 2004 "substantially burdens [Plaintiffs'] religious exercise by banning student family housing outright" because there is a "connection between their religious exercise and the provision of on-campus housing". *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 280 F. Supp. 3d 426, 479 (S.D.N.Y. 2017), *aff'd in part, rev'd in part and remanded*, 945 F.3d 83 (2d Cir. 2019).

207.    This Court has found that "[t]he Dormitory Law, specifically, prohibits any sort of housing as part of an educational institution that is not defined as a "dormitory" in that statute" and "the Dormitory Law explicitly precludes housing for students with families, . . . ." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 383–84 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019).

34

208.    The Village's land use regulations that prohibit Tartikov's rabbinical institute deny Tartikov the ability to construct an adequate facility for its religious exercise.

209.    The ZBA's application process contained procedural and substantive departures from norms.

210.    The ZBA's actions were arbitrary and capricious under State and local law.

211.    The Village's land use regulations prohibiting Tartikov's rabbinical institute are arbitrary and unlawful under New York common law, as described in *Cornell Univ. v. Bagnardi*, 68 N.Y.2d 583, 503 N.E.2d 509 (1986), and other precedents.

212.    Based on the existence of New York common law, as described in *Cornell Univ. v. Bagnardi*, 68 N.Y.2d 583, 503 N.E.2d 509 (1986), and other precedents, Tartikov had a reasonable expectation of being able to construct its rabbinical institute on the Subject Property.

213.    The Village has completely prevented Tartikov from building its rabbinical institute on the Subject Property and anywhere else within its jurisdiction.

214.    Tartikov has no ready alternatives to build its rabbinical institute.

215.    The Village has coerced Tartikov to change its behavior by preventing it from constructing and operating a rabbinical institute, as motivated by its sincere religious beliefs.

**Defendants Do Not Have Any Compelling Interest Justifying its Land Use Regulations That Prohibit Tartikov's Rabbinical Institute, and any Such Regulations Are Not the Least Restrictive Means of Achieving Any Governmental Interest.**

216.    Defendants did not commission any studies or consult experts when examining any need for the Local Law No. 5 of 2004.

217.    Defendants do not have any compelling governmental interests for the 2001 and 2004

Laws.

218.    This Court held that the Village lacks any compelling governmental interest justifying the Local Law No. 5 of 2004.

219.    None of the Village's stated justifications for Local Law No. 5 of 2004 required the Village to ban student family housing.

220.    The Village also claimed that the purpose of the accreditation requirement was to regulate commercial-type training schools, such as automotive and driving schools, but the regulation of such schools, which can be accredited, does not justify imposing an accreditation requirement on schools like the rabbinical institute which cannot be accredited.

221.    Local Law No. 5 of 2004 was not narrowly tailored to serve the Village's stated interests.

222.    This Court held that the Village did not use the least restrictive means of achieving any compelling governmental interest justifying Local Law No. 5 of 2004.

223.    The Village has no compelling or legitimate interest justifying its land use regulations that prohibit Tartikov's rabbinical institute use.

224.    Defendants have no compelling or legitimate interest justifying its denials of Tartikov's applications.

225.    The Village's outright ban on Tartikov's rabbinical institute use is not the least restrictive means of achieving any governmental interest.

226.    The Village's outright ban on nonaccredited institute uses is not the least restrictive means of achieving any governmental interest.

227.    The Village's outright ban on student family housing is not the least restrictive means of

achieving any governmental interest.

228.    The ZBA's outright denial of Tartikov's applications is not the least restrictive means of achieving any governmental interest.

229.    This Court also found that Local Law No. 5 of 2004 was "not the least restrictive means of achieving [Pomona's] desired goals." *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 280 F. Supp. 3d 426, 482 (S.D.N.Y. 2017), *aff'd in part, rev'd in part and remanded*, 945 F.3d 83 (2d Cir. 2019).

### Defendants Actions Have A Disparate Impact on Hasidic Jews

230.    Pomona's prohibition on student family housing is facially neutral with respect to race, color, national origin, religion, sex, familial status, and disability.

231.    Despite the facial neutrality of Pomona's prohibition on student family housing, it inflicts a disparate impact on Hasidic Jews, who are required by their religion to marry young, have large families, and to devote themselves to study of the Torah to the exclusion of other activities that detract therefrom.

232.    Because their religious beliefs compel them to spend extended periods every day in study of Torah, the Code of Jewish Law, and related materials, residential housing on the campus of the Rabbinical Institute is necessary to the Student Plaintiffs' fulfillment of their religious obligations.

233.    The proposed student family housing at the Rabbinical Institute are "dwellings" as that term is defined by the Fair Housing Act, 42 U.S.C. § 3602.

234.    The 119-acre property that the Rabbinical Institute owns in the Village of Pomona is

limited to placement of only one single-family residence under the terms of the Village's Zoning Code.

235. Limiting housing within the Village to single family residences on one acre lots disproportionately impacts these Plaintiffs and the Hasidic Jewish communities because such forms of housing are beyond their financial means.

236. The Village Code does not permit the Rabbinical Institute (constructed as and operating as a Torah Community) to exist anywhere in the Village of Pomona, either as a "matter of right" or by special use permit.

237. Tartikov does not have any readily available alternatives for its Rabbinical Institute within the Village or elsewhere.

**<u>Defendants Have Applied Their Land Use Regulations in a Discriminatory Manner to Prevent the Construction of the Rabbinical Institute</u>**

238. Defendants have applied their land use regulations in a manner to intentionally and discriminatorily prevent the use of the Rabbinical Institute in the Village based on Plaintiffs' religion and their religious speech.

239. Defendants have discriminated against the Plaintiffs and their speech in delaying, creating obstacles, and ultimately denying the Rabbinical Institute's applications.

240. Defendants departed from its normal procedures in reviewing and deciding the Rabbinical Institute's applications as set forth above.

241. Defendants acted based on bias against the Plaintiffs and their religion and religious speech in delaying, obstructing, and ultimately denying the Rabbinical Institute's applications.

242.    Defendants acted to accommodate the bias of Village residents against the Plaintiffs and their religion and religious speech in delaying, obstructing, and ultimately denying the Rabbinical Institute's applications.

243.    The history of Defendants' efforts to prevent the Rabbinical Institute from locating in the Village demonstrates Defendants' bias against Plaintiffs' religion and religious speech.

244.    Hasidic Jews would likely reside at the Rabbinical Institute.

245.    The Student Plaintiffs intend to reside at the Rabbinical Institute.

246.    Rabbi Mordechai Babad intends to reside at the Rabbinical Institute.

247.    Upon information and belief, the Plaintiffs' Applications and the subsequent ZBA Appeal were denied because approval would likely have caused members of the Hasidic Jewish community to reside at the Rabbinical College.

248.    The practice of Village officials denying approvals to Tartikov disproportionately impacts Hasidic Jews.

249.    The practice of Village officials denying approvals to Tartikov discriminates against Orthodox/Hasidic Jews.

250.    Village officials have made statements indicating a preference against Orthodox/ Hasidic Jews.

251.    Pomona's decisions were final decisions and were not reviewable by any other administrative body.

252.    Pomona's denial of Tartikov's applications severely impedes and prevents its religious exercise.

253.    The construction activity related to Tartikov's Rabbinical Institute would affect interstate commerce.  The construction's effect on interstate commerce would result from, among other things, fundraising activities related to the construction; the transfer of funds to those it engages to construct the Rabbinical Institute; the engagement of construction companies to construct the Rabbinical Institute; the employment of and payments to construction workers either by Tartikov or by companies engaged by it; the engagement of architects and engineers for the construction of the Rabbinical Institute; the purchase of necessary materials to construct the Rabbinical Institute; the engagement of a landscaping company; the use of interstate highways for the transportation of persons and materials used to construct the Rabbinical Institute; the use of interstate communication related to the construction of the Rabbinical Institute; and other activities related to the construction of the Rabbinical Institute.

254.    Tartikov's operation of the Rabbinical Institute would affect interstate commerce by or through, among other things, serving as a site for ongoing fundraising; its receipt of charitable donations from persons working or living outside of the State of New York; the use of means of interstate communication to facilitate the Rabbinical Institute's ongoing operations; the use of interstate travel related to the Rabbinical Institute's ongoing operations; and the purchase of goods and services related to the Rabbinical Institute's ongoing operations and maintenance.

255.    The Defendants' actions described above all took place under color of state law.

256.    The harm to the Plaintiffs caused by the Defendants' laws and actions is immediate and severe.

257.    Application of the Village's Code provisions to Tartikov's proposed religious land use

creates extreme expense, delay and uncertainty for Tartikov.

258.    Tartikov has also suffered significant financial damages as a result of the Defendants'
laws and their application to Tartikov.

259.    Plaintiffs have no adequate remedy at law for the harm and damage caused by
Defendants' wrongful laws and actions.

**AS A FIRST CAUSE OF ACTION**
**Free Exercise Clause**
**United States Constitution,**
**First and Fourteenth Amendments**
**42 U.S.C. § 1983**

260.    Plaintiffs repeat and reallege paragraphs 1 through 259 as if fully set forth herein.

261.    Defendants' laws (as applied to Plaintiffs) and actions deprived and continue to deprive
all Plaintiffs of their right to free exercise of religion, as secured by the First Amendment to the
United States Constitution and made applicable to the States by the Fourteenth Amendment, by
discriminating against them based on religion.

262.    The Plaintiffs have no adequate remedy at law for the harm and damage caused by
Defendants' violation of their constitutional rights.

263.    Defendants have caused the Plaintiffs to suffer, and to continue to suffer irreparable
harm, damage and injury. The Plaintiffs will continue to suffer such damages unless Defendants'
acts and conduct complained of are permanently enjoined.

## AS A SECOND CAUSE OF ACTION
### Free Speech
### United States Constitution,
### First and Fourteenth Amendments
### 42 U.S.C. § 1983

264.    Plaintiffs repeat and reallege paragraphs 1 through 263 as if fully set forth herein.

265.    Defendants' laws (on their face and as applied to Plaintiffs) and actions deprived and continue to deprive Plaintiffs of their right to freedom of speech, as secured by the First Amendment to the United States Constitution and made applicable to the States by the Fourteenth Amendment, prohibiting Plaintiffs from engaging in expression, and to receive such communication on the basis of the content of their speech.

266.    The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

267.    Defendants have caused the Plaintiffs to suffer and to continue to suffer, irreparable harm, damage and injury. The Plaintiffs will continue to suffer such damages unless Defendants' acts and conduct complained of are permanently enjoined.

## AS A THIRD CAUSE OF ACTION
### Freedom of Association
### United States Constitution,
### First and Fourteenth Amendments
### 42 U.S.C. § 1983

268.    Plaintiffs repeat and reallege paragraphs 1 through 267 as if fully set forth herein.

269.    Defendants' laws (on their face and as applied to Plaintiffs) and actions deprived and continue to deprive Plaintiffs of their right to freedom of expressive association, as secured by the First Amendment to the United States Constitution and made applicable to the States by the

42

Fourteenth Amendment, by intruding upon the Plaintiffs' right to associate for purposes of protected expressive activity.

270.    The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

271.    Defendants have caused the Plaintiffs to suffer, and to continue to suffer irreparable harm, damage and injury. The Plaintiffs will continue to suffer such damages unless Defendants' acts and conduct complained of are permanently enjoined.

**AS A FOURTH CAUSE OF ACTION**
**United States Constitution**
**42 U.S.C. § 1983: Fourteenth Amendment**
**Equal Protection Clause**
**Religious Discrimination**

272.    Paragraphs 1 through 271 are incorporated by reference as if set forth fully herein.

273.    Defendants have deprived and continue to deprive Plaintiffs of their right to equal protection of the laws, as secured by the Fourteenth Amendment to the United States Constitution, by discriminating against Plaintiffs on the basis of their religion and religious denomination.

274.    The Plaintiffs have no adequate remedy at law for the harm and damage caused by Defendants' violation of their constitutional rights.

275.    Defendants have caused the Plaintiffs to suffer irreparable harm, damage and injury.  The Plaintiffs will continue to suffer such damages unless Defendants' acts and conduct complained of are permanently enjoined.

## AS A FIFTH CAUSE OF ACTION
### United States Constitution
### 42 U.S.C. § 1983: Fourteenth Amendment
### Equal Protection Clause
### Racial Discrimination

276.    Paragraphs 1 through 275 are incorporated by reference as if set forth fully herein.

277.    Defendants have deprived and continue to deprive Plaintiffs of their right to equal

protection of the laws, as secured by the Fourteenth Amendment to the United States

Constitution, by discriminating against Plaintiffs on the basis of their race.

278.    The Plaintiffs have no adequate remedy at law for the harm and damage caused by

Defendants' violation of their constitutional rights.

279.    Defendants have caused the Plaintiffs to suffer irreparable harm, damage and injury.  The

Plaintiffs will continue to suffer such damages unless Defendants' acts and conduct complained

of are permanently enjoined.


## AS A SIXTH CAUSE OF ACTION
### "Substantial Burdens"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(a)

280.    Plaintiffs repeat and reallege paragraphs 1 through 279 as if fully set forth herein.

281.    The teaching and learning at the Rabbinical Institute are the religious exercise of the

Plaintiffs.

282.    The Village's Code provisions prohibiting the use of the Subject Property as a Rabbinical

Institute are land use regulations within the meaning of RLUIPA.

283.    The application of the Village's Code provisions to the Plaintiffs constitute imposing or

implementing land use regulations within the meaning of RLUIPA.

284.   The Village and its ZBA are "governments" under RLUIPA.

285.   Defendants' laws (on their face and as applied to Plaintiffs) and actions deprived and continue to deprive Plaintiffs of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing and implementing a land use regulation in a manner that places a substantial burden on the Plaintiffs' religious exercise without using the least restrictive means of furthering any compelling governmental interest.

286.   Such burden on Plaintiffs' religious exercise would be imposed in the implementation of a system of land use regulations under which a government makes individualized assessments of the proposed uses for the property involved.

287.   Such burden on Plaintiffs' religious exercise would affect commerce among the several States.

## AS A SEVENTH CAUSE OF ACTION
### "Nondiscrimination"
### Religious Land Use and Institutionalized Persons Act of 2000
### 42 U.S.C. § 2000cc(b)(2)

288.   Plaintiffs repeat and reallege paragraphs 1 through 287 as if fully set forth herein.

289.   Defendants' laws (as applied to Plaintiffs) and actions deprived and continue to deprive Plaintiffs of their right to the free exercise of religion, as secured by the Religious Land Use and Institutionalized Persons Act, by imposing and implementing a land use regulation in a manner that discriminates against Plaintiffs on the basis of religion and religious denomination.

## AS AN EIGHTH CAUSE OF ACTION
### Fair Housing Act
### Disparate Impact
### 42 U.S.C. § 3604(a) and (b)

290.    Plaintiffs repeat and reallege paragraphs 1 through 289 as if fully set forth herein.

291.    Defendants' zoning code provisions that prevent the application for, and construction and utilization of the Subject Property as a Rabbinical Institute, as enacted and as applied are neutral on their face as to categories of prohibited discrimination under the Fair Housing Act and amendments thereto.

292.    Nonetheless, Defendants' laws (on their face and as applied to Plaintiffs) and actions have had the effect and continue to have the effect, whether intended or not, of excluding Plaintiffs from obtaining student family housing anywhere in the Village of Pomona by discriminating against the Plaintiffs based on religion in the terms, conditions, or privileges of sale or rental of a dwelling,  in violation of 42 U.S.C. § 3604 (b), and by otherwise making unavailable or denying  a dwelling to Plaintiffs based on religion in violation of 42 U.S.C. § 3604 (a) .

293.    The Village of Pomona's prohibition of Student Family Housing disparately impacts the Plaintiffs, who require access to such housing in order to meet their own needs and to satisfy the duties and obligations of their religion.

294.    The individual plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i) and they have suffered harm, damage and injury as a result of Defendants' conduct.

46

295.    Plaintiffs have no adequate remedy at law for such harm, damage and injury caused by Defendants' conduct.

296.    Defendants have caused the Plaintiffs to suffer, and continue to suffer irreparable harm, damage and injury, and the Plaintiffs will continue to suffer such harm unless the Defendants' acts and conduct complained of are permanently enjoined.

## AS A NINTH CAUSE OF ACTION
### Fair Housing Act
### Discrimination
### 42 U.S.C. § 3604

297.    Plaintiffs repeat and reallege paragraphs 1 through 296 as if fully set forth herein.

298.    Defendants, in delaying, obstructing, and ultimately denying the Rabbinical Institute's applications, discriminated against the Plaintiffs based on religion in the terms, conditions, or privileges of sale or rental of a dwelling, in violation of 42 U.S.C. § 3604 (b), and by otherwise making unavailable or denying a dwelling to Plaintiffs based on religion in violation of 42 U.S.C. § 3604(a).

299.    The individual plaintiffs are aggrieved persons as that term is defined in the Fair Housing Act, 42 U.S.C. § 3602(i) and they have suffered harm, damage and injury as a result of Defendants' conduct.

300.    Plaintiffs have no adequate remedy at law for such harm, damage and injury caused by Defendants' conduct.

301.    Defendants have caused the Plaintiffs to suffer, and continue to suffer irreparable harm, damage and injury, and the Plaintiffs will continue to suffer such harm unless the Defendants'

acts and conduct complained of are permanently enjoined.

## AS A TENTH CAUSE OF ACTION
### Fair Housing Act
### 42 U.S.C. § 3617

302.    Plaintiffs repeat and reallege paragraphs "1" through 301 as if fully set forth herein.

303.    Defendants, in delaying, obstructing and ultimately denying Tartikov's applications to build and operate the Rabbinical Institute have intentionally discriminated against the Plaintiffs by interfering with the Plaintiffs on account of their having exercised rights, or having aided or encouraged other persons in the exercise or enjoyment of rights, that are granted or protected by 42 U.S.C. § 3604(a) and (b) in violation of 42 U.S.C. § 3617.

304.    Plaintiff Tartikov purchased the Subject Property to establish a rabbinical college on the Subject Property to include Adult Student Housing appropriate for its students, all or virtually all of whom are or will be married men with families.

305.    The Defendants have engaged in a persistent and clear pattern of retaliation against Plaintiffs for seeking to obtain Adult Student Housing within the Village of Pomona.

306.    The Plaintiffs' actions to protect their rights under 3604(a) and (b) in response to which Defendants have retaliated against Plaintiffs include, but are not limited to, the Plaintiffs filing prior suits under the Fair Housing Act in 2007 and 2020, and making multiple applications to the Defendants for approval of their rabbinical college and associated housing.

307.    Plaintiffs are aggrieved persons as that term is defined by the Fair Housing Act, 42 U.S.C. § 3602(i), and they have suffered harm, damage, and injury as a result of Defendants' conduct.

48

308.    Plaintiffs have no adequate remedy at law for such harm, damage and injury caused by Defendant's conduct.

309.    Defendants have caused the Plaintiffs to suffer, and continue to suffer irreparable harm, damage, and injury, and the Plaintiffs will continue to suffer such harm unless the Defendants' acts and conduct complained of are permanently enjoined.

## AS AN ELEVENTH CAUSE OF ACTION
### New York Civil Practice Law and Rules Article 78

310.    Plaintiffs repeat and reallege paragraphs 1 through 309 as if fully set forth herein.

311.    The ZBA Decision wrongly affirmed the denials of the site plan application and special permit by the Building Inspector, and the bases for ZBA Decision were arbitrary, capricious, and contrary to New York State law, and should be annulled and vacated pursuant to Article 78 of the New York Civil Practice Laws and Rules.

312.    The ZBA Decision wrongly denied Tartikov's application for use variances, and the bases for ZBA Decision were arbitrary, capricious, and contrary to New York State law, and should be annulled and vacated pursuant to Article 78 of the New York Civil Practice Laws and Rules.

313.    The ZBA's decision was arbitrary and capricious and not supported by the evidence.

## RELIEF SOUGHT

WHEREFORE, Plaintiffs demand Judgment as follows:

A.      Declaratory judgment holding the laws and actions of the Defendants that prohibit

49

Plaintiffs from applying for, and constructing and using the Subject Property as a nonaccredited rabbinical institute with student family housing to be unconstitutional and illegal under the United States and New York Constitutions, and the New York State common law, including:

1.    Any requirement that an educational institution be accredited by the New York State Education Department or similar recognized accrediting agency;

2.    Any prohibition against educational facilities providing student family housing for its students, including single family, two-family and/or multi-family dwelling units;

3.    Any prohibition against educational facilities providing student family housing with separate cooking, dining or housekeeping facilities;

4.    Enactment, imposition and enforcement of Local Law No. 1 of 2001;

5.    Enactment, imposition and enforcement of Local Law No. 5 of 2004;

6.    The February 24, 2020 refusal by the Village Board to consider Tartikov's text amendment and vote to refund Tartikov's February 7, 2020 text amendment fee;

7.    The March 2, 2021 refusal by the Building Inspector to respond to Tartikov's Request for Interpretation;

8.    The August 11, 2021 refusal by the ZBA to review the Building Inspector's refusal to respond to Tartikov's Request for Interpretation;

9.    The November 28, 2022 refusal by the Village Board to consider Tartikov's text amendment and vote to refund Tartikov's March 11, 2021 text amendment fee;

10.    The December 11, 2023 rejection by Pomona's Village Building Inspector of Tartikov's October 19, 2023 application for use variances as premature;

11.     The March 25, 2024 refusal by the Village Board to consider Tartikov's October 19, 2023 zone change petition and vote to return the application fee that Claimant had submitted for its October 19, 2023 zone change application;

12.     The April 1, 2024 denial of Tartikov's October 19, 2023 special permit application and October 19, 2023 site plan applications;

13.     The January 22, 2025 denial by the ZBA of Tartikov's application for use variances;

14.     The January 22, 2025 denial by the ZBA of Tartikov's appeal of the denial of its site plan application; and

15.     The January 22, 2025 denial by the ZBA of Tartikov's appeal of the denial of its special permit application.

B.     Declaratory judgment declaring that the Plaintiffs' use of the Subject Property as a non-accredited rabbinical institute with student family housing is permitted within the R-40 zoning district as a special permit use;

C.     Declaratory judgment declaring that the laws and actions of the Defendants, described above, that prevent the application for, and construction and utilization of the Subject Property as a non-accredited rabbinical institute deprive Plaintiffs of their statutory rights under the Fair Housing Act by having a discriminatory impact upon Plaintiffs based upon religion and race, and declaring that such action constitutes an illegal official act under color of law;

D.     Declaratory judgment declaring that portion of the Subject Property of the Rabbinical Institute used for dwelling purposes is a permitted use under the Fair Housing Act;

E.      Annulment of those provisions of the Village Zoning Code, described above, that violate the Plaintiffs' civil and constitutional rights and that prevent the application for, construction and utilization of the Subject Property as a non-accredited rabbinical institute with student family housing;

F.      Vacating the ZBA Decision affirming the denial of the site plan application pursuant to New York Civil Practice Law and Rules Article 78.

G.      Vacating the ZBA Decision affirming the denial of the special permit application pursuant to New York Civil Practice Law and Rules Article 78.

H.      Vacating the ZBA Decision denying Tartikov's application for use variances pursuant to New York Civil Practice Law and Rules Article 78.

I.      Preliminary and permanent injunctive relief enjoining all Defendants from unconstitutionally and illegally applying the provisions of the Village Zoning Code, described above, that violate the Plaintiffs' civil and constitutional rights and that prevent the application for, construction and utilization of the Subject Property as a non-accredited rabbinical institute with student family housing as described above;

J.      Enjoinder of the Defendants their officers, employees, agents, successors and all others acting in concert with them from applying their laws in a manner that violates Plaintiffs' civil and constitutional rights by preventing the application for, construction and utilization of the Subject Property as a non-accredited rabbinical institute with student family housing as described above;

K.      Compensatory and punitive damages in an amount to be determined by the Court,

sustained by Tartikov for its inability to construct and utilize the subject property as a non-accredited rabbinical institute with student family housing as described above.

L.      An award to Plaintiffs of full costs, disbursements and attorneys' fees, to the extent permitted by law, arising out of Defendants' actions and land use decisions and out of this litigation; and

M.      Granting such other, further and different relief as to this Court seems just, proper and equitable.


Dated: Nanuet, New York
        February 20, 2025

Joseph A. Churgin (JC 6854)
Donna Sobel (DS 3267)
Savad Churgin
55 Old Turnpike Road, Suite 209
Nanuet, New York 10954

John G. Stepanovich (JS 8876)
Stepanovich Law, PLC
2000 Arctic Ave.
Virginia Beach, Virginia 23451

Roman P. Storzer (to file motion to be
admitted *pro hac vice*)
Storzer & Associates, P.C.
1025 Connecticut Avenue, N.W., St. 1000
Washington, D.C. 20036


*Attorneys for Plaintiffs*

53