USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: ________________
DATE FILED: 9/28/2026

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CONGREGATION RABBINICAL INSTITUTE OF TARTIKOV, INC., f/k/a CONGREGATION RABBINICAL COLLEGE OF TARTIKOV, INC., RABBI MORDECHAI BABAD, MEILECH MENCZER, JACOB HERSHKOWITZ, CHAIM SCHMIEL ROSENFELD, and ISAAC ROSENBAUM,<br><br>Plaintiffs,<br><br>-against-<br><br>VILLAGE OF POMONA, NY, BOARD OF TRUSTEES OF THE VILLAGE OF POMONA, NY, ZONING BOARD OF APPEALS OF THE VILLAGE OF POMONA, NY, PLANNING BOARD OF THE VILLAGE OF POMONA, NY, and LOUIS ZUMMO, *in his individual capacity and his official capacity as the Building Inspector of Pomona, NY*,<br><br>Defendants. | No. 25-CV-1471 (NSR)<br><br>**OPINION & ORDER** |

NELSON S. ROMÁN, United States District Judge:

Plaintiff Congregation Rabbinical Institute of Tartikov, Inc. ("Tartikov") owns an approximately 119-acre parcel of land (the "Subject Property") in the Village of Pomona, New York (the "Village"). Tartikov seeks to build a rabbinical institute (the "Institute") on the Subject Property, which will provide facilities to train rabbinical judges and include housing for its students and their families. Rabbi Mordechai Babad, Meilech Menczer, Jacob Hershkowitz, Chaim Shmiel Rosenfeld, and Isaac Rosenbaum (collectively, the "Individual Plaintiffs"), who intend to study at or teach at the Institute, challenge, together with Tartikov (collectively, "Plaintiffs"), certain zoning laws enacted by the Village. Plaintiffs allege that these laws violate the First and Fourteenth

Amendments to the U.S. Constitution; the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"), 42 U.S.C. § 2000cc *et seq.*; the Fair Housing Act ("FHA"), 42 U.S.C. § 3601 *et seq.*; 42 U.S.C. §§ 1981 and 1982; the New York State Constitution, New York Civil Practice Law and Rules Article 78, New York Civil Rights Law, and New York common law.

Before the Court is the Motion to Dismiss the Second Amended Complaint (the "Motion") filed by the Village; the Board of Trustees of the Village of Pomona (the "Village Board"); the Zoning Board of Appeals of the Village of Pomona (the "ZBA"); the Planning Board of the Village of Pomona (the "Planning Board"); and Louis Zummo, the Building Inspector of Pomona (collectively, "Defendants") pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1] (ECF No. 84.)

For the following reasons, Defendants' Motion is GRANTED in part and DENIED in part.

## FACTUAL BACKGROUND

The Court has previously noted that this litigation has a complex and protracted history. *See Congregation Rabbinical Inst. of Tartikov, Inc. v. Vill. of Pomona, NY ("Tartikov VII")*, 2026 WL 507849, at *1 (S.D.N.Y. Feb. 23, 2026). Over the course of nearly two decades, courts in this District and the Second Circuit have issued several opinions addressing issues related to Plaintiffs' proposed development of the Subject Property. The following background is drawn from the Second Amended Complaint (the "SAC"), documents attached to and incorporated by reference therein, and matters of which the Court may properly take judicial notice. For the purposes of the instant Motion, the Court accepts the SAC's factual allegations as true and draws all reasonable inferences in Plaintiffs' favor. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

[1] The Court refers to the parties' motion papers as follows: (1) Defendants' memorandum of law in support of their Motion, ECF No. 85 ("Defs.' Mem."); (2) Plaintiffs' memorandum of law in opposition, ECF No. 86 ("Pls.' Opp."); and (3) Defendants' reply memorandum of law, ECF No. 88 ("Defs.' Reply").

## I. Tartikov's Formation and Proposed Religious Institute

Tartikov is a New York religious corporation. (SAC ¶ 16.) In August 2004, Tartikov purchased the Subject Property, an approximately 100-acre parcel in the Village, and later acquired approximately 19 additional acres, bringing the total area of the Subject Property to approximately 119 acres. (*Id.* ¶¶ 3, 240.) Tartikov purchased the Subject Property with the intent of constructing the Institute. (*Id.* ¶¶ 1–2.) The Institute would include housing for students and their families. (SAC ¶¶ 53–74.) The Individual Plaintiffs, all of whom are Hasidic Jews, seek to live at the Institute and either teach or study there. (*Id.* ¶¶ 17–23, 29.)

According to Plaintiffs, members of the Hasidic Jewish community are religiously precluded from resolving certain internal disputes in secular courts. (*Id.* ¶¶ 30–31.) Tartikov's purpose is to develop and operate a rabbinical institute to train Hasidic Jewish rabbis to become qualified *dayanim*, rabbis who serve as judges in Jewish religious courts. (*Id.* ¶ 32.) Qualification as a *dayan* requires immersion in a Torah community, consisting of a residential living and learning environment designed to minimize outside distractions and enable students to devote themselves to the study and mastery of the *Shulchan Aruch*, the Code of Jewish Law. (*Id.* ¶¶ 32–35.) Tartikov therefore seeks to develop and operate a religious campus where students will be dedicated to their religious obligations of mastering Jewish law and meeting their religious obligations to their families. (*Id.* ¶¶ 36–38.)

Plaintiffs allege that living in a Torah community is integral to Tartikov's intended educational experience because students would live among fellow students and teachers and immerse themselves in a community of Torah scholars. (*Id.* ¶¶ 57–60.) Tartikov therefore seeks to provide on-campus housing for its students and their families. (*Id.* ¶¶ 60–61.) Plaintiffs maintain that Jewish law requires prospective students to live with their families and that the

proposed family housing would permit them to satisfy those obligations while pursuing their religious studies. (*Id.* ¶ 65.) The proposed campus would also include classrooms, study halls, courtrooms, a library containing religious texts and commentaries, one or more *shuls*, or synagogues, and *mikvahs*, or ritual baths. (*Id.* ¶¶ 68–72.)

The Village's Zoning Code (the "Village Code"), however, allegedly restricts Tartikov's ability to develop the Institute. (*See generally id.*)

## II. The Village Code and Restrictions on Educational Institutions

Since the Village's formation in 1967, the Village Code has zoned property for single-family residences on one-acre lots. Village Code § 130-5.[2] This zoning designation is known as "R-40." *Id.* The stated purpose of the Village Code is to preserve the Village's rural and low-density character. *Id.* § 130-2. Consistent with that designation, the Village requires a minimum lot size of 40,000 square feet (approximately one acre) for the development of single-family residences. *Id.* § 130-5.

The Village Code also regulates "[e]ducational institutions." Educational institutions, as well as dormitories, houses of worship, and other enumerated uses, are permitted only pursuant to special-use permits issued by the Village Board and site plan approval by the Planning Board. *Id.* §§ 130-10, 130-11. The ZBA separately possesses authority to consider use and area variances. *Id.* § 130-28(D). A property owner may also petition to amend the Village Code or seek a zone change. *Id.* §§ 130-25–130-45.

[2] The Village Code is available on the Village's website. *See* Village of Pomona, Code Book Page (accessed Sept. 28, 2026), available at https://www.pomonavillage.com/codebook.html. The Court may take judicial notice of relevant internet material and public records issued by government agencies. *See Boarding Sch. Review, LLC v. Delta Career Educ. Corp.*, 2013 WL 6670584, at *1 n.1 (S.D.N.Y. Mar. 29, 2013) (taking judicial notice of several websites because district courts "ha[ve] the discretion to take judicial notice of internet material"); *Wells Fargo Bank, N.A. v. Wrights Mill Holdings, LLC*, 127 F. Supp. 3d 156, 166 (S.D.N.Y. 2015) (recognizing that district courts may take "routine[ ]" judicial notice of "documents retrieved from official government websites."); *Cangemi v. United States*, 13 F.4th 115, 124 n.4 (2d Cir. 2021) (taking judicial notice of information published on government agency websites).

On January 22, 2001, the Village adopted Local Law No. 1 of 2001. Village Code § 130-4 (2001). Local Law No. 1 defined an "educational institution" as "[a]ny school or other organization or institution conducting a regularly scheduled comprehensive curriculum of academic and/or alternative vocational instruction similar to that furnished by kindergartens, primary[,] or secondary schools and operating under the Education Law of New York State, and duly licensed by the State of New York." *Id.* The law did not address dormitories. *Id.* At the time, however, New York courts recognized that educational institutions generally could locate on their property facilities for accessory uses reasonably associated with their educational purposes. *See, e.g.*, *Town of Islip v. Dowling Coll.*, 275 A.D.2d 366, 367 (2000) (educational institutions may engage in and locate on their property facilities for social, recreational, athletic, and other accessory uses reasonably associated with their educational purposes); *Ass'n of Zone A & B Homeowners Subsidiary, Inc. v. Zoning Bd. of Appeals of City of Long Beach*, 298 A.D.2d 583, 584 (2002) (affirming that educational institutions are generally permitted to engage in accessory uses on their property).

Against this backdrop, on September 27, 2004, the Village adopted Local Law No. 5 of 2004. Village Code § 130-4(F). Local Law No. 5 amended the definition of an "educational institution" to include certain private and religious schools, colleges, and graduate and post-graduate schools conducting a full-time curriculum of instruction and "accredited by the New York State Education Department or similar recognized accrediting agency." *Id.* The accreditation requirement remains relevant to Tartikov's proposed use because Tartikov seeks approval to operate as an unaccredited educational institution. (SAC ¶¶ 40–52.) Local Law No. 5 also permitted dormitories as an accessory use to educational institutions, but defined permissible dormitories in a manner that excludes the type of student-family housing Tartikov proposes.

Village Code § 130-4(F). In relevant part, dormitory rooms may not contain separate cooking, dining, or housekeeping facilities, and certain single-family, two-family, and multi-family dwelling units are excluded from the definition of a dormitory. *Id*.

On January 22, 2007, the Village further restricted dormitories through the adoption of Local Law No. 1 of 2007, which provides that (1) a dormitory building shall not occupy more than twenty (20) percent of the total square footage of all buildings on the lot, and (2) the maximum height for a dormitory building is 25 feet. *Id*. §§ 130-4, 130-10.[3] (SAC ¶ 6.) Plaintiffs challenge in the instant action Local Law No. 1 of 2001 and Local Law No. 5 of 2004 (collectively, the "Challenged Laws").[4]

Plaintiffs allege that the Challenged Laws prevent Tartikov from developing the Institute. First, Plaintiffs allege that Tartikov cannot satisfy the Village's accreditation requirement because the New York State Education Department no longer serves as an institutional accrediting agency. (SAC ¶ 44.) Nor can Tartikov presently satisfy the requirements of the Association of Advanced Rabbinical and Talmudic Schools ("AARTS"), which Plaintiffs identify as the relevant and only private entity authorized to accredit Tartikov. (*Id.* ¶ 46.) AARTS requires, in relevant part, that an institution be operational for two years before it may become accredited. (*Id.*) Plaintiffs

[3] Although not material to the issues presently before the Court, Plaintiffs challenge only Local Law No. 1 of 2001 and Local Law No. 5 of 2004 because the Second Circuit affirmed the judgment enjoining enforcement of Local Law No. 1 of 2007. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona ("Tartikov IV")*, 945 F.3d 83, 126 (2d Cir. 2019).

[4] The parties disagree on what constitutes the Challenged Laws. Defendants use "Accreditation Law" to encompass the accreditation and licensure requirements applicable to educational institutions, including those originating in Local Law No. 1 of 2001 and subsequently modified by Local Law No. 5 of 2004. (Defs.' Mem. at 3–4.) Plaintiffs disagree, arguing that the accreditation requirement was first enacted through Local Law No. 5 of 2004. (Pls.' Opp. at 1–2.) As explained below, the Court concludes that an accreditation-related requirement was first introduced, in some form, through Local Law No. 1 of 2001. (*See infra* Section I.B.1.) For clarity and consistency, the Court therefore refers to the accreditation requirements established by Local Law Nos. 1 of 2001 and 5 of 2004 collectively as the "Accreditation Law," and the dormitory restrictions established by Local Law No. 5 of 2004 as the "Dormitory Law."

consequently allege that Tartikov cannot become accredited unless it first operates, but cannot operate in the Village as an educational institution unless it is first accredited. (*Id.* ¶¶ 43–52.)

Second, Plaintiffs allege that the Challenged Laws prohibit the student-family housing required for Tartikov's proposed Torah community. (SAC ¶¶ 53–67.) Specifically, Plaintiffs allege that no other form of student housing for educational institutions is permitted as an accessory use and that the proposed institute requires housing for married students and their families to fulfill its religious and educational mission. (*Id.*)

### III. Plaintiffs' Prior Litigation Concerning the Challenged Laws

Plaintiffs first commenced federal action concerning the Challenged Laws in 2007. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, No. 07-CV-6304 (KMK), ECF No. 1 (S.D.N.Y.) (the "First Action").[5] Following motion practice, summary judgment proceedings, and a bench trial, the Honorable Kenneth M. Karas entered judgment in Plaintiffs' favor on several claims concerning the Village Code. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona ("Tartikov III")*, 280 F. Supp. 3d 426 (S.D.N.Y. 2017). With respect to the Challenged Laws, Judge Karas held that Plaintiffs established violations of the First and Fourteenth Amendments, and certain provisions of RLUIPA, the FHA, and the New York Constitution. *Id*. at 495. Both parties appealed. *Tartikov IV*, 945 F.3d 83. In 2019, the Second Circuit affirmed in part, reversed in part, vacated in part, and remanded. *Id*. at 126. The Second Circuit specifically held that Plaintiffs lacked standing to bring claims against the Challenged Laws because Tartikov had not submitted a formal proposal for its project, applied for a permit, or otherwise engaged in conduct invoking the operation of those zoning provisions. *Id.* at 110.

---

[5] The Court may take judicial notice of "relevant pleadings, motion papers, orders, and judgments in [a separate] court action" when resolving a Rule 12(b)(6) motion to dismiss. *See U.S. Fid. & Guar. Co. v. Petroleo Brasileiro S.A.-Petrobras*, 2001 WL 300735, at *9 n.7 (S.D.N.Y. Mar. 27, 2001). The Court therefore takes judicial notice of the relevant filings, orders, and decisions in Plaintiffs' prior actions concerning the Subject Property.

Following that decision, Tartikov submitted a text-amendment petition to the Village seeking amendment of the Challenged Laws. (SAC, Prayer for Relief ¶ A.7.) The Village Board declined to consider the petition in February 2020, (*id.*), and Plaintiffs commenced another action later that year. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, No. 20-CV-6158 (KMK), ECF No. 1 (S.D.N.Y.) (the "Second Action"). Judge Karas dismissed the action, concluding that Plaintiffs had not established a cognizable injury or received a final decision from the Village concerning Tartikov's proposed development of the Subject Property. *See Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona ("Tartikov V")*, 2021 WL 4392489, at *10 (S.D.N.Y. Sept. 24, 2021). The Second Circuit affirmed in May 2022, concluding that the text-amendment petition did not identify Tartikov's particular proposed land use for the Subject Property and therefore the Village Board's refusal to consider that petition did not constitute a final decision concerning Tartikov's development plans. *See Congregation Rabbinical Coll. of Tartikov v. Vill. of Pomona ("Tartikov VI")*, 2022 WL 1697660, at *2–3 (2d Cir. May 27, 2022).

## IV. Tartikov's Continued Efforts to Obtain Zoning Relief in 2021

While the Second Action remained pending, Tartikov continued its efforts to obtain zoning relief concerning the Institute.

On January 7, 2021, Tartikov submitted a request for interpretation to Defendant Louis Zummo, the Village Building Inspector. (SAC ¶ 75.) The request sought determinations concerning five issues, including whether a non-accredited rabbinical institute with student-family housing was permitted in the Village. (*Id.*) On March 2, 2021, a Village attorney informed Tartikov that Zummo would not respond to the request for interpretation. (*Id.* ¶ 76.) On March 31, 2021, Tartikov appealed Zummo's refusal to the ZBA. (*Id.* ¶ 77.) On August 11, 2021, the

Village informed Tartikov that the ZBA would not review the matter because there had been no determination by Zummo for the ZBA to consider. (*Id.* ¶ 78.)

Separately, on March 11, 2021, Tartikov filed another text-amendment petition. (*Id.* ¶ 80.) The petition sought removal of the specific provisions from Local Law No. 5 of 2004 requiring accreditation of educational institutions and prohibiting student-family housing. (*Id.*) On November 28, 2022, the Village Board declined to consider the petition and voted to refund Tartikov's filing fee. (*Id.* ¶ 81.)

## V. Tartikov's Land-Use Applications in 2023

Following the Second Circuit's *Tartikov VI* decision in the Second Action, Tartikov submitted four applications detailing its proposed development of the Subject Property on October 19, 2023. (*Id.* ¶ 82.) These applications included: (1) a special-use permit application; (2) a site plan application; (3) an application for use variances; and (4) a zone change petition seeking creation of a Special Institutional Education Zoning District. (*Id.* ¶ 82, Exs. A–D.)

Unlike the text-amendment petition at issue in the Second Action, these applications specifically detailed Tartikov's proposed land use of the Subject Property, including a non-accredited rabbinical institute with student-family housing. (*Id.* ¶¶ 82–87.) Plaintiffs allege, however, that none of Tartikov's applications were placed on the Village Board's, Planning Board's, or ZBA's respective November 2023 agendas. (*Id.* ¶ 90.) They further allege that the Planning Board did not make the preliminary determinations concerning environmental review that Plaintiffs contend were required at that time. (*Id.* ¶ 91.) Specifically, the applications were subject to environmental review under the State Environmental Quality Review Act ("SEQRA"), a process that included the submission of Environmental Assessment Forms ("EAFs") addressing Tartikov's proposed development of the Subject Property. (SAC ¶¶ 91–93.)

On December 11, 2023, Zummo sent a letter directing Tartikov to resubmit EAFs associated with its special-use permit application, site plan application, and zone change petition using a uniform title and project description. (*Id.* ¶ 92.) Zummo also rejected the use variance application as premature because there had not yet been an underlying determination from which a variance could be sought. (*Id.* ¶ 94.) On January 19, 2024, Tartikov submitted replacement EAFs. (*Id.* ¶ 95.) Plaintiffs allege that the special-use permit and site plan applications were fully submitted by February 26, 2024. (*Id.* ¶ 97.) On March 25, 2024, the Village Board declined to consider Tartikov's zone change petition and voted to refund the corresponding application fee. (*Id.* ¶¶ 103–06.)

On April 1, 2024, Zummo denied Tartikov's special-use permit and site plan applications. (*Id.* ¶ 107.) Zummo's letter stated that "accreditation is a requirement for an educational institution and that unaccredited educational uses are prohibited in the Village" and Tartikov's proposed use as "an unaccredited educational institution" was not permitted. (*Id.* ¶ 108.) Zummo further stated that accessory uses could not be considered without an approved principal use and advised Tartikov that it would need to seek a use variance from the ZBA. (*Id.* ¶¶ 109–10.)

## VI. Tartikov's ZBA Applications in 2024

After the disposition of its October 2023 applications, on April 26, 2024, Tartikov submitted three matters to the ZBA: (1) an application seeking use variances permitting operation of a non-accredited rabbinical institute and student-family housing; (2) an appeal from Zummo's denial of the special-use permit application; and (3) an appeal from Zummo's denial of the site plan application. (*Id.* ¶ 111, Exs. E–G.)

Plaintiffs allege that the ZBA's handling of the three applications was "fraught with procedural irregularities, violations of state and local law, missed deadlines, and differential

treatment." (*Id.* ¶ 112.) The applications were submitted before the advertised deadline for the ZBA's May 22, 2024 meeting, but, similar to Tartikov's October 2023 applications, were not placed on that agenda. (*Id.* ¶¶ 113–17.) According to Plaintiffs, a ZBA attorney informed Tartikov that two unrelated applications were received earlier and that the ZBA did not wish to consider five applications at one meeting. (*Id.* ¶¶ 115–17.) Tartikov's three applications were instead placed on the June 26, 2024 agenda. (*Id.* ¶¶ 118–20.)

At the June 26, 2024 meeting, Tartikov explained that it sought use variances permitting a non-accredited rabbinical institute with student-family housing. (*Id.* ¶¶ 120–23.) Tartikov also requested that the applications proceed so that a lead agency could be established for purposes of SEQRA review. (*Id.* ¶ 123.) The ZBA scheduled public hearings on the three applications for July 24, 2024. (*Id.* ¶ 124.)

At the July 24, 2024 meeting, the ZBA considered the three applications together. (*Id.* ¶¶ 125–32.) Plaintiffs allege that, although a ZBA attorney acknowledged that segmentation of the SEQRA review was disfavored, he recommended that the ZBA initially consider only the accreditation issue, rather than the proposed development of the Subject Property as a whole. (*Id.* ¶ 126.) Tartikov objected and emphasized that it was seeking separate variances from both the accreditation requirement and the student-family housing restrictions. (*Id.* ¶¶ 127–28.) The ZBA nevertheless proceeded with a segmented review focused initially on accreditation. (*Id.* ¶ 128.) The ZBA also adopted resolutions stating its intent to serve as lead agency for a coordinated SEQRA review and directing that notice be provided to other involved agencies. (*Id.* ¶¶ 129–31.)

Members of the public also spoke in opposition to Tartikov's applications during the hearing. (*Id.* ¶ 133.) Plaintiffs allege that comments included statements that "we do not want more segregated schools in the town" and that the Village should avoid continuing to approve

"segregated schools." (*Id.*) Plaintiffs maintain that the term "segregated" was a "code word" for an all-Jewish school. (*Id.*) Along these lines, Plaintiffs also allege that the Village's consideration of Tartikov's applications occurred against a backdrop of hostility toward the Orthodox and Hasidic Jewish community. (*Id.* ¶¶ 257–87.) For instance, Plaintiffs allege that Zummo, who denied Tartikov's October 2023 special-use permit and site plan applications, had previously been accused of using his position as the Village's Building Inspector to obstruct permits and otherwise discriminate against Orthodox and Hasidic Jewish residents. (*Id.* ¶¶ 262–66, 272–76.) Plaintiffs further allege that Zummo delayed for more than a year the issuance of a demolition permit for obsolete structures on the Subject Property, even though Tartikov had previously received a permit for substantially the same demolition. (*Id.* ¶¶ 267–71.)

On August 15, 2024, the Rockland County Department of Planning issued its General Municipal Law review of Tartikov's variance application. (*Id.* ¶ 136.) The County noted that it generally disfavored use variances because of the applicable hardship standard, but stated that Tartikov otherwise appeared to satisfy the Village Code's definition of an educational institution except for accreditation. (*Id.*) The review further stated that the lack of accreditation, standing alone, did not present significant land-use impacts and that it had "no objection to the granting of the requested use variance." (*Id.*)

The public hearing resumed on September 25, 2024. (*Id.* ¶ 137.) Plaintiffs allege that, at that meeting, the ZBA stated that there were no other agencies involved in the SEQRA review and rescinded portions of its prior resolutions directing that notice be provided to other involved agencies. (*Id.* ¶¶ 138–43.) The ZBA proceeded to question Tartikov about whether the Institute could obtain accreditation. (*Id.* ¶¶ 144–49.) Tartikov responded that the Institution could not presently be accredited because it was not operational. (*Id.* ¶¶ 145–49.) Plaintiffs further allege

that the ZBA chairperson suggested that Tartikov temporarily operate at another location until it became eligible for accreditation. (*Id.* ¶¶ 150–52.)

On October 23, 2024, Tartikov submitted to the ZBA a letter from AARTS stating that Tartikov could not obtain accreditation because, among other reasons, it was not operational with a physical location. (*Id.* ¶ 164.) When the hearing resumed on November 20, 2024, Tartikov again maintained that it could not obtain accreditation until it had operated for two years and could not operate in the Village without accreditation. (*Id.* ¶¶ 165–70.) The ZBA again questioned whether Tartikov could temporarily rent another facility before seeking accreditation. (*Id.* ¶ 170.)

Plaintiffs likewise allege that the ZBA repeatedly delayed completion of its environmental review. (*Id.* ¶¶ 163, 172–77.) Although the public hearing closed on November 20, 2024, the ZBA had not yet completed its environmental review and therefore did not vote on Tartikov's applications. (*Id.* ¶¶ 172–75.) The ZBA subsequently deferred its environmental review until January 2025 and ultimately voted on Tartikov's three applications on January 22, 2025. (*Id.* ¶¶ 175–78.)

## VII. January 22, 2025 ZBA Determinations

On January 22, 2025, the ZBA completed its environmental review of Tartikov's applications. (*Id.* ¶¶ 178–81.) The ZBA determined that Tartikov's proposed development would have no environmental impacts in the categories considered, except with respect to consistency with community plans. (*Id.* ¶¶ 179–80.) The ZBA further determined that the proposed development would result in "no significant adverse impacts on the environment" and issued a negative declaration. (*Id.* ¶ 181.) The ZBA then unanimously denied Tartikov's three applications. (*Id.* ¶¶ 182–87.)

With respect to the requested accreditation variance, Plaintiffs allege that the ZBA determined that Tartikov had not adequately established that accreditation was unavailable to it. (*Id.* ¶ 194.) Plaintiffs dispute that conclusion and allege that the record before the ZBA established that Tartikov could not obtain accreditation without first operating, while the Village Code prevented Tartikov from operating without accreditation. (*Id.* ¶¶ 194–95.) Plaintiffs further allege that the ZBA identified governmental interests supporting the accreditation requirement, including educational quality, protection against fraud and mismanagement, academic standards, public health and safety, and oversight of facilities and instructors. (*Id.* ¶ 195.)

Plaintiffs also allege that the ZBA declined to reach the separate variance request concerning student-family housing because it had elected to consider accreditation first. (*Id.* ¶ 203.) Plaintiffs therefore contend that the ZBA refused to consider their request for authorization of student-family housing while simultaneously denying Tartikov's applications based on its lack of accreditation. (*Id.* ¶¶ 178–95, 203.) Plaintiffs allege that no further administrative review of the ZBA's determinations is available. (*Id.* ¶ 209.)

Following these determinations, Plaintiffs allege that Tartikov has pursued every application and petition available to it that could permit construction of the Institute. (*Id.* ¶¶ 10–12.) Specifically, the SAC identifies a second text-amendment petition, a request for interpretation, a site plan application, a special-use permit application, a zone change petition, two applications for use variances, and two ZBA appeals. (*Id.*) Plaintiffs allege that all nine were denied and that "there are no more applications [Tartikov] can make." (*Id.*)

**PROCEDURAL HISTORY**

Plaintiffs commenced this action on February 20, 2025. (ECF No. 1.) Plaintiffs subsequently filed the First Amended Complaint ("FAC") on April 11, 2025. (ECF No. 16.) On

that same date, Plaintiffs moved for a preliminary injunction. (ECF No. 38.) Defendants opposed the preliminary injunction and, in turn, moved to dismiss the FAC. (ECF No. 50.) After briefing was completed on both motions, the Court permitted Plaintiffs to file the SAC. (ECF No. 68.) The SAC was filed on August 21, 2025. (ECF No. 69.) Defendants' motion to dismiss the FAC was thereafter denied as moot. (ECF No. 68.)

Defendants sought leave to move to dismiss the SAC on September 9, 2025. (ECF No. 71.) The Court granted Defendants leave to file the motion, waived the pre-motion conference requirement, and set a briefing schedule. (ECF No. 74.) Defendants served their opening motion papers on November 3, 2025. (ECF Nos. 84–85.) Plaintiffs served their opposition papers on December 3, 2025. (ECF Nos. 86–87.) Defendants served their reply papers on January 20, 2026, at which time all motion papers were filed on the docket. (ECF Nos. 84–88.)

On February 23, 2026, the Court denied Plaintiffs' motion for a preliminary injunction, concluding that Plaintiffs failed to demonstrate irreparable harm. (ECF No. 89.) Defendants' Motion is now before the Court.

## LEGAL STANDARD

### I. Federal Rule of Civil Procedure 12(b)(1)

Under Federal Rule of Civil Procedure 12(b)(1), "[a] case is properly dismissed for lack of subject matter jurisdiction . . . when the district court lacks the statutory or constitutional power to adjudicate it." *Nike, Inc. v. Already, LLC*, 663 F.3d 89, 94 (2d Cir. 2011) (citation and internal quotations omitted). "A plaintiff asserting subject matter jurisdiction has the burden of proving by a preponderance of the evidence that it exists." *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)). In assessing whether there is subject matter jurisdiction, the district court must accept as true all

material facts alleged in the complaint. *Conyers v. Rossides*, 558 F.3d 137, 143 (2d Cir. 2009). Without jurisdiction, the district court is devoid of the "power to adjudicate the merits of the case," and therefore must decide a motion under Federal Rule of Civil Procedure 12(b)(1) before addressing any motion on the merits, *Carter v. HealthPort Tech., LLC*, 822 F.3d 47, 54–55 (2d Cir. 2016).

**II. Federal Rule of Civil Procedure 12(b)(6)**

Under Federal Rule of Civil Procedure 12(b)(6), dismissal is proper unless the complaint "contain[s] sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). When there are well-pled factual allegations in the complaint, "a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 679. While the district court must take all material factual allegations as true and draw reasonable inferences in the non-moving party's favor, it is "not bound to accept as true a legal conclusion couched as a factual allegation," or to credit "mere conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 555).

The Second Circuit "deem[s] a complaint to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference . . . and documents that plaintiffs either possessed or knew about and upon which they relied in bringing the suit." *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000) (internal citations omitted). The critical inquiry is whether a plaintiff has pled sufficient facts to nudge their claims "across the line from conceivable to plausible." *Twombly*, 550 U.S. at 570. A motion to dismiss will be denied where the allegations "allow[ ] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

**III. Section 1983 Claims**

"Section 1983 itself creates no substantive rights; it provides only a procedure for redress for the deprivation of rights established elsewhere." *Sykes v. James*, 13 F.3d 515, 519 (2d Cir. 1993) (citing *City of Okla. City v. Tuttle*, 471 U.S. 808, 816 (1985)). "To state a claim under Section 1983, a plaintiff must allege facts indicating that some official action has caused the plaintiff to be deprived of his or her constitutional rights." *Zherka v. Amicone*, 634 F.3d 642, 644 (2d Cir. 2011) (citing *Colombo v. O'Connell*, 310 F.3d 115, 117 (2d Cir. 2002) (per curiam)). When the alleged constitutional deprivation follows from an individual defendant's conduct, the plaintiff must establish a legally sufficient causal connection between that conduct and the deprivation. *See Zahrey v. Coffey*, 221 F.3d 342, 349–50 (2d Cir. 2000). Additionally, a plaintiff seeking monetary damages must show the defendant's personal involvement in the alleged constitutional deprivation as a prerequisite to recovery under Section 1983. *See Farid v. Ellen*, 593 F.3d 233, 249 (2d Cir. 2010) (citing *Farrell v. Burke*, 449 F.3d 470, 484 (2d Cir. 2006)).

**DISCUSSION**

The SAC asserts eighteen causes of action. (*See* SAC ¶¶ 299–409.) Defendants seek dismissal of all eighteen counts. (*See generally* Defs.' Mem.) The Court first addresses Plaintiffs' standing to pursue their claims. The Court then considers Plaintiffs' constitutional claims, followed by their claims under RLUIPA, the FHA, Sections 1981 and 1982, and state law. Finally, the Court addresses Defendants' arguments for dismissal of the claims against Zummo.

**I. Article III Standing**

At the outset, Defendants argue that Plaintiffs lack standing to challenge the Challenged Laws. (Defs.' Mem. at 11–12.) Defendants advance three principal arguments: (1) Plaintiffs cannot challenge the Accreditation Law because Tartikov purchased the Subject Property after the

relevant accreditation requirement was enacted and thus "bought into" the alleged injury; (2) Plaintiffs cannot challenge the Dormitory Law because the Village never applied that law to the Subject Property, and, therefore, Plaintiffs cannot establish an injury fairly traceable to the Dormitory Law; and (3) the Individual Plaintiffs lack standing because their alleged future involvement with the Institute is conjectural and hypothetical. (*Id.*)

Article III of the Constitution restricts federal judicial power to the resolution of cases and controversies. U.S. Const. art. III, § 2. "That case-or-controversy requirement is satisfied only where a plaintiff has standing." *Sprint Commc'ns Co., L.P. v. APCC Servs., Inc.*, 554 U.S. 269, 273 (2008). The Supreme Court has explained that constitutional standing requires a plaintiff to establish at minimum three elements—that the plaintiff suffered an "injury in fact," which means an "invasion of a legally protected interest," the existence of "a causal connection between the injury and the conduct complained of," and "a likelihood that 'the injury will be redressed by a favorable decision.'" *Fulton v. Goord*, 591 F.3d 37, 41 (2d Cir. 2009) (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560–61 (1992)). A "legally protected interest" is one that is "concrete and particularized" and "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560 (quotation marks omitted). Standing is a jurisdictional predicate that cannot be waived. *See Leopard Marine & Trading, Ltd. v. Easy Street Ltd.*, 896 F.3d 174, 188 (2d Cir. 2018); *accord Arbaugh v. Y&H Corp.*, 546 U.S. 500, 514 (2006) (quoting *United States v. Cotton*, 535 U.S. 625, 630 (2002)).

Because Plaintiffs assert both facial and as-applied challenges to the Challenged Laws, (*see* SAC ¶¶ 299–409), the Court first addresses whether Plaintiffs have standing to pursue their facial challenges. The Court then considers whether Plaintiffs' as-applied challenges to the Challenged Laws satisfy the final-decision requirement and the remaining requirements of Article III standing.

Finally, the Court separately considers whether the Individual Plaintiffs have established an injury in fact.

### A. Facial Challenges

Plaintiffs' facial challenges to the Challenged Laws include claims under the Free Exercise, Free Speech, and Freedom of Association Clauses of the First Amendment, RLUIPA's substantial burden provision, the FHA's disparate impact provision, the New York Constitution's religious-liberty provision, and New York common law. (SAC ¶¶ 300, 304, 308, 324, 331, 397, 408.)

"A facial challenge to a statute considers only the text of the statute itself, not its application to the particular circumstances of an individual." *Field Day, LLC v. Cty. of Suffolk*, 463 F.3d 167, 174 (2d Cir. 2006) (internal quotations omitted); *accord Washington v. Glucksberg*, 521 U.S. 702, 740 (1997) (Stevens, J., concurring) (A facial challenge is one that addresses "not the application of [that] statute to a particular set of plaintiffs . . ., but the [legality] of the statute [itself.]"). An as-applied challenge, on the other hand, "requires an analysis of the facts of a particular case to determine whether the application of a statute, even one constitutional on its face, deprived the individual to whom it was applied of a protected right." *Id*. at 174; *see also Brooklyn Legal Servs. Corp. v. Legal Servs. Corp.*, 462 F.3d 219, 228 (2d Cir. 2006) ("Facial and as-applied challenges differ in the extent to which the invalidity of a statute need be demonstrated (facial, in all applications; as-applied, in a personal application)"), *overruled on other grounds*, *Bond v. United States*, 131 S. Ct. 2355 (2011). A plaintiff, moreover, "need not await a final decision to challenge a zoning policy that is discriminatory on its face." *See Sunrise Detox V, LLC v. City of White Plains*, 769 F.3d 118, 123 (2d Cir. 2014) (citation omitted).

As Judge Karas previously explained in *Tartikov V*, Plaintiffs attempted to characterize their claims as facial yet "only attack[ed] the Challenged Laws in relation to their specific

circumstances rather than on facial grounds." 2021 WL 4392489, at *10 (S.D.N.Y. Sept. 24, 2021). Judge Karas concluded that Plaintiffs' allegations "lack[ed] an explanation as to how or why the Challenged Laws [were] facially invalid," and, as a result, treated those claims solely as as-applied challenges. *Id*. The SAC now provides additional allegations in an attempt to cure that deficiency. As to the Accreditation Law, Plaintiffs allege, in relevant part, that the Village Code requires an educational institution to obtain accreditation before operating, while AARTS—the only accrediting organization relevant to Tartikov—requires an institution to operate for two years before becoming eligible for accreditation. (SAC ¶¶ 40–52.) These additional allegations, however, do not cure the deficiency identified by Judge Karas. They explain why Tartikov cannot satisfy the Accreditation Law, but not why the law is invalid on its face. Plaintiffs thus still "bring claims . . . as they apply to them—which is squarely an as-applied, not facial, challenge." *Tartikov V*, 2021 WL 4392489, at *10. The Court recognizes the "Catch-22" dilemma arising from Tartikov's inability to obtain accreditation from AARTS, but that does not excuse the SAC's failure to "plead or explain how or why the . . . [r]esolution is facially invalid; that is, unconstitutional or illegal on its face." *Islamic Cmty. Ctr.*, 258 F. Supp. 3d 405, 415 (S.D.N.Y. 2017).

The same is true of the Dormitory Law. Plaintiffs allege that the Institute requires an established Torah community. (SAC ¶¶ 35–37.) A Torah community will permit Tartikov's prospective students to fully immerse themselves in their studies and religion. (*Id*.) But Tartikov cannot establish a Torah community unless prospective students are permitted to live on the Subject Property with their families. (*Id*. ¶ 38.) And Tartikov is unable to provide student-family housing because the Dormitory Law prohibits dormitories from containing separate cooking, dining, or housekeeping facilities and excludes single-family, two-family, and multifamily dwelling units from the definition of a dormitory. (SAC ¶¶ 53–54.) Yet Plaintiffs' theory of facial

invalidity depends on the Dormitory Law's application to their particular circumstances. While these restrictions appear in the text of the Dormitory Law, the SAC does not explain how the restrictions themselves are unlawful independent of their effect on Tartikov's proposed religious use. Plaintiffs' alleged injuries concerning the Dormitory Law arise from the restrictions' effect on Tartikov's particular proposed use, not from any alleged facial infirmity in the restrictions themselves. As Judge Karas already explained, merely "alleging a facial challenge does not excuse pleading and Article III requirements." *Tartikov V*, 2021 WL 4392489, at *10 (S.D.N.Y. Sept. 24, 2021); *see also Lost Lake Holdings LLC v. Town of Forestburgh*, 2025 WL 1899026, at *7 (S.D.N.Y. July 9, 2025) ("Even a cursory review of plaintiffs' complaint and arguments reveals that plaintiffs challenge the application of such resolutions . . . to them."); *Weissman v. Fruchtman*, 700 F. Supp. 746, 753 (S.D.N.Y. 1988) (dismissing plaintiffs' facial challenges to an ordinance as unconstitutional because it was not specifically applied to them).

Plaintiffs' alleged injuries depend on the Challenged Laws' application to Tartikov's particular proposed development of the Subject Property. The SAC therefore does not demonstrate that the Challenged Laws are unlawful independent of their application to Plaintiffs. To the extent Plaintiffs purport to assert facial challenges to the Challenged Laws, those challenges are dismissed.

**B. As-Applied Challenges**

Plaintiffs' as-applied challenges to the Challenged Laws include claims under the Free Exercise, Free Speech, and Freedom of Association Clauses of the First Amendment, the Equal Protection Clause of the Fourteenth Amendment, RLUIPA's substantial burden and nondiscrimination provisions, the FHA, 42 U.S.C. §§ 1981 and 1982, the New York Constitution's religious-liberty and equal protection provisions, New York Civil Rights Law § 40-c, and New

York common law. (SAC ¶¶ 300, 304, 308, 312, 316, 324, 328, 331, 337, 342, 347, 354–81, 397, 400, 402, 409.)

As-applied claims in the land-use context generally are not ripe until a landowner receives a final, definitive decision on a land-use application. *See Vill. Green at Sayville, LLC v. Town of Islip*, 43 F.4th 287, 290 (2d Cir. 2022); *Sunrise Detox*, 769 F.3d at 122 ("In other words, a non-final decision on how a parcel of land may be used does not ordinarily give rise to an injury that is sufficiently concrete and particularized to satisfy Article III."). As long as "avenues still remain for the government to clarify or change its decision," the decision is not final and therefore not ripe for judicial review. *Pakdel v. City & Cnty. of San Francisco*, 594 U.S. 474, 480 (2021). But "[o]nce the government is committed to a position, however, these potential ambiguities evaporate and the dispute is ripe for judicial resolution." *Id*. (quotation marks omitted). The final decision requirement overlaps with both constitutional ripeness and the first *Lujan* standing factor by asking whether the alleged injury has become sufficiently concrete and nonconjectural to satisfy Article III. *See Vill. Green at Sayville*, 43 F.4th at 297 (explaining that the final-decision requirement and constitutional ripeness are "really just about the first *Lujan*[ ] factor" (quotation marks omitted)).

Because Defendants raise separate standing arguments with respect to the Accreditation and Dormitory Laws, the Court addresses each in turn to determine whether the final decision requirement has been satisfied.

**i. Accreditation Law**

As a preliminary matter, Plaintiffs contend that Defendants misrepresent the record by maintaining that Tartikov purchased the Subject Property after the Village enacted the Accreditation Law. (Pls.' Opp. at 1, 9.) That contention appears to be incorrect, however. The Village enacted Local Law No. 1 on January 22, 2001, more than three years before Tartikov

purchased the Subject Property. Village Code § 130-4 (2001). Local Law No. 1 defined an "educational institution" as "[a]ny school or other organization or institution . . . *operating under* the Education Law of New York State, and *duly licensed* by the State of New York." *Id*. (emphasis added). Although the 2001 law did not expressly use the word "accreditation," it restricted educational institutions to those "operating under" New York Education Law and "duly licensed by the State of New York." *Id*. That understanding of the 2001 law is not novel. When discussing the evolution of the Village's accreditation requirements, the Second Circuit explained in *Tartikov IV* that Local Law No. 5 of 2004 "loosened [the] accreditation requirements" imposed by Local Law No. 1. *See* 945 F.3d at 116. Contrary to Plaintiffs' contention, the Village imposed an accreditation-related restriction on educational institutions before Tartikov purchased the Subject Property.[6]

That does not necessarily mean Plaintiffs lack standing. Defendants' argument that Tartikov "bought into" the alleged injury largely relies on a single footnote from the *Tartikov IV* decision, in which the Second Circuit observed that because Tartikov "purchased the [Subject Property] years after [the Accreditation Law] was enacted . . . buying into an injury in fact does not suffice for Article III standing." 945 F.3d at 125 n.289. What Defendants omit is that the Second Circuit nevertheless declined to rest its decision on "this" ground and instead rested its decision on "evidentiary grounds." *Id*. Nor did the Second Circuit cite any authority to support the proposition that a plaintiff who acquires property subject to an existing land-use restriction

[6] Because the Court concludes that Local Law No. 1 of 2001 imposed an accreditation-related restriction, the Court denies Plaintiffs' request for leave to file a sanctions motion without prejudice. (ECF No. 77.) Specifically, Plaintiffs sought leave to move for sanctions based on Defendants' statements that, among other things, "since 2001, [the Village] has required accreditation for educational institution." (*Id*.) At this early stage of the proceedings, the Court declines to permit sanctions motion practice concerning a potentially fact-intensive issue. Plaintiffs may renew their request, if appropriate, following the completion of discovery and development of the factual record.

necessarily lacks Article III standing to challenge that restriction.[7] *Id*. Indeed, another court in this District recognized that the Second Circuit's *Tartikov IV* decision "cites no authority to support its statement" and that the "Court [was] not aware of any" precedent in this Circuit to support such a statement. *See Orthodox Jewish Coal. of Chestnut Ridge v. Vill. of Chestnut Ridge, New York*, 2021 WL 1226930, at *15 (S.D.N.Y. Mar. 31, 2021), *on reconsideration*, 2021 WL 3605041 (S.D.N.Y. Aug. 13, 2021). That court likewise recognized that "the Second Circuit's statement in *Tartikov [IV]* . . . is dicta, and is not binding." *Id.*; *see also Jimenez v. Walker*, 458 F.3d 130, 142 (2d Cir. 2006) ("[D]icta are not and cannot be binding. Holdings—what is necessary to a decision—are binding. Dicta—no matter how strong or how characterized—are not." (alterations and quotation marks omitted)). This Court agrees that the Second Circuit's statement concerning "buying into an injury" is nonbinding dicta and does not, by itself, resolve Plaintiffs' standing here.

The Court also cannot ignore the several decisions issued in the First and Second Actions identifying the deficiencies that previously prevented Plaintiffs from establishing standing to challenge the Challenged Laws. Returning to *Tartikov IV*, the Second Circuit concluded that Tartikov lacked standing to challenge the Challenged Laws, in relevant part, because:

> Tartikov never submitted a formal proposal for the building project, applied for a permit, or engaged in any other conduct that would implicate or invoke the operation of the challenged zoning laws. Whatever harm may arise from the application of the zoning laws to Tartikov's property is merely conjectural at this

[7] Defendants' reliance on *Nat. Res. Def. Council, Inc. v. U.S. Food & Drug Admin*., 710 F.3d 71, 84 (2d Cir. 2013), *as amended* (Mar. 21, 2013), does not alter the Court's conclusion. (Defs.' Reply at 3 n.1.) There, the Second Circuit recognized that "a plaintiff may not establish injury for standing purposes based on a 'self-inflicted' injury." *NRDC*, 710 F.3d at 85. The Second Circuit, however, clarified that a "self-inflicted" injury defeats the causation necessary to establish standing "only if . . . the injury is so completely due to the plaintiff's own fault as to break the causal chain." *Id*. (quoting *St. Pierre v. Dyer*, 208 F.3d 394, 404 (2d Cir. 2000)). That is not the case here. Although Tartikov purchased the Subject Property after an accreditation-related requirement was enacted, Plaintiffs' alleged injury is not completely attributable to that decision. Zummo subsequently applied the Accreditation Law to the Subject Property, and the ZBA denied Tartikov's requested variance from the accreditation requirement. (SAC ¶¶ 107–11, 178–95.) The Village's conduct therefore remains a contributing cause of Plaintiffs' alleged injury, and Tartikov's purchase of the Subject Property does not break the causal chain. *See NRDC*, 710 F.3d at 85 ("So long as the defendants have engaged in conduct that may have contributed to causing the injury, it would be better to recognize standing." (quotation marks omitted)).

> time. Conjectural injuries do not suffice under Article III. We therefore lack jurisdiction over Tartikov's claims.

945 F.3d at 110 (altered).

After the Second Circuit's *Tartikov IV* decision, Tartikov submitted on February 7, 2020, a text-amendment petition to the Village seeking repeal of the Challenged Laws. (SAC, Prayer for Relief ¶ A.7.) The text-amendment petition stated:

> WHEREAS, Congregation Rabbinical College of Tartikov, Inc. ("Tartikov") is a New York religious corporation formed to establish a rabbinical college as a Torah community for its students and teachers on property that it owns in the Village of Pomona;
>
> THEREFORE, Tartikov hereby petitions the Board of Trustees of the Village of Pomona, pursuant to Pomona Village Code §§ 130-35-45, to repeal Local Law No. 1 of 2001 and Local Law No. 5 of 2004.

*Tartikov V*, 2021 WL 4392489, at *7. Despite Tartikov's submission of the text-amendment petition, it did not resolve its standing deficiency. The Village Code specifically required any "petition" seeking an amendment to "describe[ ] the proposed changes." Village Code § 130-36. With respect to that requirement, Judge Karas in *Tartikov V* held that Tartikov's text-amendment petition "offer[ed] no description whatsoever as to what [Plaintiffs] wish[ed] to amend." 2021 WL 4392489, at *7. More fundamentally, Tartikov had still not submitted a formal development plan for the Institute or otherwise obtained a definitive determination from the Village concerning its proposed use of the Subject Property. *Id*. at *9–10. Judge Karas therefore concluded that Plaintiffs had "not alleged a cognizable injury and ha[d] not received a final decision from the Village as to the Challenged Laws," and thus lacked standing to pursue their claims. *Id*. at *10. On appeal, the Second Circuit affirmed Judge Karas's decision. *See Tartikov VI*, 2022 WL 1697660, at *2 (2d Cir. May 27, 2022).

The circumstances here are now materially different. Following the Second Circuit's decision in *Tartikov VI*, Tartikov submitted four land-use applications in October 2023. (SAC ¶ 82.) Those applications were: (1) a special-use permit application; (2) a site plan application; (3) an application for use variances; and (4) a zone change petition seeking creation of a Special Institutional Education Zoning District. (*Id.* ¶ 82, Exs. A–D.) Unlike the text-amendment petition at issue in the Second Action, these applications specifically identified Tartikov's particular proposed development of the Subject Property, including a non-accredited rabbinical institute with student-family housing. For instance, Tartikov's special-use permit application expressly sought permission to "construct, develop and operate a non-accredited rabbinical institute with adult student housing," consisting of an educational building and 255 student and faculty housing units. (*See* SAC, Ex. A.) The application further explained that Tartikov could not obtain accreditation from the New York State Education Department or another accrediting body and sought relief from the Challenged Laws. (*Id.*) Each of the four applications specifically identified Tartikov's proposed development and sought a different form of land-use relief necessary to permit Tartikov to develop the Subject Property as proposed. (SAC ¶¶ 82–87, Exs. A–D.) These applications also resulted in the Village applying the Accreditation Law to Tartikov's proposed development of the Subject Property. On April 1, 2024, after Tartikov's special-use permit and site plan applications had been fully submitted, Zummo denied both applications. (SAC ¶ 107.) Zummo denied the applications because "accreditation is a requirement for an educational institution and that unaccredited educational uses are prohibited in the Village" and Tartikov's proposed use as "an unaccredited educational institution" was not permitted. (*Id.* ¶ 108.) Zummo further advised Tartikov that, to pursue its proposed unaccredited educational use, it would need to seek a use variance from the ZBA. (*Id.* ¶¶ 109–10.)

Tartikov thereafter pursued precisely that relief. In April 2024, Tartikov submitted three matters to the ZBA: (1) an application seeking use variances permitting operation of a non-accredited rabbinical institute and student-family housing; (2) an appeal from Zummo's denial of the special-use permit application; and (3) an appeal from Zummo's denial of the site plan application. (SAC ¶ 111, Exs. E–G.) On January 22, 2025, after several public hearings, the ZBA ultimately denied Tartikov's requested accreditation variance, concluding that Tartikov had not adequately established that accreditation was unavailable to it. (SAC ¶¶ 178–209.) During the proceedings, the ZBA chairperson had suggested that Tartikov temporarily operate at another location until it became eligible for accreditation, and the ZBA later questioned whether Tartikov could temporarily rent another facility before seeking accreditation. (*Id.* ¶¶ 150–52, 170.) Plaintiffs allege, however, that Tartikov submitted a letter from AARTS stating that it could not obtain accreditation because it was not operational with a physical location. (*Id.* ¶ 164.) Plaintiffs now maintain that no additional administrative review of the ZBA's determination is available. (*Id.* ¶ 209.)

Unlike the First and Second Actions, Tartikov has now taken the steps that Judge Karas and the Second Circuit found lacking. The Court is unaware of any further action that Tartikov could take to obtain a different determination from the Village, especially given that it has pursued the available land-use applications and variance procedures. Judge Karas has already explained that "the final decision requirement in land-use disputes defers the Court's review of Plaintiffs' claims until they have 'arisen in a more concrete and final form.'" *Tartikov V*, 2021 WL 4392489, at *9 (quoting *Murphy v. New Milford Zoning Comm'n*, 402 F.3d 342, 347 (2d Cir. 2005)). "In order to have a final decision, 'a development plan must be submitted, considered, and rejected by the governmental entity.'" *Id.* (quoting *Goldfine v. Kelly*, 80 F. Supp. 2d 153, 159 (S.D.N.Y.

2000)). A claim is further "not ripe until [plaintiffs] also seek[ ] variances that would allow [them] to develop the property." *Id.* Tartikov has submitted several land-use applications detailing its proposed development of the Subject Property. (SAC ¶¶ 82–89, Exs. A–D.) Zummo then determined that the Accreditation Law prohibited Tartikov's proposed unaccredited educational use. (SAC ¶¶ 107–10.) Tartikov likewise pursued the available variance process, first seeking a use variance in October 2023 and, after Zummo rejected that application as premature, again seeking a variance from the Accreditation Law before the ZBA in April 2024. (*Id.* ¶¶ 82, 94, 107–11, Exs. C, E.) The ZBA ultimately denied that requested variance. (*Id.* ¶¶ 178–209.) These allegations satisfy the final decision requirement. Tartikov has "submitted . . . meaningful application[s] to municipal agencies to address its land-use controversy, and the municipal entity responsible for the relevant zoning laws has had an opportunity to commit to a position." *Ateres Bais Yaakov Acad. of Rockland v. Town of Clarkstown*, 88 F.4th 344, 351 (2d Cir. 2023). Having pursued these avenues for obtaining approval of its proposed development, Tartikov has reached the point at which further "compliance" appears to have "become impossible." *Vill. Green at Sayville*, 43 F.4th at 297.

Nor does Defendants' argument that traceability and redressability fail because an independent accrediting body ultimately determines whether Tartikov qualifies for accreditation fare any better. (Defs.' Reply at 3.) The Second Circuit has made clear that "the causal-connection element of Article III standing, which is the requirement that the plaintiff's injury be fairly traceable to the challenged action of the defendant and not the result of the independent action of some third party not before the court, does not create an onerous standard." *Ateres*, 88 F.4th at 352–53; *see also Carter*, 822 F.3d at 55–56 ("A defendant's conduct that injures a plaintiff but does so only indirectly, after intervening conduct by another person, may suffice for Article III

standing."). It requires no more than "*de facto* causality," a standard lower than that required for proximate causation. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Plaintiffs satisfy this standard. Although an independent accrediting body ultimately determines whether Tartikov may obtain accreditation, the Village has made accreditation a condition of Tartikov's proposed educational use of the Subject Property and denied Tartikov a variance permitting it to proceed without accreditation. (SAC ¶¶ 110, 178–208.) Plaintiffs' alleged injury is thus fairly traceable to the Village's application of the Accreditation Law, notwithstanding the role of independent accrediting bodies. The injury is also redressable because a favorable decision preventing Defendants from enforcing the Accreditation Law would remove the Accreditation Law as a barrier to Tartikov's proposed educational use of the Subject Property.

Plaintiffs have therefore satisfied the final-decision requirement with respect to the Accreditation Law. The injury that the Second Circuit previously characterized as "merely conjectural" is no longer conjectural, and Plaintiffs have sufficiently alleged an injury in fact arising from application of the Accreditation Law to Tartikov's proposed development of the Subject Property. *See Tartikov IV*, 945 F.3d at 110.

**ii. Dormitory Law**

Defendants likewise argue that Plaintiffs lack standing to challenge the Dormitory Law because the Village never applied it to Plaintiffs or denied Plaintiffs' April 2024 variance application on that basis. (Defs.' Mem. at 12.) Defendants' argument, however, is difficult to reconcile with the Second Circuit's decision in *Ateres*. There, the Second Circuit recognized that "[s]o long as a plaintiff has submitted a meaningful application to municipal agencies to address its land-use controversy, and the municipal entity responsible for the relevant zoning laws has had an opportunity to commit to a position that by all accounts, it intends to be final, the parties' dispute

is sufficiently final for ripeness purposes." 88 F.4th at 351 (citing *Vill. Green at Sayville*, 43 F.4th at 297–98). Indeed, the Second Circuit concluded that, "in declining review of [plaintiff's] application, the ZBA—representing the [town defendant]—reached a decision that was sufficiently final for ripeness purposes." *Id.*; *see also Sunrise Detox*, 769 F.3d at 123 ("[A] plaintiff need not await a final decision to challenge . . . the manipulation of a zoning process . . . to avoid a final decision."); *Vill. Green at Sayville*, 43 F.4th at 298 (same).

That is the case here. Tartikov first submitted a use variance application on October 19, 2023. (SAC ¶ 82, Ex. C.) On December 11, 2023, Zummo denied Tartikov's application as premature, noting that there had not yet been an underlying determination on Tartikov's land-use applications from which a variance could be sought. (*Id.* ¶ 94.) Following the disposition of Tartikov's land-use applications, Tartikov submitted an application seeking use variances permitting operation of a non-accredited rabbinical institute and student-family housing on April 26, 2024. (*Id.* ¶ 111, Ex. E.) The ZBA thereafter elected to consider the requested variances separately, addressing the accreditation variance first. (*Id.* ¶ 128.) After denying the accreditation variance on January 22, 2025, the ZBA declined to consider Tartikov's requested variance for student-family housing. (*Id.* ¶ 203.) Consistent with *Ateres*, the Court finds that Tartikov submitted a meaningful application seeking relief from the Dormitory Law, and the ZBA had the opportunity to consider that application but declined to do so. The absence of a formal denial therefore does not defeat finality. Plaintiffs' alleged injury is also fairly traceable to Defendants because the ZBA declined to consider the requested student-family housing variance, which Plaintiffs allege departed from its usual practice. (SAC ¶¶ 128, 203.) That injury is likewise redressable because a favorable decision would remove the Dormitory Law as a barrier to the Institute, even if other restrictions remain. *See Knight v. City of New York*, 164 F.4th 173, 179 (2d

Cir. 2026) ("To satisfy Article III, a plaintiff must show that his requested relief would provide meaningful redress for an injury, not that it would relieve him of every injury."); *Am. Cruise Lines v. United States*, 96 F.4th 283, 286 (2d Cir. 2024) (same); *Larson v. Valente*, 456 U.S. 228, 243 n.15 (1982) (same).

The Court therefore concludes that the absence of a formal denial of Tartikov's student-family housing variance does not preclude a finding of finality or otherwise defeat Plaintiffs' standing to challenge the Dormitory Law as applied to Plaintiffs.

### C. Individual Plaintiffs

Defendants' final standing argument is that the Individual Plaintiffs lack standing because they have not suffered an injury in fact. (Defs.' Mem. at 12.) Specifically, Defendants characterize the Individual Plaintiffs' alleged injuries as speculative and hypothetical because they depend on the Individual Plaintiffs' stated intentions to participate in the Institute in the future. (*Id.*; Defs.' Reply at 5.) In turn, Plaintiffs assert that Defendants' argument is precluded by collateral estoppel because Judge Karas previously determined in the First Action that the Individual Plaintiffs had a personal and concrete stake in seeking the rabbinical institute to be built. (Pls.' Opp. at 12 (citing *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona ("Tartikov I")*, 915 F. Supp. 2d 574, 592 (S.D.N.Y. 2013))).

Collateral estoppel prohibits parties from relitigating an issue of fact or law when "(1) the identical issue was raised in a previous proceeding; (2) the issue was actually litigated and decided in the previous proceeding; (3) the party raising the issue had a full and fair opportunity to litigate the issue in the prior proceeding; and (4) the resolution of the issue was necessary to support a valid and final judgment on the merits." *Marsh & McLennan Agency LLC v. Williams*, 2025 WL 1265817, at *11 (S.D.N.Y. Apr. 30, 2025). Even assuming the issues presented in *Tartikov I* and

this action are identical concerning the Individual Plaintiffs, Judge Karas's standing determination does not have preclusive effect. The Second Circuit subsequently vacated the portions of the judgment premised on claims for which Plaintiffs lacked standing and remanded with instructions to dismiss those claims, concluding that Plaintiffs' alleged injuries arising from the Challenged Laws were conjectural. *See Tartikov IV*, 945 F.3d at 110. A determination underlying a vacated judgment lacks preclusive effect. *See Universal City Studios, Inc. v. Nintendo Co.*, 578 F. Supp. 911, 919 (S.D.N.Y. 1983) ("A judgment that has been vacated, reversed, or set aside on appeal is thereby deprived of all conclusive effect, both as res judicata and as collateral estoppel." (citation omitted)), *aff'd*, 746 F.2d 112 (2d Cir. 1984). Because the judgment underlying Judge Karas's standing determination was subsequently vacated, that determination cannot supply the basis for collateral estoppel here.

This conclusion does not mean that the Individual Plaintiffs fail to establish standing, however. Contrary to Defendants' contention that the Individual Plaintiffs' alleged injuries are speculative and hypothetical, the Individual Plaintiffs alleged concrete plans to participate at the Institute. The Individual Plaintiffs allege that they have been thwarted from studying, teaching, and living at the Institute because of the Challenged Laws. (SAC ¶¶ 17–22.) Plaintiffs have also submitted declarations that, taken as true, demonstrate that each Individual Plaintiff has been either offered a faculty position or enrollment as a student at the Institute once it opens. (*See* ECF No. 53 ¶¶ 12–14; ECF No. 54 ¶¶ 9–13; ECF No. 55 ¶¶ 11–12; ECF No. 56 ¶¶ 8–10; ECF No. 57 ¶¶ 9–11; ECF No. 58 ¶¶ 10–11.) These allegations and declarations amount to more than indefinite "some day intentions" to participate at the Institute.[8] *See Lujan*, 504 U.S. at 564. Rather, they

[8] Plaintiffs' declarations were originally submitted in connection with their preliminary injunction motion. The Second Circuit permits courts to "refer to evidence outside the pleadings" when resolving a Rule 12(b)(1) motion. *See Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000); *Cortlandt St. Recovery Corp. v. Hellas Telecomms., S.À.R.L.*, 790 F.3d 411, 417 (2d Cir. 2015). Indeed, where "jurisdictional facts are placed in dispute," a court has the

demonstrate that the Individual Plaintiffs have concrete and particularized interests in participating at the Institute and are presently unable to do so because the Challenged Laws allegedly prevent its development. *See Vill. of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 264 (1977) (holding that an individual who sought to live in a planned housing development had standing to challenge zoning laws preventing development of that housing); *ACORN v. Cnty. of Nassau*, 2006 WL 2053732, at *11 (E.D.N.Y. July 21, 2006) (allowing individual plaintiffs who sought to live in affordable housing project in defendant city to challenge zoning ordinances preventing construction of the affordable housing project).

The Court therefore concludes that the Individual Plaintiffs have sufficiently established an injury in fact.[9]

* * *

For these reasons, the Court concludes that Plaintiffs lack standing to pursue their facial challenges because their alleged injuries depend on the Challenged Laws' application to Tartikov's particular proposed use of the Subject Property. Plaintiffs have, however, adequately established standing to pursue their as-applied challenges to the Challenged Laws, and those challenges are sufficiently final and ripe for judicial review.

## II. Federal and State Equal Protection and RLUIPA Nondiscrimination Claims

"power and obligation to decide issues of fact by reference to evidence outside the pleadings, such as affidavits." *Tandon v. Captain's Cove Marina of Bridgeport, Inc.*, 752 F.3d 239, 243 (2d Cir. 2014) (internal quotation marks omitted); *LeBlanc v. Cleveland*, 198 F.3d 353, 356 (2d Cir. 1999). The Court therefore may consider Plaintiffs' declarations in resolving Defendants' challenge to the Individual Plaintiffs' standing.

[9] Plaintiffs alternatively advance two standing arguments relying on RLUIPA and the FHA, as well as an alternative theory based on stigmatic injury. (Pls.' Opp. at 7–8.) The Court need not address these arguments, however. First, neither RLUIPA nor the FHA alters Article III's standing requirements. Article III standing remains a prerequisite to the exercise of federal jurisdiction. Second, Defendants do not challenge Plaintiffs' statutory standing under either RLUIPA or the FHA. (Defs.' Mem. at 11–13.) Finally, the Court has already concluded that Plaintiffs satisfy Article III's standing requirements, at least with respect to their as-applied challenges.

Having determined that Plaintiffs have standing to pursue their as-applied challenges to the Challenged Laws, the Court now addresses the merits of Defendants' dismissal arguments. Defendants first argue that Plaintiffs fail to state claims under the federal and state Equal Protection Clauses and RLUIPA's nondiscrimination provision because the SAC does not plausibly allege intentional discrimination in Defendants' application of the Challenged Laws. (Defs.' Mem. at 13–14; Defs.' Reply at 5–7.)

The Equal Protection Clause "is essentially a direction that all persons similarly situated should be treated alike." *Brown v. City of Syracuse*, 673 F.3d 141, 151 (2d Cir. 2012). A plaintiff may pursue an equal protection claim where a government actor purposefully discriminated against a suspect class, *see Giano v. Senkowski*, 54 F.3d 1050, 1057 (2d Cir. 1995), such as a racial group, *Pyke v. Cuomo*, 567 F.3d 74, 77 (2d Cir. 2009) (per curiam), or a religion, *see Pedersen v. Office of Personnel Mgmt.*, 881 F. Supp. 2d 294, 309–10 (D. Conn. 2012) ("[C]ourts apply the most searching constitutional scrutiny to those laws that burden a fundamental right or target a suspect class, such as those based on race, national origin, sex or religion." (alteration in original) (internal quotation marks omitted)). RLUIPA's nondiscrimination provision similarly provides that "[n]o government shall impose or implement a land use regulation that discriminates against any assembly or institution on the basis of religion or religious denomination." 42 U.S.C. § 2000cc(b)(2). Plaintiffs' intentional discrimination claims arise under the federal Equal Protection Clause, RLUIPA's nondiscrimination provision, and the New York Equal Protection Clause. (SAC ¶¶ 311–18, 327–28, 399–400.) These claims may be analyzed together under the federal Equal Protection framework. *See Tartikov IV*, 945 F.3d at 110 n.211 ("The equal protection guarantees under the New York Constitution are coextensive with those under the U.S. Constitution."); *id.*

("RLUIPA's nondiscrimination provision codifies the equal protection guarantees of the Fourteenth Amendment.").

The Second Circuit recognizes "three types of equal protection violations: (1) a facially discriminatory law; (2) a facially neutral statute that was adopted with a discriminatory intent and applied with a discriminatory effect . . .; and (3) a facially neutral law that is enforced in a discriminatory manner." *Chabad Lubavitch of Litchfield Cnty., Inc. v. Litchfield Historic Dist. Comm'n*, 768 F.3d 183, 199 (2d Cir. 2014). In the First Action, the Second Circuit observed that "Tartikov focused, and the district court based its holding, on the second theory." *Tartikov IV*, 945 F.3d at 111. That is no longer the case. Plaintiffs now pursue the third theory—arguing that the Challenged Laws are facially neutral but are being enforced in a discriminatory manner.[10] (SAC ¶¶ 245–98; Pls.' Opp. at 13.) In determining whether a facially neutral statute was enforced in a discriminatory manner, courts examine "direct and circumstantial evidence of discriminatory intent." *Chabad*, 768 F.3d at 199 (citing *Southside Fair Hous. Comm. v. City of New York*, 928 F.2d 1336, 1354 (2d Cir. 1991); *Arlington Heights,* 429 U.S. at 266).

Defendants argue, in relevant part, that Plaintiffs' intentional discrimination claims fail because they do not identify a "comparator" consisting of other similarly situated prospective educational institutions that were permitted to operate without satisfying the Accreditation and Dormitory Laws. (Defs.' Reply at 6.) That is incorrect. Identifying a similarly situated comparator is only one means of pleading intentional discrimination. Plaintiffs "*can* assert that they were treated differently than an identifiable, similarly situated group of individuals for malicious

[10] The Court rejects Defendants' contention that the Second Circuit's decision in *Tartikov IV* is dispositive of Plaintiffs' equal protection claims. (Defs.' Mem. at 13–14.) The Second Circuit observed that "Tartikov focused, and the district court based its holding, on the second theory." *Tartikov IV*, 945 F.3d at 111. As explained above, that is no longer the case. The Court must instead consider whether Defendants enforced the Challenged Laws against the Subject Property in a discriminatory manner. Most of Defendants' arguments in their opening motion papers thus provide no basis to dismiss Plaintiffs' equal protection claims.

reasons, including but not limited to racial prejudice." *Elliott v. City of New York*, 723 F. Supp. 3d 249, 263 (S.D.N.Y. 2024) (emphasis added) (citing *LeClair v. Saunders*, 627 F.2d 606 (2d Cir. 1980)). But that does not mean Plaintiffs *must* identify a similarly situated comparator. To the contrary, where a plaintiff alleges that a facially neutral law is being enforced in a discriminatory manner, the plaintiff need not "show a better treated, similarly situated group of individuals of a different race." *Pyke v. Cuomo*, 258 F.3d 107, 110 (2d Cir. 2001); *see also Doe v. Vill. of Mamaroneck*, 462 F. Supp. 2d 520, 543 (S.D.N.Y. 2006) ("[P]laintiffs are not obligated to identify a better treated, similarly situated group of individuals of a different race in order to establish a claim of denial of equal protection."). A similarly-situated-group requirement is unnecessary "because the [defendant's] differential treatment of the target group [can] otherwise be clearly demonstrated." *Elliott*, 723 F. Supp. 3d at 264. Indeed, the Court may consider a "multitude of factors, including the series of events leading up to a land use decision, the context in which the decision was made, whether the decision or decisionmaking process departed from established norms, statements made by the decisionmaking body and community members, reports issued by the decisionmaking body, whether a discriminatory impact was foreseeable, and whether less discriminatory avenues were available." *Chabad*, 768 F.3d at 199 (citation omitted).

Applying this framework, the Court concludes that Plaintiffs plausibly allege that Defendants enforced the Challenged Laws with discriminatory intent. Following the First Action, Tartikov initially submitted a text-amendment petition to the Village Board seeking amendment of the Challenged Laws. (SAC, Prayer for Relief ¶ A.7.) The Village Board refused to consider the petition. (*Id.*) Tartikov subsequently submitted a request for interpretation on January 7, 2021, seeking a determination as to whether the Village would permit the construction of a non-accredited rabbinical institute with student-family housing. (SAC ¶ 75.) Zummo declined to

respond to Tartikov's request, and the ZBA thereafter declined to consider Tartikov's appeal from Zummo's refusal. (*Id.* ¶¶ 76–78.) Tartikov then submitted an additional text-amendment petition on March 11, 2021, this time seeking to repeal the specific portions of the Challenged Laws preventing Tartikov from constructing the Institute. (*Id.* ¶¶ 79–81.) The Village Board again declined to consider Tartikov's petition. (*Id.* ¶ 81.)

Plaintiffs allege similar irregularities with respect to Tartikov's October 2023 applications, which consisted of: (1) a special-use permit application; (2) a site plan application; (3) an application for use variances; and (4) a zone change petition seeking creation of a Special Institutional Education Zoning District. (*Id.* ¶ 82, Exs. A–D.) None of Tartikov's applications were placed on the Village Board's, Planning Board's, or ZBA's November 2023 agendas. (*Id.* ¶ 90.) Nor did any of the three Boards make the preliminary environmental determinations required under SEQRA. (*Id.* ¶ 91.) Nearly two months later, Zummo instead required Tartikov to resubmit its EAFs. (*Id.* ¶¶ 92–93.) The Village Board later declined to consider Tartikov's zone change petition, despite being advised that it had discretion to do so. (*Id.* ¶¶ 105–06.) More than five months after Tartikov submitted its applications, Zummo denied the special-use permit and site plan applications because the Institute was not accredited. (*Id.* ¶¶ 107–09.)

The irregularities continued when Plaintiffs sought relief from the ZBA. After the disposition of its four October 2023 applications, Tartikov submitted three matters to the ZBA in April 2024: (1) an application seeking use variances permitting operation of a non-accredited rabbinical institute and student-family housing; (2) an appeal from Zummo's denial of the special-use permit application; and (3) an appeal from Zummo's denial of the site plan application. (*Id.* ¶ 111, Exs. E–G.) Although Tartikov submitted its ZBA applications before the advertised deadline for the May 2024 meeting, the ZBA postponed their consideration until June, purportedly because

two previously received applications were already scheduled for May. (*Id.* ¶¶ 112–17.) Notwithstanding the ZBA's explanation, those same two applications subsequently appeared alongside Tartikov's applications on the June 2024 agenda. (*Id.* ¶¶ 118–19.) The ZBA then elected to segment its review and initially consider only the Accreditation Law, despite its attorney's acknowledgment that SEQRA regulations and New York law disfavor segmentation. (*Id.* ¶¶ 126–28.) Plaintiffs further allege that the ZBA waited until Tartikov's third appearance to inquire about accreditation, requested materials already contained in the record, scheduled a meeting during certain Jewish holidays when Tartikov could not attend, and repeatedly failed to complete its environmental review within the required or previously announced timeframes. (*Id.* ¶¶ 158–62, 172–77.)

The circumstances surrounding the ZBA's reliance on the Accreditation Law further support Plaintiffs' claims. Plaintiffs allege that Tartikov repeatedly explained that the Institute cannot be constructed because the New York State Education Department no longer provides institutional accreditation. (*Id.* ¶¶ 148–49.) Plaintiffs further allege that Tartikov explained to the ZBA that it cannot obtain accreditation through private means because AARTS requires a rabbinical institute to be operational before it can obtain accreditation, leaving Tartikov unable to obtain accreditation without first operating and unable to operate in the Village without first obtaining accreditation. (*Id.* ¶¶ 148–49, 166–69.) Rather than address this alleged "Catch-22," the ZBA chairperson suggested that Tartikov rent a facility outside the Village, operate there until it obtained accreditation, and then return to the Village. (*Id.* ¶¶ 150–52, 170–71.) The ZBA subsequently denied Tartikov's variance application because Tartikov had not sufficiently established that it could not become accredited. (*Id.* ¶ 194.) It did so despite the Rockland County Department of Planning's conclusion that lack of accreditation, standing alone, presented no

significant land-use impacts and its lack of objection to the requested variance, as well as the Village's own environmental review finding no significant adverse environmental impacts from the proposed project. (*Id.* ¶¶ 191–94.)

Additional irregularities arose from the ZBA's treatment of Tartikov's requested variance from the Dormitory Law. Tartikov's April 2024 ZBA application expressly sought a use variance permitting both the operation of a non-accredited rabbinical institute and student-family housing. (*Id.* ¶ 111, Ex. E.) Yet the ZBA elected to segment its review and consider only accreditation, over Tartikov's objection. (*Id.* ¶¶ 126–28.) The ZBA ultimately declined to consider Tartikov's requested variance for student-family housing, reasoning that, without a permissible primary use, the proposed housing could not be considered. (*Id.* ¶¶ 203–06.) Thus, despite Tartikov's repeated efforts to obtain permission for student-family housing, Defendants effectively conditioned consideration of that request on Tartikov first overcoming the Accreditation Law—the same requirement that Plaintiffs allege Tartikov cannot satisfy without first operating its rabbinical institute. (*Id.* ¶¶ 148–49, 166–69.) These procedural irregularities and alleged delays further support an inference that Defendants acted with discriminatory intent. *See Lubavitch of Old Westbury, Inc. v. Inc. Vill. of Old Westbury, New York*, 2023 WL 9058143, at *16 (E.D.N.Y. Dec. 18, 2023) ("Defendants' allegedly unfair and repetitive procedures inflicted a death by a thousand cuts which motivate[d] the Court to consider the entirety of the government entity's conduct, not just a slice of it.") (internal quotations omitted), *report and recommendation adopted in part*, 2024 WL 656516 (E.D.N.Y. Feb. 16, 2024).

Nor do these alleged irregularities stand alone. The SAC also provides factual allegations supporting an inference that the treatment of Tartikov's applications occurred against a backdrop of hostility toward Orthodox and Hasidic Jews. For instance, during the ZBA proceedings,

Plaintiffs allege that members of the public opposed Tartikov's variance application by stating, among other things, that "we do not want more segregated schools in the town" and that the Village should not "keep approving segregated schools," which purportedly referred to all-Jewish schools. (*Id*. ¶ 133.) More significantly, Zummo is alleged to have obstructed permits sought by Orthodox and Hasidic Jews and made repeated derogatory statements about members of those communities. (*Id*. ¶¶ 262–87.) These allegations are not, as Defendants contend, merely generalized allegations of historical hostility untethered to the Village's rejection of Tartikov's applications. (Defs.' Reply at 6–7.) Although the Second Circuit in *Tartikov IV* ultimately reversed in part Judge Karas's judgment in *Tartikov III*, it nevertheless recognized evidence of statements "indicative of [the Village's] prejudice against Tartikov and Orthodox/Hasidic Jews" and statements by community members "express[ing] animus against Orthodox/Hasidic Jews." 945 F.3d at 120. Indeed, the Second Circuit recounted statements from elected Village officials campaigning on "a promise to stand up to the threat posed by [Tartikov's] huge development that will include housing for thousands of adult students and their families" that would "have real environmental and safety problems." *Id*. at 106. The Second Circuit also recounted statements that members of the Hasidic community "break[ ] every law there is" and that Tartikov was "in the wrong town, and the wrong [V]illage." *Id*. at 120–21. The allegations concerning Zummo are also similar to evidence previously found sufficient to permit an inference of discriminatory intent in litigation involving the Village. *See Indig v. Vill. of Pomona*, 2024 WL 4008231, at *15 (S.D.N.Y. Aug. 30, 2024) ("Considering the discriminatory comments made by Zummo . . . about the . . . Orthodox Jews in the Village generally, a reasonable jury could conclude that Defendants' stated reasons for their actions were merely pretext for discrimination"). As explained above, Tartikov has now invoked the Village's land-use procedures, and Plaintiffs' present claims challenge Defendants' application

of the Challenged Laws to the Institute. (*See supra* Section I.B.) The Court can thus consider these allegations of hostility as part of the circumstances bearing on whether Defendants enforced the Challenged Laws against Tartikov in a discriminatory manner. *See Chabad*, 768 F.3d at 199.

At this early stage, Plaintiffs' allegations of repeated procedural irregularities, the circumstances surrounding Defendants' application of the Challenged Laws, and alleged anti-Hasidic animus among Village officials and community members plausibly support an inference that Defendants applied the Challenged Laws in a discriminatory manner. The Court's conclusion is supported by precedent in this District. *See Indig*, 2024 WL 4008231, at *10 (finding an equal protection violation where defendants "slow-walked approval of [plaintiffs'] plans because they were [Hasidic] Jews" and considering whether "the same result would have been reached without consideration of their religion" (quoting *United States v. City of Yonkers*, 96 F.3d 600, 610 (2d Cir. 1996)); *Bloomingburg Jewish Educ. Ctr. v. Village of Bloomingburg*, 111 F. Supp. 3d 459, 469, 487 (S.D.N.Y. 2015) (holding plaintiffs sufficiently alleged discriminatory animus against members of Board of Trustees who were "alleged to have been anti-Hasidic" and with support from an advocacy organization intent on "blocking Hasidic Jews" from moving into the village); *Central UTA of Monsey v. Village of Airmont*, 2020 WL 377706, at *17–18 (S.D.N.Y. Jan. 23, 2020) (finding allegations of discriminatory intent plausible where, among other things, a ZBA member specifically identified houses of worship as a reason for imposing a moratorium and the only houses of worship then contemplated for construction or renovation were Hasidic Jewish synagogues).

Defendants' Motion is therefore denied with respect to Plaintiffs' federal and state Equal Protection and RLUIPA nondiscrimination claims.

## III. RLUIPA Substantial Burden and First Amendment Free Exercise Claims

Although addressed separately, Defendants advance substantially similar arguments for dismissal of Plaintiffs' RLUIPA substantial burden and First Amendment Free Exercise claims. (Defs.' Mem. at 15–19.) RLUIPA's substantial burden requirement, moreover, was intended to incorporate principles from First Amendment Free Exercise jurisprudence. *See Westchester Day Sch. v. Vill. of Mamaroneck*, 504 F.3d 338, 348 (2d Cir. 2007) ("RLUIPA's legislative history indicates that Congress intended the term substantial burden to be interpreted 'by reference to Supreme Court [free exercise] jurisprudence.'") (quoting 146 Cong. Rec. S7774, S7776 (2000)); *Murphy*, 402 F.3d at 350 (noting that Congress intended RLUIPA to be a codification of "existing Free Exercise jurisprudence"); *Chabad*, 768 F.3d at 198 ("RLUIPA, after all, codified 'existing Free Exercise . . . rights against states and municipalities' that discriminated against religious land use.") (citation omitted). The Court thus considers these claims together.

RLUIPA's substantial burden provision prohibits state actors from "impos[ing] or implement[ing] a land use regulation in a manner that imposes a substantial burden on the religious exercise of a person, including a religious assembly or institution," unless the government satisfies strict scrutiny. 42 U.S.C. § 2000cc(a)(1). "A substantial burden exists where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Newdow v. Peterson*, 753 F.3d 105, 109 (2d Cir. 2014) (internal quotations and citation omitted). Where the government's "actions are arbitrary, capricious, unlawful, or taken in bad faith, a substantial burden may be imposed because it appears that the applicant may have been discriminated against on the basis of its status as a religious institution." *Fortress Bible Church v. Feiner*, 694 F.3d 208, 219 (2d Cir. 2012). In the context of zoning laws, "courts have held that zoning schemes which impose conditions on the use of the property, such as limitations on the size of the facilities to be used by the religious institution, can impose a substantial burden." *Tartikov I*, 915 F. Supp. 2d at 631–

32 (collecting cases). Courts have also "found religious institutions have satisfied the substantial burden requirement by alleging or proving that a municipality's zoning scheme imposes significant delay, uncertainty, and expense." *Id*. at 632 (collecting cases).

The First Amendment similarly "prohibits the enactment of any law prohibiting the free exercise of religion." *Bronx Household of Faith v. Cmty. Sch. Dist. No. 10*, 127 F.3d 207, 215 (2d Cir. 1997). "At a minimum, the protections of the Free Exercise Clause pertain if the law at issue discriminates against some or all religious beliefs or regulates or prohibits conduct because it is undertaken for religious reasons." *Commack Self-Serv. Kosher Meats, Inc. v. Hooker*, 680 F.3d 194, 210 (2d Cir. 2012) (citation omitted). The First Amendment, along those lines, "prohibits government actions that substantially burden the exercise of sincerely held religious beliefs unless those actions are narrowly tailored to advance a compelling government interest." *Fortress Bible Church*, 694 F.3d at 220 (quoting *Fifth Ave. Presbyterian Church v. City of New York,* 293 F.3d 570, 574 (2d Cir. 2002)). "In other words, such actions are subject to strict scrutiny by reviewing courts." *Id*. Where the government "seeks to enforce a law that is neutral and of general applicability," however, "then it need only demonstrate a rational basis for its enforcement, even if enforcement of the law incidentally burdens religious practices." *Fifth Ave. Presbyterian Church*, 293 F.3d at 574.

As a preliminary matter, the Court rejects Defendants' argument that Plaintiffs' RLUIPA claims do not squarely fall within RLUIPA's substantial burden provision. (Defs.' Mem. at 16.) A plaintiff may bring a RLUIPA substantial burden claim where: (1) "the substantial burden is imposed in a program or activity that receives Federal financial assistance"; (2) "the substantial burden affects, or removal of that substantial burden would affect, commerce"; or (3) "the substantial burden is imposed in the implementation of a land use regulation or system of land use

regulations, under which a government makes, or has in place formal or informal procedures or practices that permit the government to make, individualized assessments of the proposed uses for the property involved." 42 U.S.C. § 2000cc(a)(2). The SAC makes clear that Plaintiffs invoke the second and third provisions because they assert that the alleged substantial burden affects interstate commerce and was imposed through a system involving individualized assessments of proposed property uses. (SAC ¶¶ 290–91, 325–26.)

The Court also rejects Defendants' reliance on the Second Circuit's decision in *Tartikov IV*. (Defs.' Mem. at 18.) There, the Second Circuit determined that the federal courts lacked jurisdiction over Plaintiffs' RLUIPA substantial burden and free exercise claims because "Tartikov . . . never submitted a formal proposal for the building project, applied for a permit, or engaged in any other conduct that would implicate or invoke the operation of the challenged zoning laws." *Tartikov IV*, 945 F.3d at 110. That is no longer the case, however. As explained above, Tartikov submitted four land-use applications in October 2023, including special-use permit, site plan, use variance, and zone change applications. (SAC ¶ 82, Exs. A–D.) Tartikov subsequently submitted three applications to the ZBA in April 2024 seeking use variances and appealing the denials of its special-use permit and site plan applications. (*Id.* ¶ 111, Exs. E–G.) Those applications were ultimately denied. (*Id.* ¶¶ 194, 203–06.) In particular, the ZBA denied Tartikov's request for a variance permitting it to operate a non-accredited rabbinical institute and declined to consider its requested variance for student-family housing. (*Id.* ¶¶ 194, 203–06.) The factual allegations presented in the SAC are readily distinguishable from those before the Second Circuit in *Tartikov IV* because Tartikov has now invoked the operation of the Challenged Laws. (*See supra* Section I.B.)

The Court concludes that Plaintiffs have plausibly alleged that Defendants' application of the Challenged Laws imposes a substantial burden on their religious exercise. Beginning with the Accreditation Law, Plaintiffs allege that Tartikov cannot obtain accreditation from the State of New York or AARTS, the only recognized accrediting agency available to Tartikov. (SAC ¶¶ 45–46.) The State of New York no longer serves as an institutional accrediting agency. (*Id.* ¶ 44.) For Tartikov to obtain accreditation from AARTS, it must be operational for at least two years. (*Id.* ¶ 46.) But Tartikov cannot operate the Institute in the Village unless it is accredited. (*Id.* ¶ 48.) Notwithstanding Defendants' contention that "20 years [have passed] since Plaintiffs made even the barest effort at obtaining accreditation," (Defs.' Mem. at 19), Tartikov submitted special-use permit and site plan applications expressly seeking permission to "construct, develop and operate a non-accredited rabbinical institute with adult student housing," consisting of an educational building and 255 student and faculty housing units. (*See* SAC ¶ 82, Exs. A–B.) After those applications were denied, Tartikov sought a use variance from the Accreditation Law, but the ZBA denied that application as well. (*Id.* ¶¶ 194, 203–06, Ex. E.) The ZBA chairperson's suggestion that Tartikov operate at a rented property outside the Village does not cure Plaintiffs' dilemma. (*Id.* ¶¶ 150–52.) The Second Circuit has explained that, in determining whether a land-use decision imposes a substantial burden, courts consider whether there are "quick, reliable, and financially feasible alternatives" available to the religious institution. *Westchester Day Sch.*, 504 F.3d at 352. Indeed, "[w]hen the school has no ready alternatives, or where the alternatives require substantial 'delay, uncertainty, and expense,' a complete denial of the school's application might be indicative of a substantial burden." *Id.* at 349 (citation omitted). Here, Plaintiffs expressly allege that the ZBA's proposed alternative would impose "undue delay, expense and uncertainty" because Tartikov would be required to procure another large parcel and construct an interim school with

family housing, or locate an existing facility capable of satisfying the religious requirements of the Institute. (SAC ¶¶ 151–52.)

The Court reaches the same conclusion concerning the Dormitory Law. Plaintiffs allege that the Institute requires a Torah community, which in turn requires prospective students to reside with their families. (*Id.* ¶¶ 35–38.) Yet the Dormitory Law prohibits the very housing necessary to accommodate Tartikov's Torah community by excluding single-family, two-family, and multifamily dwelling units from the definition of a dormitory and prohibiting separate cooking, dining, or housekeeping facilities. (*Id.* ¶¶ 53–54.) These allegations plausibly establish more than a "minimal impact on religious exercise" and a "close nexus" between the Dormitory Law and Tartikov's inability to establish the Torah community required for the Institute. *See Fortress Bible Church*, 694 F.3d at 219; *see also Roman Cath. Diocese of Rockville Ctr., N.Y. v. Inc. Vill. of Old Westbury*, 2012 WL 1392365, at *9 (E.D.N.Y. Apr. 23, 2012) (holding that defendant's zoning conditions, including its set-back requirement, imposed a substantial burden, because they, inter alia, limited the amount of the land available for religious burial purposes); *Cathedral Church of the Intercessor v. Inc. Village of Malverne*, 2006 WL 572855, at *8 (E.D.N.Y. Mar. 6, 2006) (finding plaintiff adequately alleged substantial burden, where space limits imposed by defendants "constrained" the ability of the church's parishioners to "observe or participate" in religious services).

The Court also rejects Defendants' argument that rational-basis applies to Plaintiffs' free exercise claims. (Defs.' Mem. at 15.) Although the Challenged Laws do not discriminate against religious exercise on their face, "[f]acial neutrality is not determinative" because the Free Exercise Clause prohibits "[o]fficial action that targets religious conduct for distinctive treatment." *Cent. Rabbinical Cong. of U.S. & Canada v. New York City Dep't of Health & Mental Hygiene*, 763 F.3d

183, 194 (2d Cir. 2014). Here, Plaintiffs allege that Tartikov's land-use and variance applications were denied or declined for consideration. (SAC ¶¶ 104–09, 194, 203–06.) And Plaintiffs allege that, in considering those applications, the Village subjected Tartikov to numerous procedural irregularities, as detailed above. (*See supra* Section II.) Taken together, these allegations plausibly support an inference that Defendants targeted Tartikov's proposed religious use for distinctive treatment. *See Fortress Bible Church*, 694 F.3d at 220. The Court also need not determine whether Defendants' application of the Challenged Laws survives strict scrutiny at this early stage. *See Cent. UTA of Monsey*, 2020 WL 377706, at *16 ("[A] plaintiff need only allege a *prima facie* violation; an analysis of whether the government has shown a compelling government interest or the use of least restrictive means is more appropriately addressed in connection with summary judgment.").

Defendants' Motion is therefore denied with respect to Plaintiffs' RLUIPA substantial burden claim and First Amendment Free Exercise Clause claim.

## IV. Freedom of Speech and Association Claims

Defendants next move to dismiss Plaintiffs' First Amendment Freedom of Speech and Association claims. (Defs.' Mem. at 20–21.) Defendants argue that their application of the Accreditation Law does not implicate the First Amendment because the law only requires that Tartikov be accredited before operating and, in any event, is content neutral because it applies equally to all schools in the Village. (*Id*. at 21.) Because both claims rest on substantially similar allegations, the Court addresses them collectively.

The First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech." U.S. Const. amend. I. Constitutionally protected speech includes, among other things, certain symbolic speech and expressive conduct. *See Rumsfeld v. F. for Acad. & Instit. Rts., Inc.*,

547 U.S. 47, 66–69 (2006). The level of scrutiny applicable to a restriction on protected speech depends, in part, on whether the restriction is content based or content neutral. *See Mastrovincenzo v. City of New York*, 435 F.3d 78, 98 (2d Cir. 2006); *see also Universal City Studios, Inc. v. Corley*, 273 F.3d 429, 450 (2d Cir. 2001) (recognizing two different types of regulations—content-based regulations, which receive strict scrutiny, and content-neutral regulations, which receive intermediate scrutiny). Regulations are content-based if the claimed reason for the restriction is itself content based. *Boos v. Barry*, 485 U.S. 312, 320–21 (1988) (holding that regulations "that focus on the direct impact of speech on its audience" are viewed as content-based restrictions); *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 48 (1986) (holding that a regulation justified by the secondary effects that adult theatres have on the surrounding community was content neutral). Regulations are content-neutral, in this relevant context, if they limit the time, place, or manner of protected expression. *See Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011) (articulating the standard for content-neutral regulations).

Under strict scrutiny, a content-based regulation may be upheld only if it serves a "compelling" government interest, "is necessary to serve the asserted [compelling] interest," *R.A.V. v. City of St. Paul*, 505 U.S. 377, 395 (1992) (alteration and emphasis in original) (internal quotation marks omitted), is precisely tailored to serve that interest, and is the least restrictive means available for that purpose. *See Ashcroft v. Am. Civil Liberties Union*, 542 U.S. 656, 666 (2004); *Boos*, 485 U.S. at 321. Content-neutral restrictions, on the other hand, invite intermediate scrutiny. *Mastrovincenzo*, 435 F.3d at 98. Under this less stringent test, a content-neutral regulation will be upheld if it is narrowly tailored to serve a significant government interest and allows for alternative channels for communication. *See Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Clark v. Cmty. for Creative Non-Violence*, 468 U.S. 288, 293 (1984); *Deegan v.*

*City of Ithaca*, 444 F.3d 135, 142 (2d Cir. 2006). To be narrowly tailored, a content-neutral regulation need not be the least restrictive or least intrusive means of achieving the asserted government interest. *See Ward*, 491 U.S. at 798 n.6 (noting that the least-restrictive-means test is "wholly out of place" in reviewing a content-neutral regulation).

Defendants appear to challenge only the Accreditation Law. Neither Defendants' opening nor reply papers advance arguments concerning the Dormitory Law. (Defs.' Mem. at 20–21; Defs.' Reply at 9–10.) Specifically, Defendants argue that the Accreditation Law is content-neutral because it applies equally to all schools in the Village. (Defs.' Mem. at 21.) Defendants also argue that the Accreditation Law only requires Tartikov to obtain accreditation. (*Id.*) Defendants' arguments largely rehash those advanced at the pleading stage in *Tartikov I*. There, Defendants argued, in relevant part, that "the only possible effect of the ordinances is to limit Plaintiffs' construction of a rabbinical college, which Defendants assert is conduct that is not expressive." *See Tartikov I*, 915 F. Supp. 2d 574, 624 (S.D.N.Y. 2013). Judge Karas found that argument unpersuasive, explaining that Plaintiffs alleged that Tartikov desired to "construct and operate a rabbinical [institute] to foster the expression of certain ideas among and between faculty members and students" and that the proposed institute would "involve [expressive] Orthodox teachings and principles." *Id.* at 625. Plaintiffs make substantially similar allegations here. (SAC ¶¶ 17–22, 29, 32–38.)

The Court recognizes that Judge Karas indicated that Plaintiffs "barely [ ] pled enough facts to establish that the rabbinical college would engage in and foster expressive conduct," and cautioned that "after the record is filled with evidence, or the lack of it becomes glaring, Plaintiffs will not be able to substantiate their pleadings." *Id.* at 625–26. Indeed, following discovery, Judge Karas granted summary judgment on Plaintiffs' Free Speech claims. *See Congregation Rabbinical*

*Coll. of Tartikov, Inc. v. Vill. of Pomona ("Tartikov II")*, 138 F. Supp. 3d 352, 429 (S.D.N.Y. 2015). That later determination was based on the evidentiary record developed at summary judgment and does not undermine Plaintiffs' allegations at the pleading stage. For much the same reason, the Court need not resolve at this stage whether the Accreditation Law is subject to strict or intermediate scrutiny because "[t]hose are topics for another day." *Tartikov I*, 915 F. Supp. 2d at 626.

As explained above, Plaintiffs allege that Tartikov desires to develop a rabbinical institute where students would study and master Jewish law to become qualified *dayanim* while living and learning among fellow students and teachers in a Torah community. (SAC ¶¶ 17–22, 29, 32–38.) These allegations plausibly allege that the Institute would foster protected expression and that Defendants burdened that expression through their application of the Accreditation Law. *See Lubavitch of Old Westbury*, 2023 WL 9058143, at *9 (recommending denial of village defendant's motion to dismiss where plaintiffs allege that the "proposed development in [the Village] is not 'purely functional' in that it would foster the expression of Orthodox Jewish beliefs and ideas among potential congregants"); *Chabad Lubavitch v. Borough of Litchfield*, 796 F. Supp. 2d 333, 345 (D. Conn. 2011) (denying motion to dismiss Free Speech claim where defendants "acted with the intent to interfere with the Chabad's religious speech" in trying to prevent the religious plaintiffs from developing and using their property as a place of worship), *aff'd in part, vacated in part, remanded sub nom.*, 768 F.3d 183 (2d Cir. 2014).

The same conclusion applies to Plaintiffs' freedom of association claims. Under the First Amendment, there are two types of "freedom of association" that merit constitutional protection: (1) the choice to enter into and maintain intimate human relationships, and (2) association for the purpose of engaging in activities protected by the First Amendment. *See Lubavitch of Old*

*Westbury*, 2023 WL 9058143, at *9 (citing *Sanitation & Recycling Indus., Inc. v. City of New York*, 107 F.3d 985, 995–96 (2d Cir. 1997)). Plaintiffs' claims implicate the latter. (SAC ¶¶ 307–10.) Because the Court has already determined that Plaintiffs sufficiently allege that the Accreditation Law burdens protected speech, Plaintiffs have also plausibly alleged that the Accreditation Law burdens their ability to associate for the purpose of engaging in that protected activity. *See, e.g.*, *Lubavitch of Old Westbury*, 2023 WL 9058143, at *9 (concluding that because "the Court already found that Plaintiffs sufficiently allege that . . . Defendant's actions implicate a Free Speech right, the Court similarly finds that Plaintiffs have adequately pled a Freedom of Expressive Association claim"); *Chabad Lubavitch*, 796 F. Supp. 2d at 345 (denying motion to dismiss Free Association claim because defendants had "intent to interfere" with the Chabad's "religious speech and expressive association"); *see also Tabbaa v. Chertoff*, 509 F.3d 89, 101 (2d Cir. 2007) ("[I]mplicit in the right to engage in activities protected by the First Amendment [is] a corresponding right to associate with others in pursuit of a wide variety of political, social, economic, educational, religious, and cultural ends." (quoting *Roberts v. U.S. Jaycees*, 468 U.S. 609, 622 (1984)).

Defendants' Motion is therefore denied with respect to Plaintiffs' First Amendment Free Speech and Association claims.

## V. FHA Claims

Plaintiffs assert four distinct FHA claims: (1) disparate impact under 42 U.S.C. § 3604(a) and (b); (2) religious discrimination under 42 U.S.C. § 3604; (3) familial status discrimination under 42 U.S.C. § 3604; and (4) interference and retaliation under 42 U.S.C. § 3617. (SAC ¶¶ 329–53.) Because these claims present distinct theories of liability and require separate analyses, the Court addresses each in turn.

**A. Disparate Impact**

The Court begins with Plaintiffs' disparate impact claim. Defendants primarily focus on the Accreditation Law—arguing that the Second Circuit's decision in *Tartikov IV* is dispositive of Plaintiffs' disparate impact claim. (Defs.' Mem. at 14.) That is incorrect for two reasons. First, the Second Circuit's decision in *Tartikov IV* arose from a materially different procedural posture involving a developed evidentiary record. *See* 945 F.3d at 89 (rendering decision based on a "careful consideration of the extensive record" presented "after a bench trial"). That is not the case here. The Court is only addressing the SAC's allegations. No evidence has been admitted into the record at this juncture. Second, Defendants misinterpret Plaintiffs' disparate impact claim. Specifically, Plaintiffs' claim focuses on the Dormitory Law—not the Accreditation Law. (SAC ¶¶ 329–34; Pls.' Opp. at 15.) Although Defendants address the Dormitory Law in their reply papers, as discussed in more detail below, they largely rely on arguments concerning the evidentiary showing required to establish a disparate impact claim on a developed record. (Defs.' Reply at 7.) The Court thus proceeds to consider Plaintiffs' disparate impact claim as pleaded.

The FHA provides that "it shall be unlawful . . . [t]o refuse to sell or rent after the making of a bona fide offer, or to refuse to negotiate for the sale or rental of, or otherwise make unavailable or deny, a dwelling to any person because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(a). The U.S. Department of Housing and Urban Development's regulations, moreover, define what it means "to otherwise make unavailable or deny" a dwelling as including conduct that is "[d]iscouraging any person from inspecting, purchasing or renting a dwelling," 24 C.F.R. § 100.70(c)(1), or "[d]enying or delaying the processing of an application made by a purchaser," *id.* § 100.70(d)(3). The FHA similarly prohibits discrimination "against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision

of services or facilities in connection therewith, because of race, color, religion, sex, familial status, or national origin." 42 U.S.C. § 3604(b).

The Second Circuit has prescribed a burden-shifting test when analyzing a plaintiff's disparate impact claim. Under this test, a plaintiff must first establish a *prima facie* case by showing, "(1) the occurrence of certain outwardly neutral practices, and (2) a significantly adverse or disproportionate impact on persons of a particular type produced by the defendant's facially neutral acts or practices." *Mhany Mgmt., Inc. v. Cnty. of Nassau*, 819 F.3d 581, 617 (2d Cir. 2016) (citation omitted). A policy has a "discriminatory effect" when, although it was "adopted for neutral reasons[,] [it] has a discriminatory impact on the availability of housing for [a protected group] or the terms and conditions on which the housing is offered." *Hous. Rts. Initiative v. Compass, Inc.*, 2023 WL 1993696, at *21 (S.D.N.Y. Feb. 14, 2023) (quoting *Hack v. President & Fellows of Yale College*, 237 F.3d 81, 88 (2d Cir. 2000)). Once a plaintiff has presented a *prima facie* case of disparate impact, "the burden shifts to the defendant to 'prov[e] that the challenged practice is necessary to achieve one or more substantial, legitimate, nondiscriminatory interests.'" *Id*. (citing *Texas Dep't of Hous. & Cmty. Affs. v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 527 (2015)). If the defendant meets its burden, "the burden of proof shifts back to the plaintiff to show that the 'substantial, legitimate, nondiscriminatory interests supporting the challenged practice could be served by another practice that has a less discriminatory effect.'" *Mhany*, 819 F.3d at 617.

Because the Court is addressing only the SAC's allegations, and neither party has had the opportunity to introduce evidence into the record, "it is premature for the Court to entertain an inquiry on whether any defendant could prevail on its step two burden." *Hous. Rts. Initiative*, 2023 WL 1993696, at *23; *cf. Mhany Mgmt.*, 819 F.3d at 620 (agreeing with the district court's analysis

that defendants, during a bench trial, met their step two burden having "identified legitimate, bona fide governmental interests, such as increased traffic and strain on public schools"). Likewise, whether Plaintiffs can satisfy the third step of the FHA disparate impact inquiry is more appropriately addressed after the development of an evidentiary record. *Id*. at *24; *see also Winfield v. City of New York*, 2016 WL 6208564, at *5 ("The *prima facie* case for showing discrimination is an evidentiary standard, not a pleading requirement") (citing *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 516 (2002)). At the pleadings stage, Plaintiffs "are merely required to plausibly plead disparate impact; they are not required to prove causation or disparate impact through statistical evidence at the pleading stage." *Washington v. United States Dep't of Hous. & Urb. Dev.*, 2019 WL 5694102, at *21 (E.D.N.Y. July 29, 2019) (citing *Winfield*, 2016 WL 6208564, at *6).[11]

Applying the pleading standard, the Court concludes that Plaintiffs have plausibly alleged a disparate impact claim. The Court has discussed at length Plaintiffs' allegations concerning the Dormitory Law and its effect on Tartikov's proposed student-family housing. (*See supra* Section I.B.2.) Plaintiffs describe the Dormitory Law as a facially neutral law that prohibits dormitories in the Village with separate cooking, dining, or housekeeping facilities for individual families. (SAC ¶¶ 53–54, 329–34.) Plaintiffs further allege that the Dormitory Law prohibits the student-family housing contemplated by Tartikov's proposed development and that the ZBA declined to consider Tartikov's requested variance permitting such housing. (*Id.* ¶¶ 203–206, 331–34.) These allegations are sufficient at the pleading stage to identify an outwardly neutral practice that

[11] The Court rejects Defendants' contentions that Plaintiffs are required to "prove" their FHA disparate impact claim and to provide evidentiary "comparators" at the pleading stage. (Defs.' Mem. at 14.) Defendants' two principal cases address the evidentiary showing necessary to establish a disparate impact claim on a developed record—not the allegations necessary to survive a motion to dismiss. *See Mhany Mgmt.*, 819 F.3d at 617; *Tsombanidis v. W. Haven Fire Dep't*, 352 F.3d 565, 572 (2d Cir. 2003). Defendants' reliance on *Mhany* and *Tsombanidis* does not establish that Plaintiffs must produce statistical evidence or evidentiary comparators to survive a motion to dismiss. The Court will consider whether Plaintiffs can make the requisite evidentiary showing, if applicable, at a later juncture.

allegedly makes housing unavailable within the meaning of the FHA. *See Hous. Rts. Initiative*, 2023 WL 1993696, at *26 (concluding that allegations identifying a policy that prohibited certain individuals from renting at the subject properties sufficiently pleaded an outwardly neutral practice); *Winfield*, 2016 WL 6208564, at *5–6 (finding that plaintiffs plausibly alleged an FHA disparate impact claim based on a facially neutral housing policy that allegedly perpetuated segregation).

Plaintiffs also plausibly allege that the Dormitory Law disproportionately impacts Hasidic Jews. As discussed above, Plaintiffs explain that the Institute is intended to train Hasidic Jewish men to become *dayanim*, and that its students are expected to be married men who, consistent with their religious beliefs and practices, would reside with their families on the Subject Property. (*Id.* ¶¶ 29–38, 53–67.) But the Dormitory Law prohibits the type of family housing necessary to accommodate that religious practice and therefore allegedly imposes a disproportionate burden on Hasidic Jews seeking to pursue this form of religious study. (*Id.* ¶¶ 236–44, 255, 329–35.)

The Court does recognize, however, that the SAC is devoid of specific statistics demonstrating that the Hasidic Jewish community is disproportionately impacted by the Dormitory Law. (*See generally id.*) The Court is also aware of precedent in this District dismissing a complaint in somewhat similar circumstances for failure to plausibly allege a disproportionate impact on a protected group. *See, e.g.*, *Katz v. N.Y.C. Hous. Pres. & Dev.*, 2022 WL 3156178, at *6 (S.D.N.Y. Aug. 8, 2022) (dismissing FHA disparate impact claims where plaintiffs "failed to plausibly allege that the policies have created a disproportionate effect on Orthodox Jews because they never allege that the occupancy limits have or will result in an underrepresentation of Orthodox Jews in affordable housing lotteries in New York City"). The Court acknowledges that the absence of any statistical allegations weakens Plaintiffs' disparate impact claim. But, at this

stage, Plaintiffs need not plead statistical evidence. *See Winfield*, 2016 WL 6208564, at *6 ("[A]t the pleading stage, Plaintiffs are merely required to plead plausibly disparate impact; they are not required to prove causation or disparate impact through statistical evidence."); *Jenkins v. N.Y.C. Transit Auth.*, 646 F. Supp. 2d 464, 469 (S.D.N.Y. 2009) ("It would be inappropriate to require a plaintiff to produce statistics to support her disparate impact claim before the plaintiff has had the benefit of discovery."); *Adkins v. Morgan Stanley*, 2013 WL 3835198, at *10 (S.D.N.Y. July 25, 2013) ("Plaintiffs' statistical allegations need not definitively establish causation at [the pleading] stage . . . Whether those statistics may prove insufficient at a later date is not now a question before this court.").

Although Plaintiffs will ultimately bear the burden of demonstrating that the Dormitory Law has a significantly adverse or disproportionate impact on Hasidic Jews, they need not make that evidentiary showing at this stage in the litigation. Plaintiffs' allegations concerning the particular effect of the Dormitory Law on Hasidic Jews who seek to reside with their families while pursuing religious study at Tartikov are sufficient to plausibly allege a disparate impact. (SAC ¶¶ 236–244.) Plaintiffs' allegations are further supported against the backdrop of anti-Hasidic animus in the Village. (*See supra* Section II.) The Court does, however, caution Plaintiffs that once discovery has been completed, they will be required to provide evidence demonstrating that the Dormitory Law disproportionately impacts Hasidic Jews as compared to similarly situated persons outside the protected group. *See Winfield*, 2016 WL 6208564, at *6.

Defendants' Motion is therefore denied with respect to Plaintiffs' FHA disparate impact claim.

**B. Religious and Familial Status Discrimination**

The Court next considers Plaintiffs' FHA religious and familial status claims. Plaintiffs allege that Defendants intentionally discriminated against them on the basis of their religion and familial status in connection with their efforts to obtain accreditation for the Institute and student-family housing. (SAC ¶¶ 336–45.) In other words, Plaintiffs proceed under a disparate treatment theory.[12]

In a case involving a challenge to actions taken by a municipality concerning alleged disparate treatment, "a plaintiff can establish a *prima facie* case by showing that animus against the protected group was a significant factor in the position taken by the municipal decision-makers themselves or by those to whom the decision-makers were knowingly responsive." *LeBlanc–Sternberg v. Fletcher,* 67 F.3d 412, 425 (2d Cir. 1995) (internal quotation marks and citation omitted); *see also Smith v. NYCHA*, 410 F. App'x 404, 406 (2d Cir. 2011) (summary order) (same). "If the motive is discriminatory, it is of no moment that the complained-of conduct would be permissible if taken for nondiscriminatory reasons." *LeBlanc*, 67 F.3d at 425. "Because discriminatory intent is rarely susceptible to direct proof, a district court facing a question of discriminatory intent must make a 'sensitive inquiry into such circumstantial and direct evidence of intent as may be available.'" *Mhany*, 819 F.3d at 606 (citation omitted). The existence of disparate impact on one religion is thus "an important starting point" of the discriminatory intent analysis. *Id*. Other relevant considerations for discerning discriminatory intent include: "[t]he historical background of the decision . . . particularly if it reveals a series of official actions taken for invidious purposes, [d]epartures from the normal procedural sequence, substantive departures,

---

[12] The SAC does not specify whether Plaintiffs pursue a disparate impact or disparate treatment claim concerning religious and familial status discrimination. (SAC ¶¶ 336–45.) The Court construes these claims as disparate treatment claims. Unlike Plaintiffs' disparate impact claim, which expressly alleges that the Village's facially neutral prohibition on student-family housing has a disparate impact on Hasidic Jews, (*id.* ¶¶ 329–35), Plaintiffs' FHA religious and familial status discrimination claims allege that Defendants discriminated against Plaintiffs based on religion and familial status, respectively. (*Id.* ¶¶ 336–45.)

and the legislative or administrative history . . . especially where there are contemporary statements by members of the decisionmaking body, minutes of its meetings, or reports." *Id.* (quoting *Arlington Heights*, 429 U.S. at 267); *see also Winfield*, 2016 WL 6208564, at *7 (applying these considerations at the pleading stage).

As explained above, the Court concluded that Defendants' application of the Challenged Laws presented procedural irregularities—including in the handling of Tartikov's October 2023 land-use applications and the ZBA's handling of Tartikov's April 2024 variance applications. (*See supra* Section II.) At each step, Plaintiffs allege that Defendants departed from ordinary land-use procedures in ways that delayed, obstructed, or prevented consideration of Tartikov's applications and its efforts to obtain approval for the Institute and student-family housing. Particularly significant is the ZBA's decision to segment its consideration of the Accreditation and Dormitory Laws when considering Tartikov's April 2024 variance applications, despite its own attorney acknowledging that segmentation was disfavored. (SAC ¶¶ 126–128.) Nor do these procedural irregularities stand alone. Plaintiffs allege that the Village has a history of animus towards the Hasidic Jewish community. (SAC ¶¶ 133, 245–87.) The Court also concluded, at least at this early stage, that Defendants' application of the Dormitory Law has a disparate impact on the Hasidic Jewish community. (*See supra* Section V.A.) These allegations, taken together, plausibly support an inference that Defendants' application of the Challenged Laws was motivated by religious animus.

The conclusion is closer with Plaintiffs' FHA familial status claim, however. The FHA defines "familial status" as meaning "one or more individuals (who have not attained the age of 18 years) being domiciled with (1) a parent or another person having legal custody of such individual or individuals; or (2) the designee of such parent or other person having such custody,

with the written permission of such parent or other person." 42 U.S.C. § 3602(k). Because Plaintiffs' FHA familial status claim proceeds under a disparate treatment theory, they must establish that Defendants "had a discriminatory intent or motive" with respect to Plaintiffs' familial status when applying the Dormitory Law. *See Katz v. New York City Hous. Pres. & Dev.*, 2024 WL 664711, at *4 (S.D.N.Y. Feb. 16, 2024) (citation omitted). But the factual allegations present in the SAC largely rely on the Village's animus towards Hasidic Jews, rather than families with minor children. For instance, Plaintiffs allege that Tartikov requires a Torah community and, in turn, must provide its prospective students with on-campus housing for its students and their families. (*Id.* ¶¶ 60–61.) But these allegations establish only that families with children would be affected by the Dormitory Law—not that Defendants acted because of Plaintiffs' familial status. The district court in *Katz* explained that an FHA disparate treatment plaintiff must provide "at least minimal support for the proposition that the housing provider was motivated by discriminatory intent." *Id.* at *6 (quoting *Francis v. Kings Park Manor, Inc.*, 992 F.3d 67, 73 (2d Cir. 2021)). The district court ultimately dismissed the familial status claim because the complaint "lack[ed] even minimal support for the proposition that . . . Defendants were motivated by discriminatory intent" and provided "no factual basis to plausibly infer" that the challenged conduct was motivated by familial status animus. *Id.* (quoting *Francis*, 992 F.3d at 73–74).

The same is true here. Plaintiffs identify no statements reflecting hostility toward families with children, differential treatment of similarly situated persons without children, or other circumstances supporting an inference that Defendants acted because the proposed residents would have children. Plaintiffs' conclusory allegation that Defendants made housing unavailable "based on familial status," (SAC ¶ 342), does not fill the gap. The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550

U.S. at 555); *accord A.L.M. ex rel. Moore v. Bd. of Managers of Vireum Schoolhouse Condo.*, 2021 WL 5121137, at *2 (2d Cir. Nov. 4, 2021) (summary order) ("conclusory assertions . . . cannot give rise to a reasonable inference of discriminatory animus.").

Defendants' Motion is therefore denied with respect to Plaintiffs' FHA religious discrimination claim and granted with respect to Plaintiffs' FHA familial status discrimination claim.

### C. Interference and Retaliation Claim

The Court finally turns to Plaintiffs' FHA interference and retaliation claim under 42 U.S.C. § 3617. The FHA provides that "[i]t shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by [42 U.S.C. § 3604]." 42 U.S.C. § 3617. Courts have found that, where a municipality expresses opposition to a proposed housing development, and takes concrete actions to impede that development, such conduct may constitute interference under Section 3617. *See Greens at Chester, LLC v. Town of Chester*, 2020 WL 2306421, at *1, 5 (S.D.N.Y. May 8, 2020) (concluding that allegations were sufficient to state a claim under § 3617 where municipal officials "expressed ways to exert pressure" on a housing developer in an attempt "to prevent members of the Hasidic Jewish community from moving into the Town and County"). As explained above, Plaintiffs similarly allege that the procedural irregularities surrounding Tartikov's applications occurred against a backdrop of hostility toward the Hasidic Jewish community and repeatedly impeded Tartikov's efforts to obtain approval for the Institute and student-family housing. (*See supra* Section II.) Taken together, these allegations plausibly allege that Defendants interfered with Plaintiffs' exercise or enjoyment of rights protected by the FHA.

Plaintiffs also plausibly allege retaliation. To state a claim of retaliation under the FHA, a plaintiff must allege that (1) the plaintiff engaged in protected activity by opposing conduct prohibited under the FHA; (2) the defendant was aware of that activity; (3) the defendant subsequently took adverse action against the plaintiff; and (4) a causal connection exists between the protected activity and the adverse action, i.e., that a retaliatory motive played a part in the adverse action. *See Lynn v. Vill. of Pomona*, 373 F. Supp. 2d 418, 432 (S.D.N.Y. 2005), *aff'd*, 212 F. App'x 38 (2d Cir. 2007) (summary order). Protected activity under the FHA includes any "action taken to protest or oppose statutorily prohibited discrimination, *i.e.*, retaliating because a person made a complaint, testified, assisted, or participated in any manner in a proceeding under the FHA." *Avila v. Acacia Network, Inc.*, 2024 WL 1659456, at *5 (S.D.N.Y. Apr. 15, 2024) (citation omitted). "[F]or purposes of retaliation, an adverse action is any action that would be sufficiently severe to deter a reasonable person in the plaintiff's position from participating in a protected activity." *Burris v. Hous. & Servs. Inc.*, 2023 WL 1966120, at *10 (S.D.N.Y. Feb. 13, 2023). A plaintiff can show a causal connection: "'(1) indirectly, by showing that the protected activity was followed closely by discriminatory treatment, or through other circumstantial evidence such as disparate treatment of fellow [individuals] who engaged in similar conduct; or (2) directly, through evidence of retaliatory animus directed against the plaintiff by the defendant.'" *Id*. at *9 (quoting *Natofsky v. City of New York*, 921 F.3d 337, 353 (2d Cir. 2019) (alteration in original)).

For the reasons discussed above, Plaintiffs plausibly allege that (1) they engaged in protected activity through their prior FHA litigation; (2) Defendants were aware of that activity given their involvement in the prior litigation and land-use proceedings; and (3) Defendants subsequently took adverse actions by repeatedly delaying, obstructing, or preventing consideration

of Tartikov's applications. (SAC ¶¶ 349–50; *see also supra* Section II.) Finally, drawing all reasonable inferences in Plaintiffs' favor and considering the alleged procedural irregularities and anti-Hasidic animus discussed above, Plaintiffs plausibly allege that retaliatory motive played a part in Defendants' actions.

Defendants' Motion is therefore denied with respect to Plaintiffs' interference and retaliation claims under § 3617.

* * *

For these reasons, the Court concludes that Plaintiffs have adequately pleaded FHA claims based on disparate impact and religious discrimination, as well as interference and retaliation under Section 3617. Plaintiffs have not, however, plausibly alleged that Defendants discriminated against them based on familial status. The Motion is therefore granted with respect to Plaintiffs' FHA familial status discrimination claim and denied with respect to Plaintiffs' remaining FHA claims.

## VI. Section 1981 and Section 1982 Claims

Defendants' arguments advancing dismissal of Plaintiffs' Sections 1981 and 1982 claims largely reprise their previous arguments—that Plaintiffs fail to allege discrimination on the basis of religion or race.[13] (Defs.' Mem. at 21.) Plaintiffs offer little meaningful response to Defendants' arguments other than stating that the Motion "must be denied for the reasons stated above." (Pls.' Opp. at 22.) The Court nevertheless addresses the claims under the applicable standards.

Section 1981 provides, in relevant part, that "[a]ll persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts

[13] Although Plaintiffs pursue a Section 1981 claim, Section 1983 provides the exclusive federal remedy for violations of Section 1981 committed by state actors. *See Duplan v. City of New York*, 888 F.3d 612, 619–21 (2d Cir. 2018). The Court therefore construes Plaintiffs' Section 1981 claim as asserted through Section 1983.

. . . and to the full and equal benefit of all laws and proceedings." 42 U.S.C. § 1981. Section 1982 provides that "[a]ll citizens of the United States shall have the same right, in every State and Territory, as is enjoyed by white citizens thereof to inherit, purchase, lease, sell, hold, and convey real and personal property." 42 U.S.C. § 1982. "Sections 1981 and 1982 reach only purposeful discrimination." *Francis*, 992 F.3d at 80 (citation omitted). For both claims, a plaintiff "must allege facts supporting [a defendant's] intent to discriminate against him on the basis of his race." *Id.*; *see also Hasson v. Krchmar*, 2026 WL 1649634, at *5 (S.D.N.Y. June 8, 2026) (same). Jewish individuals constitute a protected racial group for purposes of Sections 1981 and 1982. *See United States v. Nelson*, 277 F.3d 164, 177–79 (2d Cir. 2002).

Defendants principally rely on *Sherman v. Town of Chester* in seeking dismissal of Plaintiffs' Sections 1981 and 1982 claims. (Defs.' Mem. at 21 (citing 752 F.3d 554 (2d Cir. 2014)).) There, the Second Circuit dismissed a plaintiff's Sections 1981 and 1982 claims where the allegations concerned residents' fear that a development would become a "Hassidic Village." *Sherman*, 752 F.3d at 567. But the Second Circuit reached this decision because the plaintiff failed to "link" the allegations to "any Town official" and failed to allege that similarly situated non-Jews were treated differently. *Id.* That is not the case here. To the contrary, as discussed above, Plaintiffs plausibly allege that Defendants acted with discriminatory intent toward Hasidic Jews in their consideration of Tartikov's October 2023 and April 2024 land-use and variance applications. (*See supra* Section II.) That the alleged discrimination is also based on Plaintiffs' religious identity does not preclude their claims under Sections 1981 and 1982. *See LeBlanc-Sternberg v. Fletcher*, 781 F. Supp. 261, 267–68 (S.D.N.Y. 1991) (rejecting argument that Sections 1981 and 1982 were inapplicable because plaintiffs alleged discrimination against them as Orthodox Jews).

Defendants' causation argument fares no better. Defendants contend that Plaintiffs fail to plead but-for causation because they fail to allege that, absent discrimination, Defendants would have approved Tartikov's applications. (Defs.' Reply at 10.) But, as explained above, Plaintiffs plausibly allege that Defendants subjected Tartikov's applications to discriminatory treatment because Plaintiffs are Hasidic Jews. (*See supra* Section II.) The same alleged procedural irregularities and circumstances connecting Defendants' treatment of Tartikov's applications to anti-Hasidic animus plausibly support the inference that, but for that discrimination, Plaintiffs would not have been subjected to the challenged treatment.

Plaintiffs also plausibly allege interference with rights protected by Sections 1981 and 1982. As to Section 1981, Plaintiffs allege that Defendants' application of the Challenged Laws prevents Tartikov from operating the Institute and, in turn, from exercising its right to make and enforce contracts with students, faculty, and vendors. (SAC ¶¶ 357–58.) As to Section 1982, Tartikov owns the Subject Property and alleges that Defendants' discriminatory application of the Challenged Laws interferes with its right to hold and enjoy that property on equal terms. (*Id.* ¶¶ 371–80.) These allegations plausibly establish interference with Plaintiffs' contractual and property rights protected by Sections 1981 and 1982, respectively.

Defendants' Motion is therefore denied with respect to Plaintiffs' §§ 1981 and 1982 claims.

## VII. State Law Claims

Plaintiffs also assert several claims under New York law. Specifically, Plaintiffs assert claims under New York Civil Rights Law Section 40-c, the equal protection and religious-liberty provisions of the New York Constitution, and a common law challenge to the Challenged Laws under *Cornell University v. Bagnardi*, 68 N.Y.2d 583 (1986). (SAC ¶¶ 403–09.) Plaintiffs also seek relief pursuant to Article 78 of the New York Civil Practice Law and Rules. (*Id.* ¶¶ 382–85.)

As explained above, the Court has already addressed Plaintiffs' equal protection claim under the New York Constitution together with their federal Equal Protection and RLUIPA nondiscrimination claims. (*See supra* Section II.) The Court addresses Plaintiffs' remaining state-law claims in turn.

**A. New York Civil Rights Law § 40-c**

Beginning with Plaintiffs' New York Civil Rights Law Section 40-c claim, Defendants argue for dismissal on the basis that the statute applies only to discrimination involving places of public accommodation, whereas Tartikov's claim concerns the proposed use of privately owned property. (Defs.' Mem. at 22.) In response, Plaintiffs argue that Defendants construe Section 40-c too narrowly by limiting its application to places of public accommodation. (Pls.' Opp. at 23.)

Section 40-c provides:

> 1. All persons within the jurisdiction of this state shall be entitled to the equal protection of the laws of this state or any subdivision thereof.
>
> 2. No person shall, because of race, creed, color, national origin, sex, marital status, sexual orientation, gender identity or expression, or disability, as such term is defined in section two hundred ninety-two of the executive law, be subjected to any discrimination in his or her civil rights, or to any harassment, as defined in section 240.25 of the penal law, in the exercise thereof, by any other person or by any firm, corporation or institution, or by the state or any agency or subdivision of the state.

N.Y. Civ. Rights Law § 40-c. The statutory text does not expressly limit Section 40-c's protections to the public-accommodations context. *Id.* But courts in this District have held that "Section 40-c is a public accommodations statute and does not reach alleged government discrimination in plaintiffs' homes or on their private property." *Indig v. Vill. of Pomona*, 2019 WL 6173425, at *11 (S.D.N.Y. Nov. 19, 2019); *see also Am. Atheists, Inc. v. Port Auth. of NY & NJ*, 936 F. Supp. 2d 321, 340 (S.D.N.Y. 2013), *aff'd sub nom.* 760 F.3d 227 (2d Cir. 2014) (Because plaintiffs "were not denied access to any place of public accommodation . . . their Section 40–c(2) claim fails");

*Jews for Jesus, Inc. v. Jewish Cmty. Relations Council of N.Y., Inc.*, 79 N.Y.2d 227, 234 (1992) (explaining that the Civil Rights Law prohibits, "among other things, denial of access to places of public accommodation and the denial of civil rights based on religion").

Plaintiffs' discrimination allegations concern only Defendants' regulation of Tartikov's proposed use of the Subject Property—which is privately owned land—through their application of the Challenged Laws. (SAC ¶¶ 82–89, 107–11.) Plaintiffs do not allege that Defendants denied them access to, or otherwise discriminated against them in connection with, a place of public accommodation. (*Id.*) Nor do Plaintiffs identify authority applying Section 40-c to alleged discrimination arising from a municipality's regulation of privately owned property. *See People ex rel. Abrams v. Hamilton*, 125 A.D.2d 1000, 1001 (4th Dep't 1986) (applying Section 40-c in the employment-discrimination context); *Pratt v. Indian River Cent. Sch. Dist.*, 803 F. Supp. 2d 135, 150 (N.D.N.Y. 2011) (considering Section 40-c claim arising from discrimination against a student at a public school); *Kimmel v. State*, 115 A.D.3d 1323, 1323 (4th Dep't 2014) (addressing attorneys' fees in an employment-discrimination action asserting a Section 40-c claim); *Yeshiva Chofetz Chaim Radin, Inc. v. Village of New Hempstead*, 98 F. Supp. 2d 347, 348, 357 (S.D.N.Y. 2000) (denying summary judgment on Section 40-c claim where defendants presented no argument concerning that claim and without addressing Section 40-c's scope).

Defendants' Motion is therefore granted with respect to Plaintiffs' Section 40-c claim.

**B. New York Constitution, Article I, § 3**

In addition to their claims under the Free Exercise Clause, Plaintiffs also assert a religious liberty claim under the New York Constitution. The parties' arguments track those concerning Plaintiffs' free exercise claim. (Defs.' Mem. at 19; Pls.' Opp. at 20–21.)

The New York Constitution protects the "free exercise and enjoyment of religious profession and worship, without discrimination or preference." N.Y. Const. art. I, § 3. In analyzing a religious liberty claim, the New York Court of Appeals established the following balancing test: "[W]hen the State imposes an incidental burden on the right to free exercise of religion we must consider the interest advanced by the legislation that imposes the burden, and . . . [t]he respective interests must be balanced to determine whether the incidental burdening is justified." *Catholic Charities of the Diocese of Albany v. Serio*, 7 N.Y.3d 510, 525 (2006) (internal quotation marks omitted). The Court of Appeals explained that "substantial deference is due the Legislature, and . . . the party claiming an exemption bears the burden of showing that the challenged legislation, as applied to that party, is an unreasonable interference with religious freedom." *Id.*

For the same reasons the Court found Plaintiffs' allegations sufficient to state a free exercise claim, (*see supra* Section III), the Court finds that Plaintiffs have sufficiently alleged a claim under the New York Constitution. Plaintiffs allege that the Challenged Laws prevent Tartikov from developing the Institute and associated Torah community, which they contend are necessary to their religious exercise. (SAC ¶¶ 33–38, 67–69.) Those allegations are sufficient at the pleading stage to state a claim under the New York Constitution, especially considering that New York's Free Exercise clause is "more protective of religious exercise" than its federal counterpart. *See Clark v. City of New York*, 560 F. Supp. 3d 732, 743 (S.D.N.Y. 2021) (quoting *Cath. Charities*, 7 N.Y.3d at 525). At this stage, however, the Court cannot properly balance Plaintiffs' alleged burden on their religious exercise against the Village's asserted interests. (*See supra* Section III.) What "institutional needs and objectives [are] being promoted" by the Challenged Laws remains an "open question[ ] that can be discussed at a later date in a motion for

summary judgment." *Ackridge v. Aramark Corr. Food Servs.*, 2018 WL 1626175, at *22 (S.D.N.Y. Mar. 30, 2018) (citing *Rivera v. Smith*, 63 N.Y.2d 501, 511 (1984)).

Defendants' Motion is therefore denied with respect to Plaintiffs' Article I, § 3 claim under the New York Constitution.

**C. New York Common Law**

Turning to Plaintiffs' New York common law claim, Plaintiffs allege that the Village's restrictions on the Subject Property's educational use violate the principles articulated in *Cornell University v. Bagnardi*, 68 N.Y.2d 583 (1986). (SAC ¶¶ 403–08.) Defendants seek dismissal on the ground that *Cornell* prohibits only the total exclusion of educational institutions, whereas the Accreditation Law permits educational institutions that satisfy its accreditation requirement. (Defs.' Mem. at 22.) The relevant inquiry is whether Defendants' application of that restriction to Tartikov's proposed educational use is permissible under *Cornell*.

In *Cornell Univ. v. Bagnardi*, the New York Court of Appeals recognized that educational uses are entitled to favored treatment in the application of local zoning laws. *See* 68 N.Y.2d at 593. There, the Court of Appeals acknowledged a "presumption that educational uses are always in furtherance of the public health, safety and morals." *Id*. at 589. That presumption, however, "may be rebutted by a showing that the proposed use would actually have a net negative impact, and that a reasonably drawn special permit requirement may be used to balance the competing interests in this area." *Id*. The Court of Appeals emphasized that "[t]he controlling consideration in reviewing the request of a school or church for permission to expand into a residential area must always be the over-all impact on the public's welfare." *Id*. at 595.

Applying this framework, the Court must reject Defendants' interpretation of *Cornell*. Defendants argue that the Accreditation Law does not totally exclude educational institutions from

the Village and requires only that educational institutions satisfy their accreditation requirements. (Defs.' Mem. at 22.) That argument construes *Cornell* too narrowly. The Court of Appeals' analysis was not limited to total exclusions. Instead, the Court of Appeals recognized that educational uses are presumptively beneficial and that restrictions on such uses require consideration of those beneficial effects against the proposed use's potential harm to the community. *See Cornell*, 68 N.Y.2d at 594–96. Plaintiffs allege that the Accreditation Law prevents Tartikov from constructing its rabbinical institute because it cannot satisfy the Village's accreditation requirements. (SAC ¶¶ 40–52.) Notwithstanding Tartikov's variance application seeking to operate an unaccredited rabbinical institute, Plaintiffs allege that the ZBA denied the application. (*Id.* ¶ 194.) The fact that the Accreditation Law does not categorically prohibit all educational institutions does not resolve whether its restriction of Tartikov's proposed educational use is permissible under *Cornell*. Nor do Defendants offer any argument that Tartikov's proposed educational use would have a negative impact on the public welfare. (*See* Defs. Mem. at 22; Defs.' Reply at 10.) While "municipalities can enact land-use restrictions or controls to enhance the quality of life by preserving the character and desirable aesthetic features of a city . . . a zoning ordinance will be struck down if it bears no substantial relation to the police power objective of promoting the public health, safety, morals or general welfare." *Trs. of Union Coll. in Town of Schenectady in State of N.Y. v. Members of Schenectady City Council*, 91 N.Y.2d 161, 165 (1997) (internal quotations and citation omitted).

Defendants' Motion is therefore denied with respect to Plaintiffs' New York common law claim.

**D. Article 78 of the New York Civil Practice Law and Rules**

The Court next addresses Plaintiffs' Article 78 claim under the New York Civil Practice Law and Rules. Plaintiffs seek to annul and vacate the ZBA's affirmation of Zummo's denial of Tartikov's site plan and special-use permit applications, as well as the ZBA's denial of Tartikov's use variance application, as arbitrary, capricious, and contrary to New York law. (SAC ¶¶ 382–85.) Defendants do not challenge the merits of Plaintiffs' Article 78 claim and instead only argue for dismissal on the grounds that the Court should decline to exercise supplemental jurisdiction if Plaintiffs' federal claims are dismissed. (Defs.' Mem. at 23–24.)

Unlike an ordinary civil action, the substantive scope of an Article 78 proceeding is limited. These proceedings are restricted, in relevant part, to the following:

> 1. whether the body or officer failed to perform a duty enjoined upon it by law; or
> 2. whether the body or officer proceeded, is proceeding or is about to proceed without or in excess of jurisdiction; or
> 3. whether a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion, including abuse of discretion as to the measure or mode of penalty or discipline imposed; or
> 4. whether a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence.

N.Y. C.P.L.R. 7803. Plaintiffs' allegations against the ZBA's application of the Challenged Laws would fall squarely into the third category. (SAC ¶¶ 382–85.) Article 78 proceedings differ from ordinary civil actions in that Article 78 proceedings are characterized by a limited and expedited "summary procedure." *Whitfield v. City of New York*, 96 F.4th 504, 520 (2d Cir. 2024) (citing *Coma Realty Corp. v. Davis*, 200 A.D.3d 975 (2d Dep't 2021)); *see also Davidson v. Capuano*, 792 F.2d 275, 280 (2d Cir. 1986) (Article 78 proceedings are meant to ensure "a speedy correction of improper action by a body or officer" (internal quotation marks omitted)). For instance, Article 78 petitioners are generally "not entitled to discovery as of right, but must seek leave of court

pursuant to CPLR 408." *Johnson v. Annucci*, 208 A.D.3d 1403, 1404 (3d Dep't 2022). Another example is that if a triable issue of fact is raised in an Article 78 proceeding, it must be tried "forthwith," CPLR 7804(h), meaning that the proceeding is entitled to a "special trial preference" on the court's calendar. *See Whitfield*, 96 F.4th at 520. Because of the expedited nature of Article 78 proceedings, the Second Circuit has explained that such proceedings are reserved for petitioners seeking "immediate relief." *Id*. (citing *Davidson*, 792 F.2d at 280).

As a preliminary matter, Defendants' argument that the Court should decline supplemental jurisdiction based on the dismissal of Plaintiffs' federal claims must be rejected. The Court has denied most of Defendants' Motion with respect to Plaintiffs' federal claims. (*See supra* Sections II–VI.) That does not end the inquiry, however. Despite the survival of Plaintiffs' federal claims, the Court must still consider whether it should—or even may—exercise supplemental jurisdiction over Plaintiffs' Article 78 claim. While federal courts may exercise "supplemental jurisdiction over . . . claims that are so related to [federal] claims," district courts may nonetheless "decline to exercise [such] supplemental jurisdiction" if "there are . . . compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(a), (c). The prevailing position among courts in this District is that "[t]he very nature of an Article 78 proceeding presents such compelling reasons" to decline the exercise of supplemental jurisdiction. *See Detering v. City of New York*, 2026 WL 2209962, at *6 (S.D.N.Y. July 30, 2026) (quoting *Morningside Supermarket Corp. v. N.Y. State Dep't of Health*, 432 F. Supp. 2d 334, 346 (S.D.N.Y. 2006)). Courts have taken this position because "[a]n Article 78 proceeding is a novel and special creation of state law [that] differs markedly from the typical civil action brought in federal district court in a number of ways." *Morningside*, 432 F. Supp. 2d at 346 (internal quotation marks omitted and alteration adopted) (quoting *Lucchese v. Carboni*, 22 F. Supp. 2d 256, 258 (S.D.N.Y. 1998)).

For this reason, courts in this District have "consistently declined to exercise supplemental jurisdiction over Article 78 claims." *Furk v. Orange-Ulster BOCES*, 2016 WL 6560408, at *6 (S.D.N.Y. Nov. 2, 2016) (collecting cases); *see also, e.g.*, *De Jesus v. City of New York*, 2012 WL 569176, at *4 (S.D.N.Y. Feb. 21, 2012) ("Article 78 is . . . a procedure best suited for state courts. Recognizing state courts' exclusive jurisdiction over Article 78, courts within this circuit have consistently dec[l]ined to exercise supplemental jurisdiction over Article 78 claims." (footnote omitted) (collecting cases)); *Cartagena v. City of New York*, 257 F. Supp. 2d 708, 709 (S.D.N.Y. 2003) ("The cases that have addressed the issue have consistently declined to exercise supplemental jurisdiction over Article 78 claims." (collecting cases)); *Camacho v. Brandon*, 56 F. Supp. 2d 370, 380 (S.D.N.Y. 1999) ("[W]e see no reason to exercise [the court's] discretion [over Plaintiff's Article 78 claim] by adjudicating a purely state procedural remedy."), *reconsideration denied*, 69 F. Supp. 2d 546 (S.D.N.Y. 1999); *Lucchese*, 22 F. Supp. 2d at 258 ("Article 78 proceedings were designed for the state courts, and are best suited to adjudication there."). This principle is true even where a plaintiff's federal claims survive. *See, e.g.*, *Birmingham v. Ogden*, 70 F. Supp. 2d 353, 372 (S.D.N.Y. 1999) ("[F]ederal courts are loath to exercise jurisdiction over Article 78 claims[ ] [e]ven where a plaintiff has one or more federal claims still alive."); *see also Camacho*, 56 F. Supp. 2d at 373–74, 380 (dismissing Article 78 claim despite pending federal claim); *Lucchese*, 22 F. Supp. 2d at 257–58 (same). Some courts have extended this principle to conclude that federal courts lack the power to exercise supplemental jurisdiction over Article 78 claims. *See, e.g.*, *Blatch ex rel. Clay v. Hernandez*, 360 F. Supp. 2d 595, 637 (S.D.N.Y. 2005) (holding that an Article 78 claim "must be dismissed for lack of subject matter jurisdiction, as New York State has not empowered the federal courts to consider such claims"); *cf. Kelly v. City of*

*Mount Vernon*, 344 F. Supp. 2d 395, 406 (S.D.N.Y. 2004) ("I could consider the claim if it were pendent to a viable federal claim, but all of Plaintiff's federal claims have been dismissed.").

This Court need not adopt such a categorical rule. The nature and posture of this action provide compelling reasons to decline to exercise supplemental jurisdiction over Plaintiffs' Article 78 claim. Article 78 provides an expedited remedy that is ill-suited to the ordinary course of this federal litigation. The Court also already denied Plaintiffs' request for preliminary injunctive relief. *See Tartikov VII*, 2026 WL 507849, at *7. More significantly, this action remains in its infancy. Plaintiffs' surviving federal and state claims must now proceed down the long road of discovery, and most likely dispositive motion practice and trial. The history of the First and Second Actions confirms that these proceedings may be lengthy. Requiring an Article 78 claim to travel that same road would frustrate the expedited review that Article 78 was specifically designed to provide. *See, e.g.*, *Johnson*, 208 A.D.3d at 1404 ("[D]iscovery tends to prolong a case, and is therefore inconsistent with the summary nature of a special [Article 78] proceeding . . . ."). Plaintiffs also fail to offer any explanation as to why exercising supplemental jurisdiction over an Article 78 proceeding would be appropriate here. (Pls.' Opp. at 25.)

Defendants' Motion with respect to Plaintiffs' Article 78 claim is therefore granted, though on grounds different from those advanced by Defendants. The Court dismisses Plaintiffs' Article 78 claim without prejudice to Plaintiffs pursuing that claim in state court.

## VIII. Claims Against Zummo

The Court finally reaches Defendants' arguments that all claims against Zummo should be dismissed. Defendants advance two arguments: (1) Plaintiffs' RLUIPA claims against Zummo must be dismissed because RLUIPA does not provide for individual capacity damages; and (2) all remaining claims are barred by qualified immunity. (Defs.' Mem. at 22–23; Defs.' Reply at 10.)

Plaintiffs specifically assert two RLUIPA claims—substantial burden and nondiscrimination—and seek, in part, compensatory and punitive damages against all Defendants for the "loss of Plaintiffs' rights" under RLUIPA. (SAC ¶¶ 319–28, Prayer for Relief ¶ K.) Before addressing Defendants' arguments, the Court considers whether Plaintiffs' Section 1983 official capacity claims against Zummo may proceed. The Court addresses each issue in turn.

**A. Official Capacity Claims**

Plaintiffs bring Section 1983 claims against Zummo, whom they sue in his official and individual capacities as the Building Inspector of the Village. (SAC ¶ 28.) Although not addressed in the parties' briefings, the Court considers whether Plaintiffs' Section 1983 official capacity claims against Zummo may proceed where Plaintiffs also sue the Village.

It is well established that "official-capacity suits generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 n.55 (1978). It is also established in the Second Circuit that "a § 1983 suit against a municipal officer in his official capacity is treated as an action against the municipality itself." *Kanderskaya v. City of New York*, 11 F. Supp. 3d 431, 435 (S.D.N.Y. 2014), *aff'd*, 590 F. App'x 112 (2d Cir. 2015) (quoting *Coon v. Town of Springfield, Vt.,* 404 F.3d 683, 687 (2d Cir. 2005)). Indeed, when a plaintiff alleges "official-capacity claims against . . . [a] supervisory defendant . . . [they] are unnecessary because such claims duplicate." *Holden v. City*, 2024 WL 218438, at *2 (S.D.N.Y. Jan. 19, 2024).

Here, Plaintiffs sue Zummo in his official and individual capacities. (SAC ¶ 28.) Plaintiffs also bring claims against the Village. (*Id.* ¶ 24.) As a result, Plaintiffs' Section 1983 official capacity claims against Zummo are duplicative of those claims asserted against the Village. *See Kanderskaya*, 11 F. Supp. 3d at 435 (dismissing claims against a municipal officer in the officer's

official capacity as redundant and duplicative); *Davis v. Stratton*, 360 F. App'x 182, 183 (2d Cir. 2010) ("The suit against the mayor and police chief in their official capacities is essentially a suit against the City of Schenectady, because in a suit against a public entity, naming officials of the public entity in their official capacities add[s] nothing to the suit."); *Phillips v. Cnty. of Orange*, 894 F. Supp. 2d 345, 385 n.35 (S.D.N.Y. 2012) ("to the extent the Individual Defendants have been sued in their official capacities, these suits should be dismissed, because the municipal entities are the real parties in interest").

The Court therefore dismisses all Section 1983 official capacity claims against Zummo.

**B. RLUIPA Claims**

The Court next considers Plaintiffs' RLUIPA claims against Zummo in his individual capacity. The Second Circuit has generally held that "RLUIPA does not create a private right of action against state officials in their individual capacities" for money damages because "the legislation was enacted pursuant to Congress' spending power . . ., which allows the imposition of conditions, such as individual liability, only on those parties actually receiving the state funds." *Washington v. Gonyea*, 731 F.3d 143, 145–46 (2d Cir. 2013) (citing 42 U.S.C. § 2000cc–1(b)(1)); *see also Tripathy v. McKoy*, 103 F.4th 106, 115 (2d Cir. 2024) (reaffirming that "we remain bound by *Gonyea*'s holding that RLUIPA does not permit individual capacity damages against state officers"). The Supreme Court has since addressed the circumstances under which an individual may be held personally liable under RLUIPA. Specifically, the Supreme Court held that "[i]ndividuals may not be held liable in their personal capacities under [RLUIPA] unless those individuals have voluntarily and knowingly consented to answer lawsuits under the statute." *Landor v. Louisiana Dep't of Corr. & Pub. Safety*, 609 U.S. 59, 59–60 (2026).

Plaintiffs respond that *Gonyea* is inapplicable because it concerned RLUIPA's "Institutionalized Persons" provisions, which were enacted pursuant to Congress' Spending Clause authority, rather than RLUIPA's land-use provisions implicated here. (Pls.' Opp. at 25.) Plaintiffs, however, cite no authority establishing that RLUIPA permits individual capacity damages merely because a claim arises under its land-use provisions. (*Id.*) To the contrary, the Second Circuit reaffirmed that "RLUIPA does not permit individual capacity damages against state officers." *Tripathy*, 103 F.4th at 115. And although *Landor* addressed RLUIPA liability arising under Congress' Spending Clause authority, 609 U.S. at 59, Plaintiffs identify no authority establishing that RLUIPA's land-use provisions authorize individual capacity damages under the circumstances alleged here.[14] Nor do Plaintiffs allege that Zummo voluntarily and knowingly consented to personal liability under RLUIPA. *See id.*

Plaintiffs have therefore not established a basis for imposing individual capacity damages against Zummo under RLUIPA.

### C. Qualified Immunity

Finally, Defendants assert that Plaintiffs' claims against Zummo should be dismissed because he is entitled to qualified immunity. (Defs.' Mem. at 23.)

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the

[14] Although dicta, the Second Circuit has acknowledged that a RLUIPA claim premised on a source of congressional authority other than the Spending Clause could, "[i]n theory," permit individual capacity damages against nonrecipients. *See Tripathy*, 103 F.4th at 115 n.6. Specifically, the Second Circuit explained that "such a claim could seek individual-capacity damages against nonrecipients, given that [certain] subsection[s] [were] not enacted pursuant to the Spending Clause." *Id.* Plaintiffs invoke such a non-Spending-Clause basis here, alleging that the substantial burden on their religious exercise affects interstate commerce pursuant to § 2000cc(a)(2)(B). (SAC ¶¶ 290–91; Pls.' Opp. at 17.) But *Tripathy* did not hold that individual capacity damages are available under that provision; it merely observed that such damages could be available "[i]n theory." *Tripathy*, 103 F.4th at 115 n.6. And Plaintiffs identify no authority holding that § 2000cc(a)(2)(B) authorizes individual capacity damages against municipal officials. The Court is also unaware of any authority in this Circuit holding that a municipal official may be held personally liable for damages under RLUIPA's land-use provisions on this basis.

challenged conduct." *Taylor v. Barkes*, 575 U.S. 822, 825 (2015) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)); *see also, e.g.*, *City & Cnty. of San Francisco, Calif. v. Sheehan*, 575 U.S. 600, 611 (2015); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Lore v. City of Syracuse*, 670 F.3d 127, 162 (2d Cir. 2012) (quoting *Saucier v. Katz*, 533 U.S. 194, 202 (2001)). Accordingly, for an action to lie, "existing precedent must have placed the statutory or constitutional question beyond debate." *Taylor*, 575 U.S. at 825 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)). "This exacting standard 'gives government officials breathing room to make reasonable but mistaken judgments' by 'protect[ing] all but the plainly incompetent or those who knowingly violate the law.'" *Sheehan*, 575 U.S. at 611 (quoting *al-Kidd*, 563 U.S. at 743) (alteration in original).

Defendants, moreover, pursue qualified immunity on a motion to dismiss. "[A] defendant presenting an immunity defense on a Rule 12(b)(6) motion instead of a motion for summary judgment must accept the more stringent standard applicable to this procedural route." *McKenna v. Wright,* 386 F.3d 432, 436 (2d Cir. 2004). "[P]laintiff is entitled to all reasonable inferences from the facts alleged, not only those that support his claim, but also those that defeat the immunity defense." *Id.* Defendants therefore face a "formidable hurdle." *Id*. at 434.

The Court has already determined that Plaintiffs plausibly allege Zummo's personal involvement in conduct supporting several of their surviving claims. (*See supra* Section II.) Those allegations include that Zummo discriminatorily applied the Challenged Laws when denying Tartikov's October 2023 special-use permit and site plan applications. (SAC ¶¶ 107–10.) Zummo has also allegedly made derogatory statements concerning Hasidic and Orthodox Jews. (*Id.* ¶¶

262–66, 274–87.) These allegations are not unique to the instant action. *See Indig*, 2024 WL 4008231, at *15 ("Considering the discriminatory comments made by Zummo . . . about the . . . Orthodox Jews in the Village"), *id*. at *23 (acknowledging that "Zummo . . . impeded [plaintiffs'] construction plans by intentionally losing and/or slowing down [plaintiffs'] permit applications out of hostility toward their religion"). At this stage, the Court must accept Plaintiffs' allegations as true and draw all reasonable inferences—including those that defeat qualified immunity—in Plaintiffs' favor. *See McKenna*, 386 F.3d at 436.

Nor can Defendants demonstrate that the rights implicated by Zummo's alleged discriminatory conduct were not clearly established at the time of the alleged conduct. Long before the conduct alleged here, it was clearly established that a municipal official could not intentionally discriminate against individuals based on their religion or ancestry, selectively enforce otherwise neutral laws on that basis, or target religious exercise for discriminatory treatment. *See Oyler v. Boles*, 368 U.S. 448, 456 (1962); *Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 532–46 (1993); *LeBlanc*, 67 F.3d at 425; *Savino v. Town of Southeast*, 983 F. Supp. 2d 293, 308 (S.D.N.Y. 2013), *aff'd*, 572 F. App'x 15 (2d Cir. 2014).

Zummo is therefore not entitled to qualified immunity at this juncture.

## CONCLUSION

For the foregoing reasons, the Motion to Dismiss the Second Amended Complaint filed by the Village of Pomona, New York; the Board of Trustees of the Village of Pomona; the Zoning Board of Appeals of the Village of Pomona; the Planning Board of the Village of Pomona; and Building Inspector Louis Zummo is GRANTED in part and DENIED in part. Specifically:

1) Plaintiffs' facial challenges under the Free Exercise, Free Speech, and Freedom of Association Clauses of the First Amendment; RLUIPA's substantial burden provision; the

FHA's disparate-impact provision; Article I, Section 3 of the New York Constitution; and New York common law are dismissed without prejudice for lack of standing. Those claims may proceed only to the extent they are asserted as applied to Plaintiffs;

2) Defendants' Motion is denied to the extent Defendants seek dismissal of Plaintiffs' as-applied challenges for lack of standing or ripeness;

3) Defendants' Motion is denied with respect to Plaintiffs' as-applied federal and state equal protection claims and RLUIPA nondiscrimination claim;

4) Defendants' Motion is denied with respect to Plaintiffs' RLUIPA substantial burden and First Amendment Free Exercise claims, to the extent those claims are asserted as applied to Plaintiffs;

5) Defendants' Motion is denied with respect to Plaintiffs' First Amendment Free Speech and Freedom of Association claims, to the extent those claims are asserted as applied to Plaintiffs;

6) Defendants' Motion is denied with respect to Plaintiffs' FHA disparate impact claim, to the extent that claim is asserted as applied to Plaintiffs;

7) Defendants' Motion is denied with respect to Plaintiffs' FHA religious discrimination claim and granted with respect to Plaintiffs' FHA familial status discrimination claim;

8) Defendants' Motion is denied with respect to Plaintiffs' FHA interference and retaliation claims under 42 U.S.C. § 3617;

9) Defendants' Motion is denied with respect to Plaintiffs' claims under Sections 1981 and 1982. Plaintiffs' Section 1981 claim shall proceed through Section 1983;

10) Defendants' Motion is granted with respect to Plaintiffs' claim under New York Civil Rights Law Section 40-c;

11) Defendants' Motion is denied with respect to Plaintiffs' claim under Article I, Section 3 of the New York Constitution, to the extent that claim is asserted as applied to Plaintiffs;

12) Defendants' Motion is denied with respect to Plaintiffs' New York common law claim, to the extent that claim is asserted as applied to Plaintiffs;

13) Plaintiffs' Article 78 claim is dismissed without prejudice to Plaintiffs pursuing that claim in state court;

14) Plaintiffs' Section 1983 claims against Zummo in his official capacity are dismissed as duplicative of the claims against the Village;

15) Plaintiffs' RLUIPA claims against Zummo are dismissed to the extent Plaintiffs seek damages against him in his individual capacity; and

16) Defendants' request to dismiss the surviving individual capacity claims against Zummo based on qualified immunity is denied.

Defendants shall answer the surviving claims in the SAC by October 26, 2026. The Clerk of Court is respectfully directed to terminate the motion at 84.

SO ORDERED,

Dated: September 28, 2026
White Plains, NY

Nelson S. Román, U.S.D.J.